COOLEY LLP
MICHAEL G. RHODES (116127)
(rhodesmg@cooley.com)
WHITTY SOMVICHIAN (194463)
(wsomvichian@cooley.com)
LAUREN J. POMEROY (291604)
(lpomeroy@cooley.com)
101 California Street, 5th Floor
San Francisco, CA 94111-5800
Telephone:  (415) 693-2000

MAYER BROWN LLP
LAUREN R. GOLDMAN (*pro hac vice*)
(lrgoldman@mayerbrown.com)
MICHAEL RAYFIELD (*pro hac vice*)
(mrayfield@mayerbrown.com)
1221 Avenue of the Americas
New York, NY 10016
Telephone:  (212) 506-2500

MAYER BROWN LLP
MATTHEW D. PROVANCE (*pro hac vice*)
(mprovance@mayerbrown.com)
71 Wacker Drive
Chicago, IL 60606
Telephone: (312) 701-8598

*Attorneys for Defendant Facebook, Inc.*

[Additional counsel in signature block]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| KELLY WHALEN, S.M., a minor, by and through her guardian, Tachah Wade, and VICTORIA EDELSTEIN, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>FACEBOOK, INC.,<br><br>Defendant. | Case No. 4:20-cv-06361-JST<br><br>**FACEBOOK'S MOTION TO COMPEL ARBITRATION AND STAY LITIGATION**<br><br>Date: April 7, 2021<br>Time: 2:00pm<br>Location: Courtroom 6, 2nd Floor<br>Judge: Hon. Jon S. Tigar<br>Trial Date: None<br>Complaint Filed: January 26, 2021 |

1

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................... 1

BACKGROUND ..................................................................................................... 2

    A.    Plaintiffs Agreed To The Arbitration Clause In Instagram's 2013 Terms.............. 2

    B.    All Three Plaintiffs Again Agreed To Arbitrate In 2018 ....................................... 7

          1.    Facebook Repeatedly Notified Users Of The Update To Instagram's Terms In 2018 ........................................................... 7

          2.    The 2018 Terms Confirm That Disputes With Facebook Relating To Instagram Must Be Arbitrated ............................... 9

          3.    The Arbitration Provision Includes Features Designed To Make Arbitration Convenient For Users ........................................... 10

    C.    Plaintiffs Sued Facebook Based On Their Use Of Instagram, Notwithstanding Their Arbitration Agreement ..................................................... 10

    D.    Plaintiffs Agreed To The 2020 Terms After Filing This Lawsuit ....................... 12

ARGUMENT ........................................................................................................ 13

I.      THE FAA REQUIRES ENFORCEMENT OF PLAINTIFFS' ARBITRATION AGREEMENT ........................................................................................ 13

    A.    Plaintiffs Entered Into A Valid Arbitration Agreement ....................................... 13

    B.    Plaintiffs' Claims Fall Within The Arbitration Agreement .................................. 17

    C.    S.M.'s Status As A Minor Does Not Permit Her To Avoid Arbitration ............... 18

II.     THE FAA REQUIRES A STAY OF THIS ACTION PENDING ARBITRATION ....... 19

CONCLUSION ..................................................................................................... 20

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Cases**

*In re Amica, Inc.*,
   135 B.R. 534 (Bankr. N.D. Ill. 1992) ........................................................................18

*AT&T Mobility LLC v. Concepcion*,
   563 U.S. 333 (2011) .................................................................................................13, 18

*Babu v. Petersen*,
   4 Cal. 2d 276 (1935) ...................................................................................................18

*C.M.D. v. Facebook, Inc.*,
   2014 WL 1266291 (N.D. Cal. Mar. 26, 2014) ...........................................................19

*C.M.D. ex rel. De Young v. Facebook, Inc.*,
   621 F. App'x 488 (9th Cir. 2015) .........................................................................18, 19

*Carbajal v. H & R Block Tax Servs., Inc.*,
   372 F.3d 903 (7th Cir. 2004) ......................................................................................17

*Citizens Telecomms. Co. v. Sheridan*,
   239 W. Va. 67 (2017) ..................................................................................................16

*Cox v. Ocean View Hotel Corp.*,
   533 F.3d 1114 (9th Cir. 2008) ....................................................................................13

*E.K.D. ex rel. Dawes v. Facebook, Inc.*,
   885 F. Supp. 2d 894 (S.D. Ill. 2012) ..........................................................................19

*In re Facebook Biometric Info. Privacy Litig.*,
   185 F. Supp. 3d 1155 (N.D. Cal. 2016) ......................................................................15

*First Options of Chicago, Inc. v. Kaplan*,
   514 U.S. 938 (1995) ....................................................................................................13

*Foreman v. George Foreman Assocs.*,
   517 F.2d 354 (9th Cir. 1975) ......................................................................................18

*Friends for Health: Supporting N. Shore Health Ctr. v. PayPal, Inc.*,
   2018 WL 2933608 (N.D. Ill. June 12, 2018) ..............................................................14

*Gilmer v. Interstate/Johnson Lane Corp.*,
   500 U.S. 20 (1991) ......................................................................................................20

*Herkenrath v. Move, Inc.*,
   2018 WL 10705782 (C.D. Cal. Aug. 21, 2018) ..........................................................16

*Kaufman v. Am. Express Travel Related Servs. Co.*,
   2008 WL 687224 (N.D. Ill. Mar. 7, 2008) ................................................................................ 14

*Kindred Nursing Ctrs. Ltd. P'ship v. Clark*,
   137 S. Ct. 1421 (2017) ............................................................................................................. 13

*Kohler v. Leslie Hindman, Inc.*,
   80 F.3d 1181 (7th Cir. 1996) .............................................................................................. 14, 18

*Lamps Plus, Inc. v. Varela*,
   139 S. Ct. 1407 (2019) ....................................................................................................... 17, 18

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
   460 U.S. 1 (1983) ...................................................................................................................... 17

*Nguyen v. Barnes & Noble Inc.*,
   763 F.3d 1171 (9th Cir. 2014) ............................................................................................ 14, 15

*NYC Mgmt. Grp. v. Brown-Miller*,
   2004 WL 1087784 (S.D.N.Y. May 14, 2004) .......................................................................... 18

*Paster v. Putney Student Travel, Inc.*,
   1999 WL 1074120 (C.D. Cal. June 9, 1999) ........................................................................... 18

*Peers v. McLaughlin*,
   88 Cal. 294 (1891) .................................................................................................................... 18

*Ramirez v. Freescore, LLC*,
   2011 WL 3812608 (C.D. Cal. Aug. 30, 2011) ......................................................................... 16

*Rodman v. Safeway Inc.*,
   2015 WL 604985 (N.D. Cal. Feb. 12, 2015) (Tigar, J.) ........................................................... 16

*Rodriguez v. Instagram, LLC*,
   No. 13-53287 (Cal. Super. Ct. Feb. 28, 2014) ........................................................................ 15

*Sgouros v. TransUnion Corp.*,
   817 F.3d 1029 (7th Cir. 2016) ...................................................................................... 14, 15, 16

*Sherman v. AT&T Inc.*,
   2012 WL 1021823 (N.D. Ill. Mar. 26, 2012) ........................................................................... 15

*Silverman v. Move Inc.*,
   2019 WL 2579343 (N.D. Cal. June 24, 2019) ......................................................................... 16

*Snow v. Eventbrite, Inc.*,
   2020 WL 6135990 (N.D. Cal. Oct. 19, 2020) .......................................................................... 14

*Spencer v. Collins*,
   156 Cal. 298 (1909) .................................................................................................................. 19

*Toon v. Mack Int'l Motor Truck Corp.*,
    87 Cal. App. 151 (1927) .................................................................................................18

*Tortoriello v. Gerald Nissan of N. Aurora, Inc.*,
    379 Ill. App. 3d 214 (2008) ............................................................................................17

*United States v. Borrero*,
    771 F.3d 973 (7th Cir. 2014) ..........................................................................................13

*United States v. Sutcliffe*,
    505 F.3d 944 (9th Cir. 2007) ..........................................................................................13

*Van Tassell v. United Mktg. Grp., LLC*,
    795 F. Supp. 2d 770 (N.D. Ill. 2011) .............................................................................15

*Woodling v. Garret Corp.*,
    813 F.2d 543 (2d Cir. 1987) ...........................................................................................18

**Statutes**

740 ILCS 14/5 .........................................................................................................................11

740 ILCS 14/10 .......................................................................................................................11

740 ILCS 14/15 .......................................................................................................................11

9 U.S.C. § 2 .............................................................................................................................13

9 U.S.C. § 3 .............................................................................................................................20

1

## NOTICE OF MOTION & MOTION

2       TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

3       PLEASE TAKE NOTICE THAT, on April 7, 2021, at 2:00pm, before the Honorable Jon.

4   S. Tigar, defendant Facebook, Inc. will and hereby does move to compel arbitration of plaintiffs'

5   claims and stay this litigation.  Facebook requests oral argument on this motion.[1]

6

## STATEMENT OF RELIEF SOUGHT

7       Facebook seeks to compel arbitration of plaintiffs' claims and to stay this litigation.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

[1]      If the Court denies this motion, Facebook will move to dismiss under Federal Rule of Procedure 12(b)(6).

**INTRODUCTION**

Plaintiffs have filed their claims in the wrong forum.  They agreed to arbitrate disputes related to the Instagram service, including the claims asserted in this action.  But instead, they filed a putative class action in federal district court.  Under the Federal Arbitration Act ("FAA"), plaintiffs should be compelled to arbitrate their claims in accordance with their arbitration agreement.  In the meantime, this action should be stayed.

The three plaintiffs are Kelly Whalen; S.M. (a minor who is suing through her mother); and Victoria Edelstein.  They brought this action against Facebook, Inc., which owns and operates the Instagram service.  Plaintiffs allege that Facebook violated the Illinois Biometric Information Privacy Act ("BIPA") by improperly using facial recognition technology on photographs of them that were uploaded to Instagram, so that Facebook could identify them in subsequent images.  This claim is meritless:  Facebook does not use face recognition to identify people in content uploaded to Instagram.  And plaintiffs' claims fail for a host of other reasons.

But this Court need not, and should not, consider the merits of plaintiffs' claims, for the simple reason that they do not belong in court at all.  Ms. Whalen signed up for an Instagram account in ▓▓▓.  S.M. signed up in ▓▓▓; and Ms. Edelstein signed up in ▓▓▓.  Since Instagram's inception, the service has been subject to Instagram's Terms of Use.  And since 2013, the Terms have included a provision requiring individual arbitration of all claims relating to the Instagram service; an email was sent to users to notify them of this update.  In 2018, the Terms were updated again and the arbitration provision was revised.  Facebook sent both email and in-app notices to users describing the changes, providing links to the updated Terms, and reminding them that continued use of Instagram would constitute acceptance of the updated Terms.  Each of the plaintiffs necessarily assented to at least one of those notices through an affirmative click of a button *and* through continued use of Instagram.  Then, in 2020, *after* plaintiffs filed this lawsuit, the Terms were amended again—although the arbitration clause remained unchanged—and Instagram users (including plaintiffs) were given two notifications about the update.  Each time the Terms were amended, Instagram users were given an opportunity to opt out of the arbitration clause; none of the three plaintiffs did so, and all of them use Instagram regularly to this day.

Because all three plaintiffs agreed to resolve this dispute by arbitration, and because that arbitration agreement is fully enforceable, the Court should compel plaintiffs to arbitrate their claims on an individual basis and stay this proceeding.

## BACKGROUND

Instagram is a "photo and video-sharing social networking service."  Compl. (Dkt. 37) ¶ 2. The complaint alleges that the Instagram service "allows its users to create a personal page where users can upload photographs and videos, participate in live video broadcasts, and communicate and interact with other Instagram users."  *Id.* ¶ 30.  Facebook acquired the Instagram service in 2012. *Id.* ¶ 2.  Plaintiff Kelly Whalen registered for an Instagram account on ███████████; plaintiff S.M. registered on ███████████; and plaintiff Victoria Edelstein registered on ███ ███  Declaration of Michael Duffey ("Duffey Decl.") ¶¶ 18-19, 26-27, 36-37.  Beginning in 2013, each version of Instagram's Terms of Use has included a detailed arbitration provision.

### A.    Plaintiffs Agreed To The Arbitration Clause In Instagram's 2013 Terms.

Since Instagram's launch in 2010, this free service has been made available subject to the Terms of Use on Instagram's website.  The original Terms of Use (the "2010 Terms") contained a preamble stating:  "By using the . . . Instagram service you are agreeing to be bound by the following terms and conditions ('Terms of Use')."  Duffey Decl. Ex. 1 at 1.  Instagram informed users of its right to modify the Terms upon notice via email:  "We reserve the right to alter these Terms of Use at any time.  If the alterations constitute a material change to the Terms of Use, we will notify you via internet mail according to the preference expressed on your account."  *Id.* Ex. 1 at 2.  The 2010 Terms did not contain an arbitration provision.

After Facebook acquired Instagram in 2012, it modified the Terms (the "2013 Terms").  *Id.* ¶ 2.  Beginning around January 15, 2013, Facebook sent a notification about the update to all email addresses that users had provided when setting up or updating their accounts; Ms. Whalen was one of those users (S.M. and Ms. Edelstein had not yet signed up).  Duffey Decl. ¶¶ 3, 19.  As shown in the image below, the email stated that "we have updated our Terms of Service," and that this update would "be in effect as of January 19th, 2013."  *Id.* Ex. 3.  The phrase "Terms of Service" was a hyperlink that, if clicked, directed the user to the 2013 Terms.  *Id.* ¶ 3.

Begin forwarded message:

**From:** Instagram <no-reply@instagram.com>
**Date:** January 18, 2013 6:15:32 AM PST
**To:** ████████ @yahoo.com
**Subject: Instagram Update**

Hello,

Our community has grown by many millions of people since we wrote our original Terms of Service and Privacy Policy. As we announced in December, we have updated our Terms of Service and Privacy Policy. These policies also now take into account the feedback we received from the Instagram Community. We're emailing you to remind you that, as we announced last month, these updated policies will be in effect as of January 19th, 2013.

You can read our blog post that highlights some of the key updates. And remember, these updates don't change the fact that you own your photos that you post on Instagram, and our privacy controls work just as they did before.

Thank you,
The Instagram Team

*Id.* Ex. 3.   Ms. Whalen continued to use Instagram after receiving this email notice, thereby accepting the 2013 Terms. *Id.* ¶¶ 20-23.  These Terms were in effect when S.M. signed up in ████ and when Ms. Edelstein signed up in ████.

A user who registered for Instagram on S.M.'s signup date could have signed up using either an iOS device or an Android device.  Declaration of Gene Yoo ("Yoo Decl.") ¶ 2; Declaration of Daniel Freitas ("Freitas Decl.") ¶ 2.  S.M. uses the Instagram application on an ████████████ ████████.  *Id.* ¶ 28; *see also* Declaration of Matthew D. Provance ("Provance Decl.") ¶¶ 7-8 (describing Facebook's process for identifying S.M.).  A user who registered for the Instagram service on ████████████ using the iOS mobile application was shown a screen that allowed users to create an account. Yoo Decl. ¶¶ 2-3 & Ex. 1.  This screen contained a statement that read: "By continuing, you agree to the Privacy Policy and Terms of Service."  *Id.*  The phrase "Terms of Service" contained a hyperlink that, if clicked, would direct users to a copy of the 2013 Terms.  *Id.* To advance past this screen, users had to click an arrow on the top right corner of the screen, indicating their assent to the Terms.  *Id.*  A screenshot of this process is below:

- 3 -

*Id.* Ex. 1.[2]

A user who registered for Instagram on Ms. Edelstein's signup date could have signed up using either an iOS device or an Android device, or by visiting www.instagram.com with an Internet browser.  Declaration of Jack Pope ("Pope Decl.") ¶ 2.  Ms. Edelstein uses the Instagram application on an ▮▮▮▮▮▮▮▮▮▮▮  *Id.* ¶ 38.  As shown in the image below, a user who registered for the Instagram service on ▮▮▮▮▮▮ using the Android mobile application was shown a screen that allowed users to create an account in one of two ways.  Declaration of Sushma Nayak ¶ 3 & Ex. 1.  Users with an existing Facebook account could press a button to "Log in with Facebook" and use their Facebook account information to create an Instagram account.  *Id.* Alternatively, users could press a button to "Sign up with email or phone number."  *Id.*[3]  Directly below each of these buttons was a statement that read:  "By signing up, you agree to our <u>Terms</u>

---

[2]    A user who registered for Instagram on ▮▮▮▮▮▮▮▮ using the Android mobile application would have seen materially similar screens.  *See* Freitas Decl. ¶¶ 2-3 & Ex. 1.

[3]    Facebook's records do not indicate which option Ms. Edelstein selected.

& <u>Privacy Policy</u>.”  *Id.* ¶ 4.  The underlined word “Terms” contained a hyperlink that, if clicked, would direct users to a copy of the 2013 Terms.  *Id.*[4]



*Id.* Ex. 1.

The first section of the 2013 Terms stated that use of the Instagram service would constitute an agreement by users to the Terms:

> By accessing or using the Instagram website, the Instagram service, or any applications (including mobile applications) made available by Instagram (together, the “Service”), however accessed, you agree to be bound by these terms of use (“Terms of Use”). . . .  **These Terms of Use affect your legal rights and obligations.  If you do not agree to be bound by all of these Terms of Use, do not access or use the Service.**

Duffey Decl. Ex. 2 at 1 (bolded text in original).

That same preamble contained the following bold, capitalized “arbitration notice”:

> **ARBITRATION NOTICE:  EXCEPT IF YOU OPT-OUT AND EXCEPT FOR CERTAIN TYPES OF DISPUTES DESCRIBED IN THE ARBITRATION SECTION BELOW, YOU AGREE THAT DISPUTES BETWEEN YOU AND INSTAGRAM WILL BE RESOLVED BY BINDING,**

---

[4]     A user who registered for Instagram on ▮▮▮▮▮▮▮▮ using the iPhone mobile application or an Internet browser would have seen materially similar screens.  *See* Pope Decl. ¶¶ 2-3 & Ex. 1; Declaration of Will Camp ¶¶ 2-3 & Ex. 1.

**INDIVIDUAL ARBITRATION AND YOU WAIVE YOUR RIGHT TO PARTICIPATE IN A CLASS ACTION LAWSUIT OR CLASS-WIDE ARBITRATION.**

*Id.*

In a separate section titled "Arbitration," the Terms provided as follows:

> Except if you opt out . . . you agree that *all disputes* between you and Instagram (whether or not such dispute involves a third party) *with regard to your relationship with Instagram*, including without limitation disputes related to these Terms of Use, *your use of the Service, and/or rights of privacy* and/or publicity, will be resolved by binding, individual arbitration under the American Arbitration Association's rules for arbitration of consumer-related disputes and you and Instagram hereby expressly waive trial by jury.

*Id.* Ex. 2 at 6 (emphases added).

The clause provided that any arbitration would take place on an individual basis: "You may bring claims only on your own behalf.  Neither you nor Instagram will participate in a class action or class-wide arbitration for any claims covered by this agreement."  *Id.*

The Terms provided users with the right to continue using Instagram without being bound by the arbitration clause:  "*You may opt out of this agreement to arbitrate*.  If you do so, neither you nor Instagram can require the other to participate in an arbitration proceeding.  To opt out, you must do so in writing within 30 days of the date that you first became subject to this arbitration provision."  *Id.* (emphasis added).  None of the plaintiffs opted out.  *Id.* ¶¶ 17, 24, 34, 43.

Finally, the 2013 Terms provided that Facebook was permitted to make changes to the Terms upon "reasonable advance notice" to users, and that by using the Instagram service after the effective date of the revised terms, users would agree to the modifications:

> *We reserve the right, in our sole discretion, to change these Terms of Use* (**"Updated Terms"**) from time to time.  Unless we make a change for legal or administrative reasons, we will provide reasonable advance notice before the Updated Terms become effective.  You agree that we may notify you of the Updated Terms by posting them on the Service, and that *your use of the Service after the effective date of the Updated Terms (or engaging in such other conduct as we may reasonably specify) constitutes your agreement to the Updated Terms.* Therefore, you should review these Terms of Use and any Updated Terms before using the Service.

*Id.* Ex. 2 at 2 (emphases added).

### B. All Three Plaintiffs Again Agreed To Arbitrate In 2018.

In April 2018, Facebook amended the Terms a second time, with the changes effective on July 14, 2018 (the "2018 Terms"). *Id.* ¶¶ 4, 8 & Ex. 4. Users received up to four notifications about the update. *Id.* ¶ 5. All three plaintiffs necessarily received one or more of these notifications, and continued to use Instagram, manifesting their assent to arbitrate any claims related to the service.

#### 1. Facebook Repeatedly Notified Users Of The Update To Instagram's Terms In 2018.

Beginning around April 19, 2018, users received a notice of the 2018 Terms at the top of their "Activity" feed, which displays recent activity by other accounts the user is following, suggestions for new accounts to follow, and matters of general interest. *See id.* ¶ 5. This notification directed users to "Review changes to our Terms and Data Policy," with an arrow on the right side of that message. *See id.* Ex. 5. If users pressed the arrow, they would be directed to a "full-screen" notification that summarized the updates to the Terms and directed users to indicate their agreement to those Terms by pressing a blue button that read: "Agree to Terms." *Id.* ¶ 6 & Ex. 6 at 3. The full-screen notice contained the statement: "Read the Full Terms and Data Policy." *Id.* The phrase "Full Terms" contained a hyperlink in blue type that, if pressed, would direct users to a copy of the 2018 Terms. *Id.*

Beginning around April 24, 2018, Facebook sent an email notification to all users who had not opened the Activity feed notice described above and who—like each of the three plaintiffs— had provided an email address to Instagram. *Id.* ¶¶ 7, 19, 27, 37. The email instructed users to "take a moment to review some changes to our Terms" and "[l]et us know if you agree to [the Terms] to continue using Instagram." *Id.* Ex. 7 at 1. The email explained that, "[g]oing forward, our terms will reflect that Facebook, Inc. is responsible for Instagram." *Id.* The email contained an "Agree" button immediately above an instruction to "Read the Full Terms"; the blue phrase contained a hyperlink to the 2018 Terms. *Id.* ¶ 7 & Ex. 7 at 2.

Users who did not indicate their agreement to the 2018 Terms by clicking either the "Agree to Terms" button in the first (Activity Feed) notice, or the "Agree" button in the second (email)

notice, received two additional notifications.  The first, beginning around June 11, 2018, was a full-screen notice in the app itself.  *See id.* ¶ 8.  The notice would appear when users opened Instagram using its Android or iOS mobile application, or using an Internet browser.  *Id.*  On June 11, 2018, Ms. Whalen was using the Instagram ███████████; S.M. was using the Instagram ███████████; and Ms. Edelstein was using the ███████.  *Id.* ¶¶ 20, 29, 39.  The top of the notices for both apps contained the phrase "**Terms and Data Policy Updates**."  *Id.* Ex. 8.  They then stated:

> Please take a moment to review some changes to our Terms and Data Policy. Your Instagram experience isn't changing, and you still own your photos and videos.  We are giving you better ways to access your data and understand how it's used.  ***By continuing to use Instagram on or after July 14, 2018, you're agreeing to these updates.***
>
> Instagram has been part of Facebook since 2012, and we're making some corporate changes.  Going forward, our Terms will reflect that Facebook Inc. is responsible for Instagram.

*Id.* (emphasis added).  The blue word "Terms" contained a hyperlink to the 2018 Terms.  *Id.* ¶ 9. At the bottom was a button that users could press to go "Back to Instagram."  *Id.* ¶ 9 & Ex. 8.  Users who received this notice could not continue using Instagram until they had interacted with it.  *See id.* ¶ 10.  There was no cut-off date for this notice; it remained live until the user acknowledged it, even if the user did not open the Instagram service until months later.  *Id.*

   This group of users also received a second email, beginning around June 12, 2018, which again explained that continued use of Instagram would constitute acceptance of the updated Terms. *Id.* ¶ 11 & Ex. 9.  The email stated:

> You may have seen a notification or an email a few weeks ago telling you about our upcoming changes to our Terms and Data Policy.  Your Instagram experience isn't changing, and you still own your photos and videos.  We are giving you better ways to access your data and understand how it's used.
>
> We wanted to let you know that ***by continuing to use Instagram on or after July 14, 2018, you're agreeing to these updates.***

*Id.* (emphasis added).  The word "Terms" again contained a hyperlink.  *Id.* ¶ 12.

   All three plaintiffs continued to use Instagram.  Ms. Whalen engaged in ██ Instagram "sessions"—periods during which she performed a stream of largely uninterrupted actions on Instagram—between June 11, 2018 and June 30, 2018 (when the full-screen notice was in place for

all users had not interacted with the prior notices), including ██████████████████

████████████████████████████. *Id.* ¶ 21. Ms. Whalen has posted at least ███████

on Instagram since July 14, 2018 (the date after which use of the service constituted acceptance of

the 2018 Terms). *Id.* ¶ 22. S.M. engaged in ████████████████ between June 11, 2018 and June

30, 2018, including ████████████████████████████████████████

██ *Id.* ¶ 30. She has posted at least ██████████████ since July 14, 2018. *Id.* ¶ 31. Ms.

Edelstein engaged in ████████████████████████████████

████████████████████████████████. *Id.* ¶ 40. And she has posted

██████████ on Instagram since July 14. *Id.* ¶ 41.

### 2. The 2018 Terms Confirm That Disputes With Facebook Relating To Instagram Must Be Arbitrated.

The 2018 Terms reiterate plaintiffs' obligation to arbitrate any and all disputes relating to

their use of the Instagram service. The preamble to the Terms provides:

> These Terms of Use govern your use of Instagram and provide information about the Instagram Service, outlined below. When you create an Instagram account or use Instagram, you agree to these terms. The Instagram Service is one of the Facebook Products, provided to you by Facebook, Inc. These Terms of Use therefore constitute an agreement between you and Facebook, Inc.

*Id.* Ex. 4 at 1.

The preamble then contains a bolded, all-caps notice of arbitration:

> **ARBITRATION NOTICE: YOU AGREE THAT DISPUTES BETWEEN YOU AND US WILL BE RESOLVED BY BINDING, INDIVIDUAL ARBITRATION AND YOU WAIVE YOUR RIGHT TO PARTICIPATE IN A CLASS ACTION LAWSUIT OR CLASS-WIDE ARBITRATION.**

*Id.*

The arbitration clause, titled "How We Will Handle Disputes," explains that all disputes

"related to . . . Instagram" must be resolved in individual arbitration:

> [Y]ou and we agree that ***any cause of action, legal claim, or dispute*** between you and us ***arising out of or related to these Terms or Instagram ("claim(s)") must be resolved by arbitration on an individual basis. Class actions and class arbitrations are not permitted;*** you and we may bring a claim only on your own behalf and cannot seek relief that would affect other Instagram users.

*Id.* Ex. 4 at 5 (emphases added).

Like the 2013 Terms, the 2018 Terms gave users the right to "opt out of this provision within 30 days," and explained the process for doing so: through a short statement delivered to Facebook by regular mail. *Id.* Ex. 4 at 6.  None of the three plaintiffs opted out. *Id.* ¶¶ 17, 24, 34, 43.

### 3. The Arbitration Provision Includes Features Designed To Make Arbitration Convenient For Users.

Instagram's arbitration provision sets forth procedures that are designed to make arbitration convenient for users:

- **Flexible consumer procedures:** Arbitration is conducted under the Consumer Arbitration Rules of the American Arbitration Association ("AAA") (*id.* Ex. 4 at 5), which the AAA designed with consumers in mind (Provance Decl. Ex. 1 (AAA rules)).
- **Cost-free arbitration:**  For claims of $75,000 or less, Facebook pays "all arbitration filing fees, administration and hearing costs, and arbitrator fees." Duffey Decl. Ex. 4 at 6.  And under the AAA's Consumer Arbitration Rules, Facebook is responsible for all of the other costs and fees of arbitration.  Provance Decl. Ex. 1 at 33.[5]
- **Choice of in-person, videoconference, telephonic, or no hearing:**  The parties can agree to have the arbitrator conduct a live, in-person hearing, conduct a hearing by videoconference or telephone, or dispense with a hearing and decide the case solely on the basis of documents submitted by the parties.  *Id.* at R-29, R-32.
- **Small claims court option:**  Either party may bring a claim in small claims court as an alternative to arbitration.  Duffey Decl. Ex. 4 at 5.

These features ensure that consumers have simple, fair, and cost-free procedures for pursuing their claims against Facebook.

### C. Plaintiffs Sued Facebook Based On Their Use Of Instagram, Notwithstanding Their Arbitration Agreement.

Ms. Whalen filed this action under BIPA on August 10, 2020 (Dkt. 1), and then filed an amended complaint adding S.M. as a plaintiff on November 18, 2020 (Dkt. 21).  Ms. Edelstein initially filed her action on August 14, 2020 in the Northern District of Illinois; her case was transferred to this Court and consolidated with Ms. Whalen's and S.M.'s.  *See* Dkt 34.  On January

---

[5]     For claims of more than $75,000, the consumer's only cost is the $200 filing fee.  Provance Decl. Ex. 1 at 33.  The remaining costs and fees of arbitration are allocated to the business regardless of the amount of the claim, and the arbitrator may not reallocate them, except if the arbitrator "determin[es] that [a] party's claim or counterclaim was filed for purposes of harassment or is patently frivolous."  *Id.* at 28.

26, 2021, Ms. Whalen, S.M., and Ms. Edelstein filed an amended consolidated complaint. Compl. (Dkt. 37).

BIPA was enacted in 2008 to regulate the use of biometric technologies "in the business and security screening sectors" in Illinois. 740 ILCS 14/5(a). It requires entities that obtain "biometric identifiers" and "biometric information" to provide notice to, and obtain consent from, individuals before their data is collected; it prohibits the sale of biometric data; and it includes restrictions on how such data can be disclosed and stored. *Id.* 14/15. The statute covers six specified "biometric identifiers"—"a retina or iris scan, fingerprint, voiceprint, or scan of hand or face geometry"—as well as "biometric information" derived from one of these identifiers and used to identify a person. *Id.* 14/10.

Plaintiffs' BIPA claims originate directly from their use of the Instagram service. Each alleges that she uploaded photos and/or videos to Instagram "that include images of her face," and that she appeared in "photographs that other Instagram users have uploaded to Instagram." Compl. ¶¶ 59, 61, 63. Plaintiffs claim that Facebook "captured biometric identifiers and information from Plaintiffs' photographs" without their consent "by automatically locating and scanning Plaintiffs' faces, and by extracting geometric data relating to the contours of their faces." *Id.* ¶ 64. They allege that Facebook used that data to create a "template" of their faces and "identify" them "by cross referencing" their templates with photos uploaded later. *Id.* ¶ 33.

Although this fact is not material to this motion, plaintiffs' allegations are false. Facebook does *not* use facial recognition to identify people in photos, videos, or other content uploaded to the Instagram service. Declaration of Gary McCoy (Provance Decl. Ex. 6) ¶ 2. No templates are created for any Instagram accounts, and content uploaded to the Instagram service is not used to create templates for any Facebook accounts. *Id.* ¶¶ 3-4. Facebook disclosed these facts in the full-screen notice issued in 2018: "Because [the 2018 Terms] also cover[] Facebook, it includes information about facial recognition. We don't use facial recognition technology on Instagram. If we introduce it, we'll let you know and give you a choice." Duffey Decl. Ex. 8.

Plaintiffs seek to represent a class of "[a]ll Instagram users living in Illinois who had their biometric information or identifiers, including scans of their face geometry, collected, captured,

received or otherwise obtained by Facebook through materials uploaded to the Instagram application."  Compl. ¶ 69.

### D.   Plaintiffs Agreed To The 2020 Terms After Filing This Lawsuit.

After plaintiffs filed their lawsuits (represented by counsel), Instagram's Terms of Use were updated again, with changes becoming effective on December 20, 2020 (the "2020 Terms"). Duffey Decl. ¶ 13 & Ex. 10.  The 2020 Terms contain an arbitration clause with the same language as the 2018 Terms, and users were provided another opportunity to opt out.  *See id.* Ex. 10 at 1, 7-8.

Facebook sent all Instagram users, including plaintiffs, up to two separate notifications of the update.  *Id.* ¶ 14.  All three of the plaintiffs received both notifications.  *Id.* ¶¶ 23, 33, 42.  First, beginning around November 17, 2020, Facebook sent plaintiffs an email notification about the update, stating that Instagram was "making a few updates to [its] Terms of Use," that the "terms will be effective on December 20, 2020," and that "continuing to use the app will mean you accept them"; the blue phrase contained a hyperlink to the 2020 Terms.  *Id.* ¶ 14 & Ex. 11.  Second, beginning around November 19, 2020, plaintiffs received a direct notice of the update at the top of their Activity feed, reiterating that "[c]ontinuing to use the app means you accept these updates." *Id.* ¶ 15 & Ex. 12.  Users could respond to this notice either by (1) pressing a button at the bottom that said "Learn More," which would direct them to the 2020 Terms; (2) dismissing the notice by pressing the "X" located at the top-right corner of the notice; or (3) declining to interact with the notice, in which case it would appear at the top of the user's Activity feed three times before being taken down.  *Id.* ¶ 16 & Ex. 12.

Each of the plaintiffs again did not opt out of arbitration.  *Id.* ¶¶ 17, 24, 34, 43.  And they have continued to use Instagram after receiving the two notices.  As of February 10, 2021, Ms. Whalen's most recent Instagram session was on ███████████; S.M.'s was on ████████ ███; and Ms. Edelstein's was on ████████████.  *Id.* ¶¶ 23, 33, 42.

**ARGUMENT**

**I.      The FAA Requires Enforcement Of Plaintiffs' Arbitration Agreement.**

The FAA provides that arbitration agreements are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "The overarching purpose of the FAA . . . is to ensure the enforcement of arbitration agreements according to their terms so as to facilitate streamlined proceedings." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344 (2011). This "liberal federal policy favoring arbitration agreements" applies "notwithstanding any state substantive or procedural policies to the contrary." *Id.* at 346.

The FAA applies to any arbitration agreement that is "written" and "involv[es] commerce." 9 U.S.C. § 2. Both requirements are met here. The Instagram arbitration provision is in writing. And "the Internet is an instrumentality and channel of interstate commerce." *United States v. Sutcliffe*, 505 F.3d 944, 953 (9th Cir. 2007); *see also United States v. Borrero*, 771 F.3d 973, 975 (7th Cir. 2014) (same).

"Because the FAA mandates that district courts shall direct the parties to proceed to arbitration," when an arbitration agreement is subject to the FAA, the statute "limits courts' involvement to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Cox v. Ocean View Hotel Corp.*, 533 F.3d 1114, 1119 (9th Cir. 2008) (quotation marks and emphasis omitted). Plaintiffs validly agreed to arbitrate disputes with Facebook relating to the Instagram service. And their claims in this case fall squarely within the scope of that agreement.

**A.      Plaintiffs Entered Into A Valid Arbitration Agreement.**

To determine whether a valid arbitration agreement has been formed, a court must "apply ordinary state-law principles that govern the formation of contracts." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).[6] Facebook therefore evaluates plaintiffs' assent to the

---

[6]      The Supreme Court has repeatedly emphasized that only "generally applicable" contract rules apply; state-law rules that "discriminat[e]" against or "disfavor[]" arbitration agreements are preempted by the FAA. *Kindred Nursing Ctrs. Ltd. P'ship v. Clark*, 137 S. Ct. 1421, 1426 (2017).

1  arbitration agreement under Illinois law, which is consistent with California principles of contract

2  formation.[7]

3      "Illinois contract law requires that a website provide a user *reasonable notice* that his use

4  of the site . . . constitutes assent to an agreement."  *Sgouros v. TransUnion Corp.*, 817 F.3d 1029,

5  1036 (7th Cir. 2016) (emphasis added).  A court "ask[s] whether the web pages presented to the

6  [user] adequately communicate[d] all the terms and conditions of the agreement, and whether the

7  circumstances support the assumption that the [user] receive[d] reasonable notice of those terms."

8  *Id.* at 1034-35.[8]  Each of the plaintiffs received more than sufficient notice of the arbitration clause;

9  indeed, they agreed to three separate iterations of it.

10     ***2013***.   When S.M. and Ms. Edelstein signed up for Instagram, in ▮▮▮▮▮▮▮

11  respectively, Instagram's Terms already contained an arbitration clause.  When S.M. signed up, she

12  clicked a button on a screen that read, "[b]y continuing, you agree to the Privacy Policy and Terms

13  of Service," with a hyperlink to the 2013 Terms.  *See* pp. 3-4 *supra*.  When Ms. Edelstein signed

14  up, she clicked on a button directly above a statement that, "[b]y signing up, you agree to our Terms

15  and Privacy Policy," with a link to the Terms.  *See* pp. 4-5 *supra*.  *See also Friends for Health:*

16  *Supporting N. Shore Health Ctr. v. PayPal, Inc.*, 2018 WL 2933608, at *5 (N.D. Ill. June 12, 2018)

17  (finding valid arbitration agreement with PayPal where plaintiff users "had to complete a

18  registration process" by "affirmatively check[ing] a box, or click[ing] a button, indicating that they

19  accepted the user agreement," and "[b]efore doing so, [they] had the opportunity to review the

---

20  [7]     Instagram's Terms contain a choice-of-law clause providing that "[t]he laws of the State of
21  California, to the extent not preempted by or inconsistent with federal law, will govern these Terms
   and any claim, without regard to conflict of law provisions."  Duffey Decl. Ex. 4 at 6 (2018 Terms);
22  *id.* Ex. 10 at 8 (2020 Terms); *see also id.* Ex. 2 at 6 (similar language in 2013 Terms).  If this Court
   determines under Illinois law that a valid contract was formed between Facebook and plaintiffs, the
23  Court (or the arbitrator) should then apply California law to the merits of their claims.  Illinois law
   "respects [a] contract's choice-of-law clause" where, as here, "the contract is valid."  *Kohler v.*
24  *Leslie Hindman, Inc.*, 80 F.3d 1181, 1185 (7th Cir. 1996); *see also Kaufman v. Am. Express Travel*
25  *Related Servs. Co.*, 2008 WL 687224, at *3 (N.D. Ill. Mar. 7, 2008).

26  [8]     The Ninth Circuit has similarly held that the validity of an online agreement "turns on
   whether the website puts a reasonably prudent user on inquiry notice of the terms of the contract."
27  *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1177 (9th Cir. 2014).  Such notice "exist[s] when
   the existence of the terms [is] reasonably communicated to the user."  *Snow v. Eventbrite, Inc.*,
28  2020 WL 6135990, at *4 (N.D. Cal. Oct. 19, 2020) (quotation marks omitted).

1   terms of the user agreement, . . . including the arbitration provision").[9]

2   Ms. Whalen signed up before the arbitration clause was added.  But when Facebook

3   modified Instagram's Terms in 2013 to add the clause (among other changes), it sent Ms. Whalen

4   an email stating that "we have updated our Terms of Service" (with a hyperlink to the Terms), and

5   that the update would take "effect as of January 19th, 2013."  *See* pp. 2-3 *supra*.  The Terms

6   provided that, "[b]y accessing or using the Instagram website, . . . you agree to be bound by these

7   terms of use."  Duffey Decl. Ex. 2 at 1.  As a California state court has expressly held, this process

8   bound existing Instagram users to the 2013 arbitration clause.  *See Rodriguez v. Instagram, LLC*,

9   No. 13-53287, at 2, 5 (Cal. Super. Ct. Feb. 28, 2014) (Provance Decl. Ex. 2) (dismissing complaint

10  because "Instagram expressly claimed the right to modify the terms on notice," and "Plaintiff

11  continued to use Instagram after the [2013] Terms went into effect").

12  ***2018***.  When Facebook modified the Terms again in 2018, users received up to four separate

13  notifications about the update.  *See* pp. 7-8 *supra*.  Plaintiffs necessarily assented to those Terms—

14  which remained in place at the time these actions were filed—in each of two independently

15  sufficient ways.

16  First, each of the plaintiffs necessarily pressed a button indicating her assent to the Terms—

17  either the "Agree to Terms" button in the first Activity feed notification (in which case she would

18  have received no further notifications), the "Agree" button in the first email notification (same), or

19  the "Back to Instagram" button in the full-screen notification (if she did not click one of the first

20  two buttons).  *See* pp. 7-8 *supra*.  "Courts around the country have recognized that [an] electronic

21  'click' can suffice to signify the acceptance of a contract . . . as long as the layout and language of

22  the site give the user reasonable notice that a click will manifest assent to an agreement."  *Sgouros*,

23  817 F.3d at 1033-34.  That is because a click "require[s] affirmative action on the part of the user

24  to manifest assent."  *Van Tassell v. United Mktg. Grp., LLC*, 795 F. Supp. 2d 770, 790 (N.D. Ill.

25  2011); *see also Sherman v. AT&T Inc.*, 2012 WL 1021823, at *3 (N.D. Ill. Mar. 26, 2012)

26  _____

27  [9]   *Accord Nguyen*, 763 F.3d at 1176 (explaining that "clickwrap agreement[s]," where "the user is required to affirmatively acknowledge the agreement before proceeding with use of the website," are enforceable); *In re Facebook Biometric Info. Privacy Litig.*, 185 F. Supp. 3d 1155,

28  1166-67 (N.D. Cal. 2016) (plaintiff accepted Facebook's terms by pressing "Sign Up" button).

1   ("Signifying agreement by clicking on a box on the screen is common in Internet commerce."

2   (quotation marks and alterations omitted)).   Here, the language and layout of the site plainly

3   provided reasonable notice that a click was an acceptance of Instagram's Terms:  Two buttons were

4   expressly labeled "Agree to Terms" and "Agree," while the "Back to Instagram" button was on a

5   notice that took up the entire screen, stating that "continuing to use Instagram on or after July,

6   2018" would mean the user was "agreeing to th[e] updates."  *See* pp. 7-8 *supra*.

7          Second, plaintiffs continued to use Instagram after being given "reasonable notice that

8   [their] use of the site" would "constitute[] assent" to the 2018 Terms.  *Sgouros*, 817 F.3d at 1036.

9   Even when a consumer does *not* initially manifest agreement to a contract, such assent can be

10  accomplished by continuing to use the service after receipt of an email or other notification

11  attaching the relevant agreement.  *See, e.g.*, *Silverman v. Move Inc.*, 2019 WL 2579343, at *12

12  (N.D. Cal. June 24, 2019) (plaintiff assented to an arbitration clause because she received it in an

13  email and "continued to use the service"; "any failure by [p]laintiff to review the confirmatory

14  email or the [agreement] does not change the fact that the Agreement is enforceable against her");

15  *Herkenrath v. Move, Inc.*, 2018 WL 10705782, at *3 (C.D. Cal. Aug. 21, 2018) (arbitration

16  agreement formed where the plaintiffs were provided an "email to a webpage containing the

17  Arbitration Provision" (emphasis omitted)); *Ramirez v. Freescore, LLC*, 2011 WL 3812608, at *5

18  (C.D. Cal. Aug. 30, 2011) (compelling arbitration where the plaintiff was sent an email and "needed

19  only to click on the link 'Terms and Conditions,' which would have brought her to the page that

20  included the arbitration clause"); *see also Citizens Telecomms. Co. v. Sheridan*, 239 W. Va. 67, 72,

21  74 (2017) (customers assented to arbitration clause "through continued use of Frontier's Internet

22  service" after "Frontier provided written notice of the change to [its] Terms and Conditions" by

23  mail); *cf. Rodman v. Safeway Inc.*, 2015 WL 604985, at *11 (N.D. Cal. Feb. 12, 2015) (Tigar, J.)

24  (amendment to online contract was not binding where it was merely posted on the company's

25  website, but defendant could have "take[n] any number of actions to alert users" about the update,

26  including "*send[ing] all . . . customers an email* in order to ensure that every consumer is aware of

27  a change in the [agreement] prior to making a purchase" (emphasis added)).

28          Here, plaintiffs did not merely receive a *single* email notification setting forth the arbitration

1  provisions in Instagram's Terms and informing them that continued use of the service would

2  constitute acceptance.  All three plaintiffs received up to two emails in 2018, and up to two

3  full-screen notifications that same year, after which they continued to use Instagram.

4     *2020*.  Plaintiffs also agreed to the current Terms, which were amended after they filed their

5  lawsuits.  They received an email notification about the update stating again that "continuing to use

6  the app will mean you accept [the updated Terms]," and a similarly worded Activity feed

7  notification that they could dismiss only by pressing a button or by viewing it at least three times.

8  *See* p. 12 *supra*.  They were then given their *third* chance to opt out of the arbitration clause,

9  declined to do so, and continue to use Instagram regularly.  *See id.*

10    In short, plaintiffs cannot "reasonably claim that [they] had insufficient notice of the

11  arbitration clause" where they had multiple "opportunit[ies] to read the arbitration provisions";

12  necessarily clicked on one or more buttons indicating their acceptance of Instagram's arbitration

13  provision; and declined multiple opportunities to opt out.  *Tortoriello v. Gerald Nissan of N.*

14  *Aurora, Inc.*, 379 Ill. App. 3d 214, 234 (2008).  Plaintiffs are bound by their agreement to arbitrate.

15    **B.    Plaintiffs' Claims Fall Within The Arbitration Agreement.**

16    Plaintiffs' arbitration agreement plainly encompasses their claims in this action.  The

17  arbitration clause covers "any cause of action, legal claim, or dispute between you and us *arising*

18  *out of or related to* these Terms *or Instagram*."  Duffey Decl. Ex. 4 at 5 (emphases added); *id.* Ex.

19  10 at 7 (emphasis added).  Plaintiffs' complaint "aris[es] out of [and is] related to . . . Instagram":

20  They allege that Facebook violated BIPA by performing facial recognition on photos of them that

21  were uploaded to the Instagram service.  *See* p. 11 *supra*.  Indeed, when faced with a similar

22  provision requiring arbitration of "any claim or dispute . . . relating to" a party, the Seventh Circuit

23  has observed that "[i]t would be hard to draft a broader [arbitration] clause."  *Carbajal v. H & R*

24  *Block Tax Servs., Inc*., 372 F.3d 903, 904-05 (7th Cir. 2004).

25    To the extent there are "any doubts concerning the scope of arbitrable issues"—and there

26  are none—those doubts would have to be "resolved in favor of arbitration."  *Moses H. Cone Mem'l*

27  *Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983).  The FAA requires that "ambiguities

28  about the scope of an arbitration agreement must be resolved in favor of arbitration."  *Lamps Plus,*

1    *Inc. v. Varela*, 139 S. Ct. 1407, 1418 (2019).  Thus, in light of the strong federal policy favoring

2    the enforcement of arbitration agreements (*Concepcion*, 563 U.S. at 346), plaintiffs' arbitration

3    agreement must be interpreted to govern their claims.

4            **C.**    **S.M.'s Status As A Minor Does Not Permit Her To Avoid Arbitration.**

5           S.M. may attempt to argue that, as a minor, she can "disaffirm" her contract with Facebook,

6    including the arbitration clause in Instagram's Terms.  Any such argument should be rejected

7    because S.M. has continued to use the Instagram service after bringing this action.

8           Because Instagram's Terms provide that they are governed by California law (*see* n.7

9    *supra*), California law dictates the scope of a party's right to disaffirm those Terms.  *See Kohler*,

10   80 F.3d at 1185; *Foreman v. George Foreman Assocs.*, 517 F.2d 354, 357 (9th Cir. 1975) (holding

11   that the law designated in a contract's choice-of-law clause governs questions of the contract's

12   voidability); *Woodling v. Garret Corp.*, 813 F.2d 543, 552 (2d Cir. 1987) ("The issues of the . . .

13   enforceability or voidability of a release are plainly matters of substance as to which the parties'

14   choice of law will be honored."); *In re Amica, Inc.*, 135 B.R. 534, 545 (Bankr. N.D. Ill. 1992)

15   ("[I]ssues of voidability are matters of substance as to which the parties' choice of law will be

16   honored."); *see also NYC Mgmt. Grp. v. Brown-Miller*, 2004 WL 1087784, at *4 & n.2 (S.D.N.Y.

17   May 14, 2004) (applying choice of California law to minor's attempt to disaffirm).

18          "[I]t is a longstanding and general rule of California law that 'a party cannot apply to his

19   own use that part of the transaction which may bring to him a benefit, and repudiate the other,

20   which may not be to his interest to fulfill.'"  *C.M.D. ex rel. De Young v. Facebook, Inc.*, 621

21   F. App'x 488, 489 (9th Cir. 2015) (quoting *Babu v. Petersen*, 4 Cal. 2d 276, 286 (1935)).  This rule

22   applies equally to minors because infancy is a "shield" against abuse, rather than a "sword" for

23   retaining benefits without honoring corresponding obligations.  *Toon v. Mack Int'l Motor Truck

24   Corp.*, 87 Cal. App. 151, 154 (1927); *see Peers v. McLaughlin*, 88 Cal. 294, 299 (1891) ("[Minors]

25   cannot retain [a contract's] fruits and at the same time deny its obligations.").

26          Accordingly, California courts do not permit a minor to "accept the benefits of a contract

27   and then seek to void it in an attempt to escape the consequences of a clause that do[es] not suit

28   [her]."  *Paster v. Putney Student Travel, Inc.*, 1999 WL 1074120, at *2 (C.D. Cal. June 9, 1999)

1    (rejecting a minor's attempt to disaffirm a forum selection clause while retaining the benefits of the

2    defendant's service).   A minor's continued enjoyment of the services offered under a contract

3    precludes her from demonstrating the "unequivocal intent to repudiate" that disaffirmance requires.

4    *Spencer v. Collins*, 156 Cal. 298, 303 (1909).   Thus, in *C.M.D.*, the Ninth Circuit held that the

5    minor plaintiffs could not disaffirm their assent to Facebook's terms of service because they

6    "continu[ed] to use facebook.com after bringing their action."   621 F. App'x at 489.

7         S.M. has continued to use Instagram after she was added to Ms. Whalen's action on

8    November 18, 2020.   Duffey Decl. ¶ 32.   For example, she engaged in ███████████████

9    ███████████████████████████████████████████████████.   *Id.*   She

10   continues to use it to this day; as of February 10, 2021, S.M.'s most recent session was ███████

11   ██.   *Id.* ¶ 33.   S.M.'s claim to disaffirmance would be particularly weak given that she received

12   additional notice of the *arbitration clause* in 2020 after she filed her suit.   *See* pp. 12 *supra*.

13        S.M.'s case is indistinguishable from *C.M.D.*, which was also brought by minor residents

14   of Illinois under an Illinois statute.   *See C.M.D. v. Facebook, Inc.*, No. 3:12-cv-01216 (N.D. Cal.),

15   Dkt. 156 ¶¶ 2-6, 86-117 (Provance Decl. Ex. 3).   In that case, two different district courts (one in

16   Illinois and one in California) independently held that the plaintiffs' use of Facebook after filing

17   suit prohibited them from disaffirming Facebook's terms under California law (the law designated

18   in those terms).   *See E.K.D. ex rel. Dawes v. Facebook, Inc.*, 885 F. Supp. 2d 894, 900, 904 (S.D.

19   Ill. 2012) (transferring case to this District after rejecting plaintiffs' attempt to disaffirm

20   forum-selection clause in Facebook's terms); *C.M.D. v. Facebook, Inc.*, 2014 WL 1266291, at *4-5

21   (N.D. Cal. Mar. 26, 2014) (dismissing case under Rule 12(b)(6) after rejecting plaintiffs' attempt

22   to disaffirm substantive provisions and California choice-of-law clause in Facebook's terms).   "The

23   infancy defense may not be used inequitably to retain the benefits of a contract while reneging on

24   the obligations attached to that benefit."   *E.K.D.*, 885 F. Supp. 2d at 899.   The Ninth Circuit agreed

25   and rejected the plaintiffs' attempted disaffirmance.   621 F. App'x at 489.   This Court should do

26   the same if S.M. makes a similar attempt.

27   **II.     The FAA Requires A Stay Of This Action Pending Arbitration.**

28        When the FAA governs an arbitration provision that covers a plaintiff's claims, Section 3

of the Act directs the district court to compel arbitration and stay the lawsuit pending the resolution of arbitration.  *See* 9 U.S.C. § 3; *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 25 (1991) (FAA "provides for stays of proceedings in federal district courts when an issue in the proceeding is referable to arbitration").  The Court should enter such a stay in this case.

## CONCLUSION

Facebook respectfully requests that the Court (1) compel plaintiffs to arbitrate their claims on an individual basis in accordance with their arbitration agreement; and (2) stay this action pending the outcome of any arbitration.


Dated:  February 25, 2021

MAYER BROWN LLP

By: */s/* Lauren R. Goldman
Lauren R. Goldman
Matthew D. Provance
Michael Rayfield

Archis A. Parasharami (321661)
(aparasharami@mayerbrown.com)
1999 K Street, N.W.
Washington, D.C. 20006
Telephone:  (202) 263-3328

COOLEY LLP

Michael G. Rhodes
Whitty Somvichian
Lauren J. Pomeroy

Attorneys for Defendants FACEBOOK, INC.