Katrina Carroll (admitted *pro hac vice*)
**CARLSON LYNCH LLP**
111 West Washington Street, Suite 1240
Chicago, IL 60602
Tel.:  312-750-1265
kcarroll@carlsonlynch.com

[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]

*Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| KELLY WHALEN, individually and on behalf of all others similarly situated, and S.M., a minor, by and through her guardian, Tachah Wade, individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>   v.<br><br>FACEBOOK, INC.,<br><br>    Defendant. | Case No. 4:20-cv-06361-JST<br><br>**PLAINTIFF'S OPPOSITION TO FACEBOOK'S MOTION TO COMPEL ARBITRATION AND STAY LITIGATION**<br><br>Date:  TBD<br>Time:  TBD<br>Judge: Hon. Jon S. Tigar<br>Place: Courtroom 6, 2nd Floor |

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ............................................................................................................... 1

FACTUAL BACKGROUND ............................................................................................. 2

      A.      EVIDENCE PRODUCED IN ARBITRATION-RELATED DISCOVERY ............... 3

           1.     Facebook's Evidence .................................................................... 3

           2.     Plaintiffs' Evidence ................................................................... 12

                1.     Ms. Whalen ................................................................... 12

                2.     Minor Plaintiff S.M. ...................................................... 12

ARGUMENT ..................................................................................................................... 13

      A.      ARBITRATION IS A MATTER OF CONTRACT AND NO CONTRACT WAS ENTERED INTO BY THE PARTIES ........................................................... 13

      B.      THERE IS NO COMPETENT EVIDENCE ESTABLISHING THAT EITHER PLAINTIFF AGREED TO ARBITRATE ........................................................ 14

           1.     FACEBOOK'S DECLARATIONS ARE INADMISSIBLE AND SHOULD BE DISREGARDED ALTOGETHER OR ENTITLED TO LITTLE WEIGHT ............................................................................ 14

           2.     FACEBOOK SHOULD NOT BE PERMITTED TO INTRODUCE FURTHER EVIDENCE OF AN AGREEMENT TO ARBITRATE .............. 18

           3.     ANY PURPORTED AGREMEENT IS AN UNENFORCEABLE "BROWSEWRAP" ....................................................................... 19

           4.     FACEBOOK HAS FAILED TO ESTABLISH THAT S.M. AGREED TO ARBITRATE WHEN REGISTERING HER ACCOUNT IN 2014 ............. 24

CONCLUSION ................................................................................................................. 25

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

**Cases**

4

*Apple Inc. v. Samsung Elecs. Co.*,
2015 WL 3863249 (N.D. Cal. June 19, 2015) ............................................................... 23

5

6

*Applebaum v. Lyft, Inc.*,
263 F. Supp. 3d 454 (S.D.N.Y. 2017) .......................................................................... 31

7

*AT&T Techs., Inc. v. Commc'ns Workers of Am.*,
475 U.S. 643 (1986) ...................................................................................................... 13

8

9

*Barrowman v. Wright Med. Tech. Inc.*,
No. C15-0717JLR, 2017 WL 4161688 (W.D. Wash. Sept. 19, 2017) ....................... 17

10

*Berkson v. Gogo LLC*,
97 F. Supp. 3d 359 (E.D.N.Y. 2015) ............................................................................ 31

11

12

*Billups,Inc. v. Ambassador Techs., Inc.*,
No. 3:20-CV-00891-BR, 2021 WL 2939934 (D. Or. July 13, 2021) ......................... 21

13

*Chevron Corp. v. Pennzoil Co.*,
974 F.2d 1156 (9th Cir. 1992) ...................................................................................... 23

14

15

*Colgate v, JUUL Labs, Inc.*,
402 F. Supp. 3d 728 (N.D. Cal. 2019) .................................................................... 31, 32

16

*Comer v. Micor, Inc.*,
436 F.3d 1098 (9th Cir. 2006) ...................................................................................... 16

17

18

*Cullinane v. Uber Techs., Inc.*,
893 F.3d 53 (1st Cir. 2018) ........................................................................................... 31

19

*Doe v. Xytex Corp.*,
No. C 16-02935 WHA, 2016 WL 3902577 (N.D. Cal. July 19, 2016) ....................... 27

20

21

*Erichsen v. RBC Capital Markets, LLC*,
883 F. Supp. 2d 562 (E.D.N.C. 2012) .......................................................................... 18

22

*First Options of Chic., Inc. v. Kaplan*,
514 U.S. 938 (1995) ....................................................................................................... 14

23

24

*Gonzalez v. Citigroup, Inc.*,
2011 WL 4374997 (E.D.Cal.2011) ............................................................................... 15

25

*Granite Rock Co. v. Int'l Bhd. of Teamsters*,
561 U.S. 287 (2010) ...................................................................................................... 13

26

27

*Hagen v U.S.*,
486 F. Supp. 2d 622 (D. Md. 2007) .............................................................................. 21

28

**TABLE OF AUTHORITIES (cont.)**

**Page(s)**

**Cases (cont.)**

*Hal Roach Studios, Inc. v. Richard Feiner & Co.,*
  896 F.2d 1542 (9th Cir.1990) ........................................................................................... 16

*Hill v. Quicken Loans Inc.,*
  No. ED CV 19-0163 FMO (SPx), 2020 WL 5358394 (C.D. Cal. Aug. 5, 2020)........................... 15

*Ho v. Postmaster Gen.,*
  No. C 09-1600 MEJ, 2010 WL 309037 (N.D. Cal. Jan. 25, 2010) ................................................ 17

*Hoffman v. Citibank (South Dakota), N.A.,*
  546 F.3d 1078 (9th Cir. 2008) ........................................................................................... 23

*In re Henson,*
  869 F.3d 1052 (9th Cir. 2017) ........................................................................................... 13

*In re TFT-LCD (Flat Panel) Antitrust Litig.,*
  No. C 10-3517 SI, 2011 WL 4345316 (N.D. Cal. Sept. 15, 2011).................................................. 18

*Kilgore v. KeyBank Nat'l Ass'n,*
  718 F.3d 1052 (9th Cir. 2013) ........................................................................................... 14

*Knutson v. Sirius XM Radio Inc.,*
  771 F.3d 559 (9th Cir. 2014) ........................................................................................... 14

*Long v. Provide Commerce, Inc.,*
  245 Cal. App. 4th 855 (2016) ........................................................................................... 27

*Los Angeles Times Comm., LLC v. Dep't of Army,*
  442 F. Supp. 2d 880 (C.D. Cal. 2006) ........................................................................................... 20

*Martin v. Wells Fargo Bank, N.A.,*
  No. 12-cv-06030, 2013 WL 6236762 (N.D. Cal. Dec. 2, 2013) ............................................... 30

*McKee v. Audible, Inc.,*
  No. CV 17-1941-GW(Ex), 2017 WL 4685039 (C.D. Cal. July 17, 2017)................................ 26, 31

*Mitchell v. U-Haul Co. of Cal.,*
  No. 16-cv-04674-JD, 2017 U.S. Dist. LEXIS 79064 (N.D. Cal. May 23, 2017)..................... 14, 27

*Mulvany v. Live Nation Ent., Inc.,*
  No. 15-CV-04371-BLF, 2016 WL 7230898 (N.D. Cal. Dec. 14, 2016) ........................................ 18

*Nguyen v. Barnes & Noble Inc.,*
  763 F.3d 1171 (9th Cir. 2014) ........................................................................................... passim

*Nicosia v. Amazon.com, Inc.,*
  834 F.3d 220 (2d Cir. 2016) ........................................................................................... 32

**TABLE OF AUTHORITIES (cont.)**

**Page(s)**

**Cases (cont.)**

*Norcia v. Samsung Telecomms. Am., LLC,*
No. 14-cv-00582-JD, 2014 WL 4652332 ........................................................ 15, 16, 24

*Opperman v. Path, Inc.,*
205 F. Supp. 3d 1064 (N.D. Cal. 2016) ...................................................................... 27

*Pearson v. United Debt Holdings, LLC,*
No. 14 C 10070, 2015 WL 4960315 (N.D. Ill. Aug. 19, 2015) .................................... 18

*Rushing v. Viacom Inc.,*
No. 17-CV-04492-JD, 2018 WL 4998139 (N.D. Cal. Oct. 15, 2018).......................... 30

*Snow v. Eventbrite, Inc.,*
No. 3:20-cv03698, 2020 WL 6135990 (N.D. Cal. Oct. 19, 2020) ......................... 32, 33

*Specht v. Netscape Commc'ns Corp.,*
306 F.3d 17 (2d Cir. 2002) ................................................................................. 24, 28

*Texaco Antilles Ltd. v. Creque,*
273 F. Supp. 2d 660 (D.V.I. 2003) .............................................................................. 21

*Totten v. Kellogg Brown & Root, LLC,*
152 F. Supp. 3d 1243 (C.D. Cal.  2016) ...................................................................... 15

*Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.,*
489 U.S. 468 (1989)................................................................................................... 13

*Wicker v. Oregon ex rel. Bureau of Lab.,*
543 F.3d 1168 (9th Cir. 2008) ................................................................................... 17

*Wilson v. Huuuge, Inc.,*
944 F.3d 1212 (9th Cir. 2019) ................................................................................... 26

*Windsor Mills, Inc. v. Collins & Aikman Corp.,*
25 Cal. App. 3d 987 (1972) ....................................................................................... 24

**Statutes**

740 ILCS 14/1 .................................................................................................................. 2

**Rules**

Federal Rule of Evidence 602 ............................................................................. 16, 17, 20

## __INTRODUCTION__

This case does not involve a traditional agreement to arbitrate contained in a contract signed by the parties. Because of that, Facebook had to introduce intensely fact-based declarations to make a *circumstantial* case that Plaintiffs[1] *must have,* or *would have,* been presented with arbitration agreements upon registration and when Facebook purportedly sent notices relating to its Terms of Use ("Terms") in 2013, 2018, and December 2020 (after this lawsuit was filed). However, as Plaintiffs previously pointed out, Facebook's declarants never explicitly state that any agreement was ever actually presented or agreed to by either Plaintiff. They do not because they cannot: Facebook has no proof whatsoever establishing any agreement to arbitrate.

Over Facebook's objection, the parties conducted arbitration-related discovery into the facts supporting its motion to compel arbitration. That discovery confirms what Plaintiffs previously surmised: ███████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

███████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

███████████████ But Facebook never submitted supporting Declarations from ███████████████ to explain this evidence. To date, Plaintiffs do not know where the documents came from, what records were used to create them, and how they were created. ██████████████████████

████████████████████████████████████████████████████████████████████████████████

---

[1] On March 12, 2021, Plaintiff Victoria Edelstein voluntarily dismissed her claims. Dkt. No. 55.

1 [REDACTED]

2 [REDACTED].

3      Having made the strategic decision to withhold this evidence – from the only employees with

4 any knowledge about the purported formation of agreements to arbitrate – Facebook cannot introduce

5 any new evidence now. Privilege cannot be used as both a shield and sword and, in any event, the time

6 for arbitration-related discovery has lapsed. On the record before it, this Court should find that neither

7 Plaintiff ever agreed to arbitrate, it should deny Facebook's motion, and this case should proceed in

8 the normal course.

9 **FACTUAL BACKGROUND**

10      On August 10, 2020, Plaintiffs filed this biometric privacy case in the Superior Court of

11 California, San Mateo County, against Facebook regarding Instagram, a social networking service

12 owned by Facebook, on behalf of a class of Illinois users alleging violations of the Illinois Biometric

13 Information Privacy Act ("BIPA"), 740 ILCS 14/1, *et seq*.  Facebook removed the case to this Court

14 on September 9, 2020. Dkt. 1.  As alleged in the operative complaint (the Consolidated Class Action

15 Complaint filed on January 26, 2021 (Dkt. 37), Facebook engaged in the unauthorized collection,

16 storage, and disclosure of biometrics belonging to millions of users of its Instagram app across the state

17 of Illinois, and illegally profited from these acts in violation of applicable laws.  On February 25, 2021,

18 in lieu of filing an answer, Facebook moved to compel arbitration and stay this litigation. Dkt. 45.

19 Defendant did not move to dismiss on any ground enumerated in Rule 12(b)(6) and consequently,

20 Facebook's time to raise such defenses has now expired.

21      Having reviewed Facebook's motion, Plaintiffs apprised the Court of the existence of factual

22 disputes regarding the formation of their purported agreements to arbitrate. Dkt. 57.  Thereafter, over

23 Facebook's objection, the Court permitted the parties to conduct arbitration-related discovery,

24 including limited document discovery, depositions of three of Facebook's Declarants (Messrs. Duffey,

25 Yoo, and Freitas), and depositions of the two plaintiffs (Ms. Whalen and S.M.).  Dkt. 58.  Discovery

26 closed on June 30, 2021, and the results are discussed below.

27

28

## A.    EVIDENCE PRODUCED IN ARBITRATION-RELATED DISCOVERY

### 1.    *Facebook's Evidence*

There is no competent record evidence that Ms. Whalen was sent, saw, or ever received the purported 2013 notices of updated Terms, that Plaintiffs were sent, saw, or received the purported 2018 notices of updated Terms, or that they clicked the "Agree" button in the purported 2018 update notice emails, or clicked the "Back to Instagram" button in the purported 2018 full-screen update notice.  Nor is there any competent proof that either Plaintiff interacted with the purported 2020 update notices (sent after this lawsuit was filed).

### *Michael Duffey*

Mr. Duffey is Facebook's chief witness with respect to the Terms and various notices Facebook may have sent to users.  ███████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████  Rather, Mr. Duffey's carefully worded Declaration relies heavily on hypotheticals to create a circumstantial case for arbitration.  Dkt. No. 45-1, Duffey Decl., ¶ 3 (stating generally that users received "*up to* four separate notifications," without mention of either Plaintiff), ¶ 6 ("*if users* interacted with the activity feed notice," without mention of Plaintiffs' interactions, if any), ¶ 8 (no mention of whether either Plaintiff opened any full-screen notice), ¶ 16 ("users could respond … *in one of three ways,*" without details as to Plaintiffs).

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

---

[2] Facebook's counsel instructed the witness not to answer questions concerning the drafter of the Declaration, asserting attorney-client privilege. Carroll Decl., Ex. A, at 48:15-53:25.



OPPOSITION TO MOTION TO COMPEL ARBITRATION AND STAY LITIGATION
Case No. 4:20-cv-06361-JST

OPPOSITION TO MOTION TO COMPEL ARBITRATION AND STAY LITIGATION
Case No. 4:20-cv-06361-JST

1 ███████████████████████████████████████████████████████

2 ███████████████████████████████████████████████████████

3 ███████████████████████████████████████████████████████

4 ████████████████████████████████████

5    ████████████████████████████████████████████████████

6 ███████████████████████████████████████████████████████

7 ███████████████████████████████████████████████████████

8 ███████████████████████████████████████████████████████

9 ███████████████████████████████████████████████████████

10 ███████████████████████████████████████████████████████

11 ███████████████████████████████████████████████████████

12 ███████████████████████████████████████████████████████

13 ███████████████████████████████████████████████████████

14 ███████████████   Putting aside issues relating to source, the January 18, 2013 email advises that the Terms

15 have been updated, but says nothing about arbitration.  Nor does the email require the user to assent or

16 click "agree" anywhere to continue using Instagram.

17    ████████████████████████████████████████████████████

18 ███████████████████████████████████████████████████████

19 ███████████████████████████████████████████████████████

20 ██████████████████████████████   Again, putting origin aside, the substance of this

21 email is just as vague as the one from 2013.  It advises users of updates to Instagram's Terms, but

22 assures them that the "Instagram experience isn't changing" and that "[t]he Instagram app and the way

23 we process data are not changing."  And though the email describes certain new app features, just like

24

25

26 ─────────────────────
[4] Notably, Exhibit 1 attached to Mr. Duffey's Declaration, purporting to represent the 2011 Terms in

27 effect when Whalen opened her account, is not accurate.  That exhibit contains a reference to a future update on January 19, 2013 and thus, was presumably created much later. Mr. Duffey admitted that

28 Facebook does not have the original Terms from 2011 and the exhibit is the only version in Facebook's possession. Carroll Decl., Ex. A, at 169:5-171:22.

6

its predecessor email, it says nothing about arbitration that would alert the consumer as to the formation of a binding agreement.[5]

Though the 2018 email contains an "agree" box at the bottom, consumers were not required to click on it and Mr. Duffey said he had no knowledge of whether either Plaintiff ever clicked that box. ███████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████ Facebook's June 12, 2018 email (Exhibit 9 to the Declaration) is also silent regarding arbitration and does not even have an "agree" box.

███████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████ Rather, the email just states that Instagram is making "a few updates" to make it "easier to understand what is allowed on Instagram and how our service works." Though the email says that continuing to use the app constitutes acceptance of the new Terms, there is no "agree" button anywhere seeking assent from the user or confirming the user's receipt or review of the notice.

███████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████ In any event, the reconstructed notification simply states, "Review changes to our Terms and Data Policy," in the same size font as other notifications, without any hyperlinks or mention of arbitration.

---

[5] The same is true for the notification attached as Exhibit 8 to the Declaration, which is silent as to arbitration. This notification is even less effective than the email since it does not even contain an optional "agree" box.

1 ██████████████████████████████████████████████████

2 ██████████████████████████████████████████████████

3 ██████████████████████████████████████████████████

4 ██████████████████████████████████████████████████

5 Regardless, that notification is also silent as to arbitration, says that "[c]ontinuing to use the app means

6 you accept these updates" in the same color and font as the regular text, and does not have an "agree"

7 button to alert users that an agreement is being formed or to confirm the user's receipt and review; it

8 only has a button to "learn more."

9   ***Gene Yoo and Daniel Freitas***

10     Gene Yoo and Daniel Freitas are senior software engineers at Facebook, proffered to introduce

11 statements regarding what minor Plaintiff S.M. may or may not have been presented with when she

12 created her account. ████████████████████████████

13 ██████████████████████████████████████████████████

14 ██████████████████████████████████████████████████

15 ████████████████████     Nevertheless, a Declaration was submitted under the name of Mr. Yoo

16 regarding the 2014 account registration process for iOS users, while a similar Declaration was

17 submitted under the name of Mr. Freitas regarding the 2014 account registration process for Android

18 users.  Dkt. No. 45-2, Yoo Decl.; Dkt. No. 45-3, Freitas Decl.[6]

19     Mr. Freitas has no personal knowledge regarding the majority of the content in his Declaration.

20 ██████████████████████████████████████████████████

21 ██████████████████████████████████████████████████

22 ██████████████████████████████████████████████████

23 ██████████████████████████████████████████████████

24 ██████████████████████████████████████████████████

25

26 ────────────────────────────
[6] Because discovery has revealed that S.M. signed up using an Android device, Plaintiffs focus on the

27 testimony of Mr. Freitas, whose testimony concerned the Android registration process.
██████████████████████████████████████████████████

28 ██████████████████████████████████████████████████

1 █████████████████████████████████████████████████████████

2 █████████████████████████████████████████████████████████

3 ██████████

4         Most concerning, however, is that the image attached to Mr. Freitas' Declaration is a *rendered*

5 image of the account registration screen as it purportedly appeared in 2014, as *reconstructed* from

6 Facebook's source code, rather than a screenshot or image from Facebook's archives showing what a

7 new Instagram user *actually* saw during the account registration process in 2014.  *See* Dkt. No. 45-3,

8 Freitas Decl., Exhibit 1 thereto █████████████████████████████████

9 █████████████████████████████████████████████████████████

10 █████████████████████████████████████████████████████████

11 █████████████████████████████████████████████████████████

12 █████████████████████████████████████████████████████████

13 █████████████████████████████████████████████████████████

14 █████████████████████████████████████████████████████████

15 █████████████████████████████████████████████████████████

16 █████████████████████████████████████████████████████████

17 ████████

18    ███████████████████████████████████████████████████████

19 █████████████████████████████████████████████████████████

20 █████████████████████████████████████████████████████████

21 █████████████████████████████████████████████████████████

22 █████████████████████████████████████████████████████████

23 ███████████████████████████████████████████████

24         Moreover, the accuracy of Mr. Freitas' Declaration and rendered image with respect to Android

25 devices is critically undermined when contrasted with Mr. Yoo's Declaration and rendered image for

26 Apple devices.  For instance, while Mr. Yoo's Declaration plainly avers "[t]he size, font, and

27 positioning of the text depicted in Exhibit 1 is substantially identical to what an iOS user would have

28

9

1   seen on February 25, 2014," (Dkt. 45-2, at ¶ 3) Mr. Freitas' Declaration includes numerous caveats and

2   limitations:

3   > Exhibit 1 depicts the sign-up screen as it appears on *an Android device running a recent*
    > *version of Android's operating system software. The precise layout, color, and shading*

4   > *of certain objects depicted in Exhibit 1 may have appeared slightly different on older*
    > *versions of the operating system.* However, the size, color, and positioning of the text

5   > depicted in Exhibit 1 is substantially identical to what an Android user *whose device*
    > *was set to standard settings* would have seen on February 25, 2014.

6

7   Dkt. 45-3, at ¶3 (emphasis added).

8       Taking Mr. Freitas' Declaration at face value, his rendered image does not even purport to

9   depict the registration screen as Plaintiff S.M. saw it on February 25, 2014 on the Android device and

10  operating system she was using approximately 7.5 years ago.  Instead, it depicts the registration process

11  as it appears on *an Android device running a recent version of Android's operating system software*,

12  *whose device was set to standard settings.  Id.*  Mr. Freitas' statements are irrelevant and should not be

13  credited, however, because ███████████████████████████████████████████████

14  ████████████████████████████████████████████████████████████████████████

15  ████████████████████████████████████████████████████████████████████████

16  ████████████████████████████████████████████████████████████████████████

17  ████████████████████████████████████████████████████████████████████████

18  ██████████

19       ████████████████████████████████████████████████████████████

20  ████████████████████████████████████████████████████████████████████████

21  ████████████████████████████████████████████████████████████████████████

22  ████████████████████████████████████████████████████████████████████████

23  ████████████████████████████████████████████████████████████████████████

24  ████████████████████████████████████████████████████████████████████████

25  ████████████████████████████████████████████████████████████████████████

26  ████████████████████████████████████████████████████████████████████████

27  ████████████████████████████████████████████████████████████████████████

28  ████████████████████████████████████████████████████████████████████████

OPPOSITION TO MOTION TO COMPEL ARBITRATION AND STAY LITIGATION

1  ███████████████████████████████████████████████████████

2  ███████████████████████████████████████████████████████

3  ███████████████████████████████████████████████████████

4  ███████████████████████████████████████████████████████

5  ███████████████████████████████████████████████████████

6  ████████████████████████████████████████████████

7          Lastly, Mr. Freitas' rendering of the registration screen on Android devices as it appeared on

8  February 25, 2014 is also unreliable because it is completely different from the registration screen

9  appearing on Apple devices depicted in Mr. Yoo's Declaration, despite Facebook stating that they are

10  "materially similar" (Mot., at 4, fn. 2).  *See* Carroll Decl., ¶ 7 (comparison of side-by-side renderings).

11  Mr. Freitas' rendering contains completely different colors, images, and layouts.  Key language is also

12  different— whereas Mr. Yoo's rendering uses the correct terminology for mobile devices "[b]y tapping

13  to continue," Mr. Freitas' rendering confusingly uses the phrase "[b]y clicking Register."  *Id.*  Further,

14  Mr. Freitas' rendering seeks different information from users, including username, password, name,

15  email, and phone number, and includes an option to "USE YOUR FACEBOOK INFO," whereas Mr.

16  Yoo's rendering indicates that Apple users were only asked for their email addresses and passwords

17  with no option to use Facebook information.  *Id.*  In summary, the renderings – both purporting to be

18  from the same day – look like registration pages from two completely different websites.  ████████

19  ███████████████████████████████████████████████████████

20  ███████████████████████████████████████████████████████

21  ███████████████████████████████████████████████████████

22  ████████████████████████████████████████████

23          In short, the discovery Facebook produced makes it impossible to determine whether the images

24  recreated by Facebook's engineers accurately reflect what Plaintiff S.M. may have seen during the

25  account registration process.

26

27

28

OPPOSITION TO MOTION TO COMPEL ARBITRATION AND STAY LITIGATION

### 2.      *Plaintiffs' Evidence*

#### 1.      *Ms. Whalen*

Because Defendant did not require users to assent to the Terms when she created her account in 2011, Ms. Whalen could not have agreed to arbitrate her claims.  Facebook argues that her agreement was formed later based on what she "would have seen," but as set forth above, ███████████

████████████████████████████████████████████████████████████████

███████ Nor has Facebook introduced any witness with personal knowledge regarding the sending or display of updates and relevant records of the same.  Further, Mr. Duffey is not competent to testify on such matters, as detailed above.

Facebook cannot rely on Ms. Whalen's own records as a substitute for its own lack of records: when Ms. Whalen's email was searched, none of the emails Mr. Duffey asserts that she "would have seen" were located.  When questioned concerning the emails attached to Mr. Duffey's Declaration (sent to the personal email of Facebook's counsel and other unidentified recipients unknown to Mr. Duffey), Ms. Whalen unequivocally denied receiving them and testified that she did not delete them.  Carroll Decl., Ex. D (Whalen Dep. Tr.), at 56:18-20; 72:19-73:7; 74:22-75:7.

Ms. Whalen also testified repeatedly that she never saw Instagram's Terms. *Id.*, at 29:7-12, 33:12-34:9. Regarding the 2018 notice, Ms. Whalen testified: "I don't remember seeing this screen at all." *Id.*, at 48:5-16.  She knows that she did not see the notice on the top of the Instagram screen stating, "We've made our terms of use clearer" *Id.*, at 42:12-18. Ms. Whalen was equally unfamiliar with Instagram's activity feed: she did not even know what the activity feed is and did not recall notifications on the feed or anywhere else on Instagram on November 25, 2020 after this lawsuit was filed (the date Mr. Duffey asserts in his Declaration is the date Instagram displayed the 2020 update).  *Id.*, at 34:13-35:17, 39:15-18; *see also id.* at 41:19-23 (Ms. Whalen testified that she would "rarely ever" press an icon from home screen to go to activity feed screen).

#### 2.      *Minor Plaintiff S.M.*

Like Ms. Whalen, Plaintiff S.M., who was ten years old when she first created an Instagram account in 2014, testified that she is not familiar with Instagram's Terms (Carroll Decl., Ex. E (S.M. Dep. Tr.), at 18:16-25); does not ever remember receiving notifications on Instagram (*Id.*, at 25:8-18,

---

OPPOSITION TO MOTION TO COMPEL ARBITRATION AND STAY LITIGATION

28:14-29:7); did not recall the April 2018 notice on the notifications screen (*Id.*, at 42:17-20); and does not remember the full-screen notification in June 2018.  When S.M. was pressed concerning the notice stating "We've made our terms of use clearer," she stood by her statement that she did not see the Terms. *Id.*, at 26:11-27:16.  As set forth *supra*, Facebook has failed to satisfy its burden of proof in proving that S.M. impliedly agreed to the Terms when registering in 2014 because it does not know what registration page S.M. was presented with when registering in 2014.

## ARGUMENT

### A.   ARBITRATION IS A MATTER OF CONTRACT AND NO CONTRACT WAS ENTERED INTO BY THE PARTIES

"Arbitration is strictly a matter of consent." *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 299 (2010). The Federal Arbitration Act ("FAA") "does not confer a right to compel arbitration of any dispute at any time; it confers only the right to obtain an order directing that arbitration proceed *in the manner provided for in [the parties'] agreement*." *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 474–75 (1989) (internal quotation marks omitted) (alteration in original). "[A] party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *In re Henson*, 869 F.3d 1052, 1059 (9th Cir. 2017) (quoting *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986)).

Before compelling arbitration, the Court must find (1) that "a valid agreement to arbitrate exists and, if it does, (2) [that] the agreement encompasses the dispute at issue." *Kilgore v. KeyBank Nat'l Ass'n*, 718 F.3d 1052, 1058 (9th Cir. 2013).  In determining whether a valid agreement exists, federal courts "apply ordinary state-law principles that govern the formation of contracts." *First Options of Chic., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).  Facebook "as the party seeking to compel arbitration, has the burden of proving the existence of an agreement to arbitrate by a preponderance of the evidence." *Mitchell v. U-Haul Co. of Cal.*, No. 16-cv-04674-JD, 2017 U.S. Dist. LEXIS 79064, at *1 (N.D. Cal. May 23, 2017) (citing *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 565 (9th Cir. 2014)), attached as Exhibit F to Carroll Decl.

"Courts may only compel arbitration where there are no genuine disputes of material fact surrounding the arbitration agreement's existence." *Hill v. Quicken Loans Inc.*, No. ED CV 19-0163

13

FMO (SPx), 2020 WL 5358394, at *5 (C.D. Cal. Aug. 5, 2020); *see also, Gonzalez v. Citigroup, Inc.*, 2011 WL 4374997 at *2 (E.D.Cal.2011).  On a motion to compel arbitration, "courts treat the facts as they would when ruling on a motion for summary judgment, construing all facts and reasonable inferences that can be drawn from those facts in a light most favorable to the non-moving party." *Hill,* 2020 WL 5358394, at *4 (quoting *Totten v. Kellogg Brown & Root, LLC*, 152 F. Supp. 3d 1243, 1249 (C.D. Cal. 2016)).

Further, in establishing the very existence of an agreement, "there is no thumb on the scale in favor of finding an arbitration agreement to exist."  *Norcia v. Samsung Telecomms. Am., LLC*, No. 14-cv-00582-JD, 2014 WL 4652332, at, *4 (N.D. Cal. Sep. 18, 2014), *affirmed, Norcia v. Samsung Telecomms. Am., LLC*, 845 F.3d 1279 (9th Cir. 2017).  "[T]he 'liberal federal policy regarding the scope of arbitrable issues is inapposite' when the question is 'whether a particular party is bound by the arbitration agreement.'"  *Id.* (quoting *Comer v. Micor, Inc.*, 436 F.3d 1098, 1104 n.11 (9th Cir. 2006)).

Facebook cannot compel arbitration in this case because it has not established as a matter of law, by a preponderance of the evidence, the existence of a valid agreement to arbitrate with respect to either Plaintiff.

**B.   THERE IS NO COMPETENT EVIDENCE ESTABLISHING THAT EITHER PLAINTIFF AGREED TO ARBITRATE**

**1.   *FACEBOOK'S DECLARATIONS ARE INADMISSIBLE AND SHOULD BE DISREGARDED ALTOGETHER OR ENTITLED TO LITTLE WEIGHT***

To be considered on this motion, Facebook's declarations must be admissible evidence.  *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1550–51 (9th Cir.1990).  Statements not within the personal knowledge of a declarant are inadmissible, as Federal Rule of Evidence 602 provides that: "[a] witness may testify to a matter *only* if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."  Fed.R.Evid. 602 (emphasis added). To demonstrate personal knowledge, a declarant "must do more than assert a fact as true."  *Barrowman v. Wright Med. Tech. Inc.*, No. C15-0717JLR, 2017 WL 4161688, at *3 (W.D. Wash. Sept. 19, 2017) (citation omitted*); see also Wicker v. Oregon ex rel. Bureau of Lab.*, 543 F.3d 1168, 1178 (9th Cir.

1   2008) ("[t]he affiants' assertions about a meeting which they apparently did not attend and about which

2   they had no personal knowledge are not the proper subject of an affidavit."); *Ho v. Postmaster Gen.*,

3   No. C 09-1600 MEJ, 2010 WL 309037, at *2 (N.D. Cal. Jan. 25, 2010) (granting motion to strike

4   evidence in declaration under Rule 602 because the plaintiff "has not shown that she has personal

5   knowledge that a copy of Poster 72 dating before December 2005 could not be found.").

6          The same standard applies in the context of motions to compel arbitration.  *See, e.g., Erichsen

7   v. RBC Capital Markets, LLC*, 883 F. Supp. 2d 562, 568 (E.D.N.C. 2012) (granting motion to strike

8   declaration in support of motion to compel arbitration).  And without an authenticated arbitration

9   agreement, Facebook cannot compel Plaintiffs to arbitrate their claims.  *See Mulvany v. Live Nation

10  Ent., Inc.*, No. 15-CV-04371-BLF, 2016 WL 7230898, at *1 (N.D. Cal. Dec. 14, 2016) ("[b]ecause

11  Live Nation has not submitted a copy of the arbitration agreement or any evidence that Mulvany agreed

12  to arbitrate her claims, the motion is DENIED."); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. C

13  10-3517 SI, 2011 WL 4345316, at *4 (N.D. Cal. Sept. 15, 2011) (denying motion to compel arbitration

14  based on a "scant showing" insufficient to show proof of an agreement to arbitrate); *Pearson v. United

15  Debt Holdings, LLC*, No. 14 C 10070, 2015 WL 4960315 at *2-3 (N.D. Ill. Aug. 19, 2015) (After

16  defendant "failed to provide sufficient evidence to authenticate the purported [payday loan]

17  agreement[,]" court held it was "without sufficient evidence to find that there exists an agreement to

18  arbitrate.")

19         Though Facebook attempts to authenticate agreements to arbitrate with each Plaintiff via

20  witness declarations, none of the witnesses has any personal knowledge that an agreement to arbitrate

21  was actually formed.  As set forth at length in the factual recitation above, Facebook cannot rely on

22  Mr. Duffey to establish formation of any agreements because he lacks the requisite personal knowledge

23  to testify on this subject. Also, his testimony is speculative and lacks an adequate foundation.

24  ████████████████████████████████████████████████████

25  ████████████████████████████████████████████████████

26  ████████████████████████████████████████████████████

27  ████████████████████████████████████████████████████

28



Despite Mr. Duffey's lack of personal knowledge, however, he makes statements in his Declaration without any foundation at all and for which he has no basis:

OPPOSITION TO MOTION TO COMPEL ARBITRATION AND STAY LITIGATION
Case No. 4:20-cv-06361-JST

- Representations about emails and notifications to users generally, both before 2017 and after, about which he has no personal knowledge, (Duffy Decl. ¶¶ 3, 5, 6-12, 14-16);

- Statements about what "Records maintained in the ordinary course of business" show, when Duffy admitted that he never reviewed those records himself (Duffy Decl. ¶¶ 20-23, 29-33); and

- Representations about exhibits that Duffy has no personal knowledge regarding and cannot authenticate or otherwise sponsor (Duffy Decl. ¶¶ 3, 5-8, 11, 14, 15).

These statements should not be considered by the Court because they are inadmissible under Rules 602 and 901.

To the extent that Facebook asserts in its reply that the Court can infer that Mr. Duffey has personal knowledge of the facts set out in his Declaration by virtue of his title of "eDiscovery and litigation case manager" at Facebook, courts have declined to make such inferences even where declarants occupied much higher positions than Mr. Duffey.  *See, e.g., Los Angeles Times Comm., LLC v. Dep't of Army*, 442 F. Supp. 2d 880, 886 (C.D. Cal. 2006) (portions of a General Counsel's declaration would not be considered because it not clear how he acquired personal knowledge of relevant matters); *Billups,Inc. v. Ambassador Techs., Inc.*, No. 3:20-CV-00891-BR, 2021 WL 2939934, at *6 (D. Or. July 13, 2021) (granting motion to strike paragraphs of CEO declaration as not within personal knowledge); *Hagen v. U.S.*, 486 F. Supp. 2d 622, 626 (D. Md. 2007)(statements from a President/COO regarding what others signed or instructed would not be considered unless he had personal knowledge); *Texaco Antilles Ltd. v. Creque*, 273 F. Supp. 2d 660, 665 (D.V.I. 2003) (corporate secretary "was prevented from offering his opinion regarding the intent of the transaction ... because he had no personal knowledge of it").

In sum, the chief declarant upon whom Facebook relies ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

1   ███████████████████████████ The Court should not consider the Duffey Declaration

2   (or it should give it very little weight) because it is not competent evidence.

3        Similarly, the Court should disregard the Declaration and testimony of Mr. Freitas, given that

4   █████████████████████████████████████████████████████████

5   █████████████████████████████████████████████████████████

6   ████████████████████████████████████

7        Even if considered together, Facebook's Declarations do not establish, by a preponderance of

8   the evidence, that Facebook had a process or system in place that would produce accurate and

9   conclusive evidence of any agreement to arbitrate.  Facebook has not met its burden here.

10       **2.**     **_FACEBOOK SHOULD NOT BE PERMITTED TO INTRODUCE FURTHER_**

11                       **_EVIDENCE OF AN AGREEMENT TO ARBITRATE_**

12        Mr. Duffey testified that, █████████████████████████████

13   █████████████████████████████████████████████████████████

14   █████████████████████████████████████████████████████████

15   █████████████████████████████████████████████████████████

16   █████████████████████████████████████████████████████████

17   █████████████████████████████████████████████████████████

18   █████████████████████████████████████████████████████████

19   █████████████████████████████████████████████████████████

20   █████████████████████████████████████████████████████████

21   █████████████████████████████████████████████████████████

22   █████████████████████████████████████████████████████████

23   █████████████████████████████████████████████████████████

24   █████████████████████████████████████████████████████████

25   █████████████████████████████████████████████████████████

26   ██████████████████████████████████████. The opportunity for Facebook to submit

27   additional information supporting its motion and conduct further arbitration-related discovery has

28   expired.

18

1      Because Facebook decided to cloak relevant evidence in privilege and shield it from disclosure,

2   fundamental fairness dictates that Facebook cannot now introduce any new or clarifying evidence in

3   the future, whether from the engineers or anyone else, to support its assertion that agreements to

4   arbitrate were formed with Instagram users. *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1163 (9th

5   Cir. 1992) (reversing grant of summary judgment, finding that plaintiff created genuine issue of

6   material fact and holding that "Pennzoil cannot invoke the attorney-client privilege to deny Chevron

7   access to the very information that Chevron must refute in order to demonstrate that Pennzoil's

8   Schedule 13D is materially misleading"); *Apple Inc. v. Samsung Elecs. Co.*, 2015 WL 3863249, at *7

9   (N.D. Cal. June 19, 2015) ("The [fairness] principle is often expressed in terms of preventing a party

10  from using the privilege both as a shield and a sword ... this means that parties in litigation may not

11  abuse the privilege by asserting claims the opposing party cannot adequately dispute unless it has

12  access to the privileged materials.").

13      *3.      ANY PURPORTED AGREMEENT IS AN UNENFORCEABLE "BROWSEWRAP"*

14      Though Plaintiffs are Illinois residents, California contract law governs the relevant issues on

15  this motion. "Federal courts sitting in diversity look to the law of the forum state when making choice

16  of law determinations." *Hoffman v. Citibank (South Dakota), N.A.*, 546 F.3d 1078, 1082 (9th Cir.

17  2008). Under California's choice-of-law analysis, Illinois law would apply only upon Facebook's

18  showing, among other things, that Illinois law "materially differs from the law of California."

19  *Washington Mut. Bank, FA v. Super. Ct.*, 24 Cal. 4th 906, 911 (Cal. 2001). Facebook has made no

20  such showing here and in fact, concedes that Illinois and California law are consistent. Mot. at 14.

21      Under California law, "[m]utual manifestation of assent, whether by written or spoken word or

22  by conduct, is the touchstone of contract," and without sufficient indicia of assent by any of the parties,

23  no contract is formed. *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014) (quoting

24  *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 29 (2d Cir. 2002) (applying California law)). "An

25  agreement requires mutual assent, generally achieved through an offer and acceptance. An offer that

26  no reasonable person would recognize as a proposal…does not count." *Norcia*, 2014 WL 4652332, at

27  *8 (citation omitted). It follows that "an offeree, …is not bound by inconspicuous contractual

28

1  provisions of which he was unaware, contained in a document whose contractual nature is not obvious."

2  *Windsor Mills, Inc. v. Collins & Aikman Corp.*, 25 Cal. App. 3d 987, 993 (1972).

3      Even assuming that Facebook's declarants had introduced competent evidence that Plaintiffs

4  were presented with the Terms (which they have not), any purported agreement to arbitrate is an

5  unenforceable "browsewrap."  "Browsewrap" agreements often contain the website or app's terms and

6  conditions, but do not require that users take any affirmative action to assent.  *Nguyen*, 763 F.3d at

7  1776.  Browsewrap agreements stand apart from the other major type of Internet contract – "clickwrap"

8  agreements – which require the visitor to check a box or perform some other, explicit and recordable

9  action indicating agreement to be bound by the terms.  *Id*.

10      The enforceability of a browsewrap agreement "depends on whether the user has actual or

11  constructive knowledge of [the] website's terms and conditions."  *Nguyen*, 763 F.3d. at 1176.  In

12  *Nguyen*, the Ninth Circuit found inadequate the defendant's "conspicuous hyperlink," underlined in a

13  color-contrasting typeface, that appeared on the bottom left-hand corner of each page on the Barnes &

14  Noble website, including the checkout page.  *Id.* at 1174.  These disclosures did not provide

15  constructive notice of the arbitration clause because the website did not prompt users to review or pay

16  attention to the terms.  "[E]ven close proximity of the hyperlink to relevant buttons users must click

17  on—without more—is insufficient to give rise to constructive notice."  *Id.* at 1179.  Such disclosures

18  are insufficient to overcome courts' "traditional reluctance to enforce browsewrap agreements against

19  individual consumers."  *Id.* at 1178; *see also Wilson*, 944 F.3d at 1214-16 (declining to enforce

20  arbitration clause where users were not required to view the terms prior to downloading or using app).

21      Subsequently, courts have consistently applied *Nguyen* and its progeny to hold browsewrap

22  agreements unenforceable when the only "notice" provided to a user is a hyperlink on the website.  *See,

23  e.g., McKee v. Audible, Inc*., No. CV 17-1941-GW(Ex), 2017 WL 4685039, at *8 (C.D. Cal. July 17,

24  2017) (despite presence of a hyperlink to terms, "a reasonable consumer would not be put on notice

25  that the disclosure below the 'Start Now' button actually attached any contractual consequences to

26  clicking that particular button to begin a free membership, much less an arbitration agreement

27  contained in an agreement titled 'Terms of Use.'"); *Mitchell*, 2017 U.S. Dist. LEXIS 79064, at *3

28  (applying *Nguyen* and holding arbitration agreement to be unenforceable where link to contract's terms

is buried in an email, with no textual cue to alert the reader to the existence of the link); *Doe v. Xytex Corp.*, No. C 16-02935 WHA, 2016 WL 3902577, at *4 (N.D. Cal. July 19, 2016) ("[W]ithout notifying consumers that the linked page contains binding contractual terms, the phrase 'terms of use' may have no meaning or a different meaning to a large segment of the Internet-using public.  In other words, a conspicuous 'terms of use' hyperlink may not be enough to alert a reasonably prudent Internet consumer to click the hyperlink.") (quoting *Long v. Provide Commerce, Inc.*, 245 Cal. App. 4th 855, 867 (2016)); *Opperman v. Path, Inc.*, 205 F. Supp. 3d 1064, 1073-74 (N.D. Cal. 2016) ("hyperlinked, off-screen terms in the Privacy Policies," with no further notice, did not "provide[] users with constructive notice such that they could effectively consent to anything contained off-screen.").

As in *Nguyen* and its progeny, both Plaintiffs lack actual and inquiry notice of Facebook's Terms.  The Terms in effect when Ms. Whalen created her account do not contain an arbitration clause at all, there is no evidence that she was ever sent the email updates or viewed the notification later, or checked any box assenting to the Terms.  Indeed, when Ms. Whalen's email was searched, none of the emails that Facebook claims she would have received were located.

Similarly, a search of S.M.'s primary email address did not yield any emails from Facebook.  A search of her secondary email address did produce emails that had been sent by Facebook, but none of those emails had been opened.  The emails she received only serve to support her testimony that she did not accept Facebook's Terms; on June 15, 2018, Facebook sent S.M. the "second email notification" that was provided to Instagram users *who had not indicated their agreement to the 2018 Terms of Use*.  Duffey Decl. at ¶11.  Furthermore, in direct contradiction to the timeline set out in Mr. Duffey's Declaration, the emails she received regarding the 2020 Terms were not sent in mid-November.  *See Id*. at ¶ 14.  This email did not appear in S.M.'s inbox until December 10, 2020, raising additional questions as to the accuracy of Facebook's recordkeeping insofar as it relates to its purported notice to users.

Neither Plaintiff recalls reviewing or seeing the Terms, the emails or the notifications that Facebook claims would bind them. ███████████████████████

████████████████████████████████████

████████████████████████████████████

OPPOSITION TO MOTION TO COMPEL ARBITRATION AND STAY LITIGATION

1  ███████████████████████████████████████████████████████████

2  ███████████████████████████████████████████████████████████

3  █████████████████████████████████████

4       Further, Facebook's inconspicuous references to its Terms in the emails, its application, and

5  website fail to put Plaintiffs on inquiry notice.  Even if the emails █████████████████████████

6  ███████████████████████████████████████████████████████████

7  ████████  are considered, none of them give the user notice that they are entering into a binding

8  agreement to arbitrate.  Rather, the emails use general language and even confuse the reader by creating

9  the impression that nothing pertaining to the service is changing.  The January 2013 message

10  purportedly sent to Ms. Whalen (Exhibit 3 to the Declaration), advises that the Terms have been

11  updated, but says nothing about arbitration.  Nor does the email require the user to assent or click

12  "agree" anywhere to continue using Instagram.

13       In substance, the April 25, 2018 email is just as vague.  It advises users of updates to Instagram's

14  Terms, but assures them that the "Instagram experience isn't changing" and that the "app and the way

15  we process data are not changing."  And though the email describes certain new app features, just like

16  its predecessor email, it says nothing about arbitration that would alert the user as to the formation of

17  a binding agreement.[8]  Though the 2018 email contains an "agree" box, users were not required to click

18  it.  Mr. Duffey said he had no knowledge of whether either Plaintiff ever clicked on it, and he has no

19  information "one way or the other" to dispute Plaintiffs' statements that they did not.  Carroll Decl.,

20  Ex. A, at 191:13-16.  Facebook's June 12, 2018 email (Exhibit 9 to the Declaration) is also silent

21  regarding arbitration and does not even have an "agree" box.  Nothing in the November 11, 2020 email

22  (Exhibit 11 to his Declaration), sent to a mystery gmail account three months after this lawsuit was

23  filed, says anything about arbitration, but rather, it just states that Instagram is making "a few updates."

24  Though the email says that continuing to use the app constitutes acceptance of the new Terms, there is

25  no "agree" button anywhere.

26

27  _____

28  [8] The same is true for the notification attached as Exhibit 8 to the Declaration, which is silent as to arbitration.  This notification is even less effective than the email since it does not even contain an "agree" box.

1    Further, as detailed above, the reconstructed notifications created by Facebook's engineers are

2    not specific, contain the same size font as other notifications, without hyperlinks or any mention of

3    arbitration. The depiction of the notification at Exhibit 12 is silent as to arbitration, says that

4    "[c]ontinuing to use the app means you accept these updates" in the same color and font as the regular

5    text, and does not have an "agree" button either to alert the user that an agreement is being formed; it

6    only has a button to "learn more."

7    Plaintiffs did not *ever* agree to arbitrate, whether before or after they filed this lawsuit.

8    Facebook's only evidence that either Plaintiff assented to its Terms after this case was filed is a

9    spreadsheet created by its engineers, which purportedly reflects that Plaintiffs interacted with the 2020

10   notification.

11

12

13

14

15

16

17

18

19   Under these circumstances, Plaintiffs cannot be deemed to have assented merely by creating an

20   account or using the Instagram service. *Martin v. Wells Fargo Bank, N.A.*, No. 12-cv-06030, 2013 WL

21   6236762, at *3 (N.D. Cal. Dec. 2, 2013) (defendant's declarations that the plaintiff would have been

22   notified of the arbitration provision via mailing inserts and online messages were simply not enough).

23   "In situations like these where 'users are unlikely to see' the browsewrap agreement at issue, courts

24   have 'refused to enforce' them." *Rushing v. Viacom Inc.*, No. 17-CV-04492-JD, 2018 WL 4998139,

25   at *2 (N.D. Cal. Oct. 15, 2018) (quoting *Nguyen*, 763 F.3d at 1177) (reasoning that users need not have

26   clicked on the hyperlink to begin using the mobile app)  Indeed, "Courts have found more conspicuous

27   hyperlinks to be insufficient." *Colgate*, 402 F. Supp. 3d at 764 (citing *Cullinane v. Uber Techs., Inc.*,

28   893 F.3d 53, 56, 62-63 (1st Cir. 2018) (holding reference to "Terms of Service & Privacy Policy"

23

displayed in larger font and bold, contrasting print was not reasonably conspicuous); *see also Applebaum v. Lyft, Inc.*, 263 F. Supp. 3d 454, 458, 466-67 (S.D.N.Y. 2017) (finding small-print hyperlink colored in blue on a white background insufficient); *McKee v. Audible, Inc.*, No. CV 17-1941-GW(EX), 2017 WL 4685039, at *8 (C.D. Cal. July 17, 2017) (finding insufficient where disclosure appeared below operative button in small text); *Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 404 (E.D.N.Y. 2015) (finding inconspicuous "terms of use" reference, where consumer not required to scroll through terms, insufficient); *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 237 (2d Cir. 2016) (declining to compel arbitration where disclosure—"'By placing your order, you agree to Amazon.com's . . . conditions of use'—is not bold, capitalized, or conspicuous in light of the whole webpage")).

Facebook ignores these cases and assumes that its unremarkable references to its Terms "would notify a reasonable user of a binding arbitration agreement." Facebook's hyperlink—like those in *Colgate* and the other cases cited—would not serve to put any reasonable Internet user on notice that they are consenting to arbitrate any and all claims they might have against Facebook.

### 4.   *FACEBOOK HAS FAILED TO ESTABLISH THAT S.M. AGREED TO ARBITRATE WHEN REGISTERING HER ACCOUNT IN 2014*

Facebook's additional argument— that S.M., ███████████████, agreed to the Terms when registering her account on ███████████ via a sign-in wrap agreement— also fails because Facebook has not offered competent evidence of the registration screen as it existed when S.M. opened her account in 2014 and, even if it has, the proffered registration screen does not provide users with inquiry notice of the Terms. *See Snow v. Eventbrite, Inc.*, No. 3:20-cv03698, 2020 WL 6135990, *4 (N.D. Cal. Oct. 19, 2020).

Unlike the authorities Facebook relies on, Facebook did not produce any actual screenshots showing the registration screen actually presented to S.M. when she registered her account. Instead, Facebook proffers an image that Mr. Freitas, one of its software engineers, rendered for purposes of this litigation without personal knowledge of what that screen actually looked like in 2014. *See* Section (A)(I)- *Gene Yoo and Daniel Freitas*, at 8-11, *supra*. As set forth above, Mr. Freitas' Declaration makes clear that the image he rendered depicts the sign-up screen as it appears "*on an Android device*

*running a recent version of Android's operating system software*," that the screen would look different on older versions of the operating system, and that the rendered image is only "substantially identical" to what an Android user *whose device was set to standard settings* would have seen…"  Dkt. 45-3, ¶3. But as Mr. Freitas testified, ███████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████  Without knowing what exactly users saw on ████████████████, the Court cannot determine whether Facebook gave adequate notice or whether S.M. manifested consent.  *See Snow*, 2020 WL 6135990, *5-7 (denying motion to compel arbitration when defendant could not produce images of the webpages actually presented to plaintiff, and when existence of a scroll bar potentially meant that users may not have scrolled down to view hyperlinked terms of use).

In any event, even if Facebook did establish that the image Freitas rendered depicted the registration screen actually presented to S.M., that screen is insufficient to put her on notice because the message as a whole is inconspicuous.  For instance, the text appearing above the large, green "REGISTER" button is easily missed because it is the smallest text appearing on the screen and is gray ██████████████████████ over a gray background. Like in *Snow*, the inconspicuous text combined with the large, colorful button contrasts starkly, leading many consumers to click the large, vibrant button while never knowing that the low-contrast disclaimer subjects them to the Terms.  *Id*. at *9. Moreover, unlike the rendered image depicting the registration screen for Apple devices, the small text in Freitas' rendered screen confusingly advises users that *by clicking* they indicate agreement to the Terms.  This is misleading because mobile users can "tap" register, they cannot "click" register.

## CONCLUSION

Facebook has failed to carry its burden of showing a valid agreement to arbitrate.  The Court should deny Defendant's motion in its entirety.

1 | Dated: July 21, 2021

**CARLSON LYNCH LLP**

2

*/s/ Katrina Carroll*
Katrina Carroll (*pro hac vice*)

3

Nicholas R. Lange (*pro hac vice*)
**CARLSON LYNCH LLP**

4

111 West Washington Street, Suite 1240
Chicago, IL 60602

5

Tel.:   312-750-1265
kcarroll@carlsonlynch.com

6

nlange@carlsonlynch.com

7

**CARLSON LYNCH LLP**
Todd D. Carpenter (SBN 234464)

8

1350 Columbia St., Ste. 603
San Diego, CA 92101

9

Tel.:   619-762-1900
Fax:   619-756-6991

10

tcarpenter@carlsonlynch.com

11

Matthew E. Lee
Erin J. Ruben

12

**MILBERG COLEMAN BRYSON PHILLIPS
GROSSMAN PLLC**

13

900 W. Morgan Street
Raleigh, North Carolina 27603

14

Tel.:   919-600-5000
Fax:   919-600-5035

15

mlee@milberg.com
eruben@milberg.com

16

Jonathan B. Cohen

17

**MILBERG COLEMAN BRYSON PHILLIPS
GROSSMAN PLLC**

18

800 S. Gay Street, Suite 1100
Knoxville, TN 37929

19

Tel.:   865-247-0080
jcohen@milberg.com

20

21

*Counsel for Plaintiffs*

22

23

24

25

26

27

28

OPPOSITION TO MOTION TO COMPEL ARBITRATION AND STAY LITIGATION
Case No. 4:20-cv-06361-JST