MAYER BROWN LLP
LAUREN R. GOLDMAN (*pro hac vice*)
(lrgoldman@mayerbrown.com)
MICHAEL RAYFIELD (*pro hac vice*)
(mrayfield@mayerbrown.com)
1221 Avenue of the Americas
New York, NY 10016
Telephone: (212) 506-2500

MAYER BROWN LLP
MATTHEW D. PROVANCE (*pro hac vice*)
(mprovance@mayerbrown.com)
71 Wacker Drive
Chicago, IL 60606
Telephone: (312) 701-8598

COOLEY LLP
MICHAEL G. RHODES (116127)
(rhodesmg@cooley.com)
WHITTY SOMVICHIAN (194463)
(wsomvichian@cooley.com)
LAUREN J. POMEROY (291604)
(lpomeroy@cooley.com)
101 California Street, 5th Floor
San Francisco, CA 94111-5800
Telephone: (415) 693-2000

*Attorneys for Defendant Facebook, Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| KELLY WHALEN and S.M., a minor, by and through her guardian, Tachah Wade, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>FACEBOOK, INC.,<br><br>Defendant. | Case No. 4:20-cv-06361-JST<br><br>**FACEBOOK'S REPLY IN SUPPORT OF ITS MOTION TO COMPEL ARBITRATION AND STAY LITIGATION**<br><br>Date: To Be Determined<br>Time: To Be Determined<br>Location: Courtroom 6, 2nd Floor<br>Judge: Hon. Jon S. Tigar<br>Trial Date: None<br>Complaint Filed: January 26, 2021 |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................................ 1

ARGUMENT ...................................................................................................................................... 2

I.    There Is No Genuine Dispute That Plaintiffs Agreed To Arbitrate Their Claims .............. 3

    A.    The Evidence Produced By Facebook In Discovery Confirms Plaintiffs' Agreement To Arbitrate ................................................................................... 3

    B.    Plaintiffs Offered No Evidence That Casts Doubt On Their Formation Of Arbitration Agreements ...................................................................................... 8

        1.    Each Plaintiff Testified At Her Deposition That She Did Not Recall Whether She Saw The Notifications ............................................................. 8

        2.    As A Matter Of Law, Plaintiffs' Failure To Recall The Notifications Cannot Defeat Facebook's Motion To Compel ..................... 9

II.    Plaintiffs' Challenges To Facebook's Evidence Are Meritless ........................................ 10

    A.    Facebook's Declarants Have Personal Knowledge Of The Attested Facts .......... 10

    B.    Facebook Did Not Improperly Withhold Evidence From Plaintiffs ..................... 13

CONCLUSION ................................................................................................................................ 15

-i-

# TABLE OF AUTHORITIES

**Cases**

*Aniel v. GMAC Mortg., LLC*,
  2012 WL 5373388 (N.D. Cal. Oct. 30, 2012)..................................................................2, 10, 11

*Blau v. AT&T Mobility*,
  2012 WL 10546 (N.D. Cal. Jan. 3, 2012) ...............................................................................2, 9

*Colgate v. JUUL Labs, Inc.*,
  402 F. Supp. 3d 728 (N.D. Cal. 2019) ........................................................................................6

*Cullinane v. Uber Techs., Inc.*,
  893 F.3d 53 (1st Cir. 2018) .........................................................................................................6

*Derderian v. S.W. & Pac. Specialty Fin., Inc.*,
  673 F. App'x 736 (9th Cir. 2016) .............................................................................................11

*Doe v. Xytex Corp.*,
  2016 WL 3902577 (N.D. Cal. July 19, 2016)............................................................................5

*In re Facebook Biometric Info. Privacy Litig.*,
  185 F. Supp. 3d 1155 (N.D. Cal. 2016) ...................................................................................15

*Franco v. Greystone Ridge Condominium*,
  39 Cal. App. 5th 221 (Cal. Ct. App. 2019) ................................................................................7

*Katzman v. Los Angeles Cty. Metro. Transp. Auth.*,
  2015 WL 13861765 (N.D. Cal. Mar. 26, 2015).......................................................................14

*Kintera, Inc. v. Convio, Inc.*,
  219 F.R.D. 503 (S.D. Cal. 2003)..............................................................................................13

*Lag Shot LLC v. Facebook, Inc.*,
  2021 WL 2660433 (N.D. Cal. June 25, 2021) (Tigar, J.) .........................................................7

*Lee v. Postmates Inc.*,
  2018 WL 6605659 (N.D. Cal Dec. 17, 2018) ............................................................................6

*Levin v. Alms & Assocs.*,
  634 F.3d. 260 (4th Cir. 2011).....................................................................................................7

*McKee v. Audible, Inc.*,
  2017 WL 4685039 (C.D. Cal. July 17, 2017) ............................................................................6

*Moise v. Family Dollar Stores*,
  2017 WL 2378193 (S.D.N.Y. June 1, 2017).............................................................................9

*Murphy v. DIRECTV, Inc.*,
    2011 WL 3319574 (C.D. Cal. Aug. 2, 2011) ...................................................................... 15

*Nguyen v. Barnes & Noble, Inc.*,
    763 F.3d 1171 (9th Cir. 2014) ............................................................................................. 5

*Nguyen v. Tesla, Inc.*,
    2020 WL 2114937 (C.D. Cal. Apr. 6, 2020) ....................................................................... 9

*Peter v. DoorDash, Inc.*,
    445 F. Supp. 3d 580 (N.D. Cal. 2020) ............................................................................ 5, 6

*Pohlman v. NCR Corp.*,
    2013 WL 3776965 (N.D. Ill. July 17, 2013) ..................................................................... 15

*Snow v. Eventbrite, Inc.*,
    2020 WL 6135990 (N.D. Cal. Oct. 19, 2020) ..................................................................... 6

*Specht v. Netscape Commc'ns Corp.*,
    306 F.3d 17 (2d Cir. 2002) .................................................................................................. 5

*Stevens v. Corelogic, Inc.*,
    2016 WL 397936 (S.D. Cal. Feb. 2, 2016) ....................................................................... 13

*Tabas v. MoviePass*,
    401 F. Supp. 3d 928 (N.D. Cal. 2019) ................................................................................ 3

*Tinder v. Pinkerton Sec.*,
    305 F.3d 728 (7th Cir. 2002) .............................................................................................. 3

*U.S. Ethernet Innovations LLC v. Acer Inc.*,
    2013 WL 5370989 (N.D. Cal. Sept. 25, 2013) .................................................................. 13

*Watson Wyatt & Co. v. SBC Holdings, Inc.*,
    513 F.3d 646 (6th Cir. 2008) .............................................................................................. 7

iii

**INTRODUCTION**

Plaintiffs make only one argument in their opposition to Facebook's motion to compel arbitration: that Facebook failed to show that they are bound by Instagram's Terms of Use, including its arbitration clause. Plaintiffs appear to agree with most of the points in Facebook's motion. They do not dispute that the substance of Instagram's arbitration clause is enforceable; they do not contend that there is anything unfair about the terms or the arbitration clause; and they recognize that those terms give users the opportunity to opt out of the arbitration clause without giving up their ability to use Instagram. Plaintiffs also do not dispute that this litigation falls within the scope of the arbitration clause. The narrow dispute between the parties is whether plaintiffs affirmatively accepted Instagram's Terms or manifested their assent through continued use of Instagram. If so, Facebook's motion to compel must be granted and this action must be stayed.

When Facebook filed its opening brief, it attached evidence of the ways in which it had presented the arbitration clause to each plaintiff. Facebook produced evidence that, on as many as *nine* separate occasions, Instagram provided notice of its Terms, including the arbitration clause, to Ms. Whalen and S.M. either via an email or in-app notification. Several of these notices required each plaintiff to affirmatively click a button acknowledging her assent to the Terms before she could continue using Instagram. And Facebook provided evidence that both plaintiffs continued using Instagram after these notices were sent to them. To avoid arbitration, plaintiffs had to show that *all* of these notifications failed to provide sufficient notice of the arbitration clause.

Plaintiffs responded with lawyer-drafted declarations claiming that they never saw any of the notices, and asked the Court to permit them discovery on their assent to the Terms. The Court permitted their request, but discovery has confirmed the points in Facebook's motion. At their depositions, the plaintiffs walked away from their declarations, contending only that they could not *recall* seeing the notifications Facebook sent to all users. Meanwhile, Facebook produced a raft of evidence confirming its initial showing, and *plaintiffs* produced evidence showing that they either received or potentially deleted the notifications that they now claim to have forgotten about.

1    Plaintiffs cannot avoid arbitration simply by asserting an inability to remember agreeing to Instagram's Terms:  As Judge Breyer has put it, "Plaintiffs' statements that they 'do not recall' seeing the [notifications] . . . do not rise to the level of unequivocal denials," which is the *minimum* required to raise a genuine dispute of fact.  *Blau v. AT&T Mobility*, 2012 WL 10546, at \*4 (N.D. Cal. Jan. 3, 2012).  That rule makes sense, because "[i]f a party could get out of a contract by arguing that he did not recall making it, contracts would be meaningless."  *Id.*  So plaintiffs have fallen back on a variety of potshots at *Facebook's* evidence, which fall into two main categories.

First, plaintiffs argue that Facebook's three declarants lacked personal knowledge of the facts in their declarations.  Not so.  "[A]n affiant may testify to acts that she did not personally observe but which have been described in business records."  *Aniel v. GMAC Mortg., LLC*, 2012 WL 5373388, at \*6 (N.D. Cal. Oct. 30, 2012).  Facebook's witnesses reviewed the relevant business records and provided testimony based on what they learned.  Plaintiffs do not cite any authority for the proposition that this commonly-used approach is impermissible.

Second, plaintiffs complain that Facebook improperly "withheld" deposition testimony about certain privileged information that they believe *might* support their position—specifically, communications between one of Facebook's witnesses and other employees who gathered information and documents related to his declaration.  That is irrelevant, because plaintiffs never filed a motion to compel discovery of the information Facebook supposedly withheld.  And in any event, plaintiffs' assertion is factually erroneous.  Facebook's counsel foreclosed questioning only about communications involving the witness related to the collection of source code for *production* in this case.  Facebook did *not* assert any privilege objections to the disclosure of communications between the witness and other Facebook employees related to the contents of his declaration.

Plaintiffs have failed to bring forward any fact that contradicts the factual showing in Facebook's motion to compel arbitration.  The Court should grant that motion.

## ARGUMENT

Plaintiffs have not raised any genuine dispute about whether they are bound by the arbitration agreement, and their complaints about Facebook's discovery are meritless.

**I.      There Is No Genuine Dispute That Plaintiffs Agreed To Arbitrate Their Claims.**

"Just as in summary judgment proceedings, a party cannot avoid compelled arbitration by generally denying the facts upon which the right to arbitration rests; the party must identify specific evidence in the record demonstrating a material factual dispute for trial." *Tinder v. Pinkerton Sec.*, 305 F.3d 728, 735 (7th Cir. 2002); *accord Tabas v. MoviePass*, 401 F. Supp. 3d 928, 936 (N.D. Cal. 2019).  Facebook's motion demonstrated that plaintiffs agreed to three separate versions of Instagram's arbitration clause and received up to nine separate notices about updates to Instagram's Terms. Mot. at 2-12, 14-17.  The discovery produced by both parties has confirmed these points.[1]

     **A.      The Evidence Produced By Facebook In Discovery Confirms Plaintiffs' Agreement To Arbitrate.**

*2013 Terms*.  When Ms. Whalen opened her account, Instagram did not have an arbitration clause.  Mot. at 2.  As expressly permitted by the 2010 Terms ("We reserve the right to alter these Terms of Use at any time"), Facebook modified the Terms in 2013, added an arbitration clause, and sent an email update with a hyperlink to all users who had provided email addresses, including Ms. Whalen.  *Id.* at 2-3.  Facebook's discovery production corroborates these procedures.  An internal Facebook email from January 14, 2013 states: "The [2013 update] email is to remind Instagram users that the updated Terms of Service and Privacy Policy will go into effect on January 19th, 2013.  The email will gradually roll out to all users over the course of this week, ahead of the terms going into effect."  Supp. Decl. of Michael Duffey ("Duffey Supp. Decl.") Ex. 1.  Facebook also produced a separate copy of the email to all users, which confirms the contents of the 2013 email attached to Facebook's opening brief.  *Compare* Duffey Supp. Decl. Ex. 2, *with* Duffey Decl. Ex. 3.  Ms. Whalen continued to use Instagram after receiving the email notice.  Mot. at 3.

S.M. initially registered for Instagram on an ▉▉▉▉ device on ▉▉▉▉, when the 2013 Terms (including the arbitration clause) were already in effect.  *Id.*; *see also* S.M. Dep. at

---

[1]      Facebook analyzed whether plaintiffs are bound by Instagram's arbitration agreement primarily under Illinois law (Mot. at 14); plaintiffs primarily apply California law (Opp'n at 19). Because both states have similar principles of contract formation (*see* Mot. at 14 & n.7), Facebook will continue to rely on cases from both states.

1    14:25-15:4.[2]  She was shown a sign-in screen stating:  "By clicking Register, you are indicating
2    that you have read and agree to the Terms of Service and Privacy Policy."  Freitas Decl. Ex. 1.[3]
3    Directly underneath this language was a green button labeled "Register" that S.M. was required to
4    press to open her account.  *Id.* ¶¶ 3.a., 3.b., 3.c. & Ex. 1.  A screenshot is below:

[screenshot of Instagram registration screen]

After filing its motion, Facebook learned that S.M. opened a *second* Instagram account—a fact not mentioned in plaintiffs' complaint or opposition brief.  Supp. Decl. of Matthew D. Provance ("Provance Supp. Decl.") Ex. 1.  Facebook then produced evidence of the sign-up flow in place on December 25, 2017 when the account was created.  Yoo Supp. Decl. ¶ 2.  Once S.M. provided information to establish her account, she received a suggested username and was then required to press a blue button—set against a white background—labeled "Next."  *Id.* ¶ 3.a.  Below the "Next"

---

[2]  All deposition transcripts are filed as exhibits to the Supplemental Provance Declaration. Provance Supp. Decl. Exs. 2 (deposition of Ms. Whalen), 3 (deposition of S.M.), 4 (deposition of Mr. Duffey), 6 (deposition of Mr. Freitas), 7 (deposition of Mr. Yoo).

[3]  Facebook learned during discovery that S.M. registered her ▓▓▓▓▓▓▓▓▓▓ on an ▓▓▓ device rather than an ▓▓▓ device.  *See* S.M. Dep. at 13:22-15:1.  Her signup process was therefore different—but not materially different—from what was described in Facebook's opening brief.  *See* Mot. at 3.  The screenshot above shows the signup screen for an ▓▓▓ phone.

4

button was a statement that read: "By signing up, you agree to our **Terms** & **Privacy Policy**," with a hyperlink to the 2013 Terms. *Id.* ¶¶ 3.a., 3.b., Ex. 1. A screenshot of this process follows:

[screenshot of Instagram signup screen: "Welcome to Instagram, gyoochu2021 / Find people to follow and start sharing photos. You can change your username anytime. / Next / Change Username / By signing up, you agree to our Terms & Privacy Policy. / Already have an account? Sign In."]

A California court has expressly held that the process applied to Ms. Whalen was sufficient to bind Instagram users to the 2013 arbitration clause. *See Rodriguez v. Instagram, LLC*, No. 13-53287, at 2, 5 (Cal. Super. Ct. Feb. 28, 2014) (Ex. 2 to first Provance Decl.) (cited at Mot. 15). S.M.'s signup process was likewise more than sufficient to manifest her assent. Mot. 14-15. Indeed, S.M.'s agreements are strikingly similar to the "sign-in wrap" agreements that this Court found enforceable in *Peter v. DoorDash, Inc.*, 445 F. Supp. 3d 580, 587 (N.D. Cal. 2020) (Tigar, J.).[4] Like the DoorDash sign-up page, both Instagram registration screens stated that by clicking a button to create an account, users agreed to the Terms of Service (which contained the arbitration clause); both screens were "uncluttered" and "wholly visible" on a single page; and both screens

---

[4] The cases plaintiffs cite about the enforceability of so-called "browse-wrap" agreements (Opp'n at 19-24)—which do *not* involve the same degree of notice of terms or require an affirmative act of assent—are therefore easily distinguishable. *See, e.g.*, *Nguyen v. Barnes & Noble, Inc.*, 763 F.3d 1171, 1179 (9th Cir. 2014); *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 29 (2d Cir. 2002); *Doe v. Xytex Corp.*, 2016 WL 3902577, at *4 (N.D. Cal. July 19, 2016).

included "plainly readable" hyperlinks that contrasted against the background color and directed users to the Terms. *Id.* at 586.[5] Each plaintiff agreed to arbitrate by 2014.

*2018 Terms*. Facebook again modified the Terms and arbitration clause in 2018. It provided users with as many as four notices about the update (all attached to Facebook's motion to compel): (1) beginning around April 19, 2018, an Activity feed notification that directed users to "Agree to Terms" by pressing a button on their screen (Mot. at 7); (2) beginning around April 24, 2018, an email with a button labeled "Agree," sent to all Instagram users who had provided an email address (including both plaintiffs) but had not opened the earlier in-app notification (*id.*); (3) beginning around June 11, 2018, a full-screen notice in the Instagram app to users who had not clicked one of the first two buttons—this notice *prevented recipients from using Instagram* until they clicked a button in the notice labeled "Back to Instagram" (*id.* at 7-8); and (4) beginning around June 12, 2018, a second email to the same group of users reiterating that, "by continuing to use Instagram on or after July 14, 2018, you're agreeing to these updates" (*id.* at 8). It is undisputed that both plaintiffs continued to use Instagram after receiving at least one of these notifications. Each engaged in numerous sessions when the full-screen notice was up and after the date on which continued use of Instagram would constitute acceptance of the 2018 Terms. *Id.* at 8-9.

Facebook produced contemporaneous business records corroborating these procedures. An internal Facebook post stated that on April 19, 2018, all users outside the EU (including U.S. users) "will experience a notification that . . . asks them to accept the new Terms and Data Policy"; "[w]e

---

[5]  Plaintiffs cite several cases addressing sign-in wrap agreements whose physical layout and design provided insufficient notice. Opp'n at 21, 23-25. These cases are inapposite. *See, e.g.*, *Colgate v. JUUL Labs, Inc.*, 402 F. Supp. 3d 728, 766 (N.D. Cal. 2019) (terms link on sign-in page was "in a different color but with no other emphasis," and there was a different hyperlink on same page that was "bolded, underlined, and . . . in a larger font size," which could cause user confusion); *compare Peter*, 445 F. Supp. 3d 580, 586-87 (distinguishing *Colgate* on this basis); *see also McKee v. Audible, Inc.*, 2017 WL 4685039, at *8 (C.D. Cal. July 17, 2017) ("Start Now" button had no text stating that by clicking on the button users agreed to terms); *Snow v. Eventbrite, Inc.*, 2020 WL 6135990, at *9 (N.D. Cal. Oct. 19, 2020) (dark gray text against black background insufficient to put users on notice); *Cullinane v. Uber Techs., Inc.*, 893 F.3d 53, 57, 62-63 (1st Cir. 2018) (same); *see also Lee v. Postmates Inc.*, 2018 WL 6605659, at *6 (N.D. Cal Dec. 17, 2018) (distinguishing contract at issue in *Cullinane*, which was "presented through ambiguous hyperlinked text that recipients might not have recognized as links to the text of the contract").

will also be sending an email reminder to people who have not opened the app." Duffey Supp. Decl. Ex. 3. By June 15, 2018, Facebook had nearly completed these notices. *Id.* Ex. 4.[6]

*2020 Terms*. Instagram's Terms were updated again in 2020 (after plaintiffs filed this lawsuit), and Facebook provided users up to two notifications, both of which were attached to Facebook's motion to compel: (1) an email stating that continued use of Instagram after December 20, 2020 would constitute acceptance of the 2020 Terms; and (2) an in-app notification with the same message that users could interact with in one of three ways: (a) by pressing a "Learn More" button, which hyperlinked to the 2020 terms; (b) by clicking an "X" at the top-right corner of the notice, which would dismiss it; or (c) by declining to interact with the notice, in which case it would reappear three times at the top of the user's Activity feed before disappearing. Mot. at 12.

Plaintiffs both *received* and *interacted* with these notices.[7] Facebook's records show that Ms. Whalen received the email notice on November 20, 2020 (Duffey Supp. Decl. Ex. 5), and that S.M. received it on December 10, 2020 (*id.* Ex. 6). Facebook also produced business records ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████. Provance Supp. Decl. Ex. 5.[8]

---

[6] Plaintiffs briefly assert that the in-app notifications are insufficient because they do not explicitly reference the arbitration clause. Opp'n at 22 & n.8. That is not the law: "[C]ourts in this district have held that 'the fact that [a] contract was hyperlinked and not presented on the same screen does not mean that users lacked adequate notice of the contract terms.'" *Lag Shot LLC v. Facebook, Inc.*, 2021 WL 2660433, at *5 (N.D. Cal. June 25, 2021) (Tigar, J.).

[7] Plaintiffs repeatedly note that the 2020 Terms postdated this suit (Opp'n at 5, 7, 12, 22), but do not argue that this renders the arbitration clause unenforceable. That is for good reason: courts have repeatedly held that arbitration agreements entered into after litigation commences are fully enforceable. *See*, *e.g.*, *Franco v. Greystone Ridge Condominium*, 39 Cal. App. 5th 221, 230 (Cal. Ct. App. 2019); *Levin v. Alms & Assocs.*, 634 F.3d. 260, 268-69 (4th Cir. 2011) (arbitration clause that covered 'any dispute' between the parties was 'applicable retroactively' to preexisting disputes); *Watson Wyatt & Co. v. SBC Holdings, Inc.*, 513 F.3d 646, 649-52 (6th Cir. 2008) (same). Here, of course, plaintiffs' assent to the 2020 Terms merely operates to reinforce their agreement to the earlier versions.

[8] Plaintiffs argue that there is no evidence that they *reviewed* the email notifications. Opp'n at 5-6. But the "failure to read a contract before agreeing to its terms does not relieve a party of its obligations under the contract." *Nguyen*, 763 F.3d at 1179.

7

**B.      Plaintiffs Offered No Evidence That Casts Doubt On Their Formation Of Arbitration Agreements.**

Plaintiffs have offered nothing that casts doubt on Facebook's evidence.  Each plaintiff admitted at her deposition that she did not recall whether she saw the notifications about the updates to Instagram's Terms.  As a matter of law, plaintiffs cannot generate a material dispute of fact over whether they formed an arbitration agreement based solely on a lack of recollection—particularly in the face of evidence that they both reviewed and interacted with several of the notifications.

**1.      Each Plaintiff Testified At Her Deposition That She Did Not Recall Whether She Saw The Notifications.**

In the declarations plaintiffs submitted in response to Facebook's motion to compel, both swore (in identical statements) that they *did not* "receive or review" any of the emails or in-app notifications about the 2013, 2018, or 2020 updates.  Whalen Decl. ¶¶ 4-6; S.M. Decl. ¶¶ 4-5.  After discovery squarely refuted these unequivocal assertions (*see* Part I.A *supra*), plaintiffs abandoned them, testifying at their depositions that they could not *recall* whether they saw the notifications.

Ms. Whalen testified that she did not remember "one way or the other" whether she received the email notice about the 2013 Terms update (Whalen Dep. at 77:13-78:3), that she did not remember receiving the email or in-app notices about the 2018 Terms update (*id.* at 45:20-46:9, 48:5-20, 77:13-78:3), and that she did not remember receiving either of the two notifications about the 2020 Terms update (*id.* at 42:8-44:6, 75:14-76:12).  Although Ms. Whalen did not produce any email notifications, she testified that she deletes about 60 percent of the emails she receives (*id.* at 65:14-66:17), and acknowledged that it is possible that she deleted the notification emails from Instagram (*id.* at 67:16-68:12).  Ms. Whalen also confirmed that she has other social media accounts, including Facebook, and that she knows those other sites have terms to which a user must agree before using the service, which she agreed are a "fact of life."  *Id.* at 29:13-31:4.

Like Ms. Whalen, S.M. testified that she did not recall receiving any of the notifications about the Terms updates.  S.M. Dep. at 28:3-10, 43:12-44:10, 46:17-47:5.  But unlike Ms. Whalen, S.M. *did* produce emails she received from Instagram, including about those updates.  She produced the December 25, 2017 email she received when she opened her second Instagram account.

8

Provance Supp. Decl. Ex. 8. And she produced copies of the 2018 and 2020 emails providing notice of the updates from those years, which match identically the contents of those submitted by Facebook. *Compare id.* Ex. 9, *with* Duffey Decl. Ex. 7; *compare* Provance Supp. Decl. Ex. 10, *with* Duffey Decl. Ex. 9; *compare* Provance Supp. Decl. Ex. 11, *with* Duffey Decl. Ex. 11.[9] So the statement in S.M.'s declaration is demonstrably false.

### 2. As A Matter Of Law, Plaintiffs' Failure To Recall The Notifications Cannot Defeat Facebook's Motion To Compel.

Plaintiffs' failure to recall receiving the notifications is insufficient as a matter of law to defeat Facebook's motion. At *minimum*, a plaintiff opposing a motion to compel must "unequivocally deny" that she entered into an arbitration agreement. *Blau*, 2012 WL 10546, at *3 (quoting *Perez v. Maid Brigade, Inc.*, 2007 WL 2990368, at *4 (N.D. Cal. Oct. 11, 2007)). "Plaintiffs' statements that they 'do not recall' seeing the terms of service at the time they agreed do not rise to the level of unequivocal denials of having agreed to those terms. If a party could get out of a contract by arguing that he did not recall making it, contracts would be meaningless." *Id.* at *4; *see Moise v. Family Dollar Stores*, 2017 WL 2378193, at *3 (S.D.N.Y. June 1, 2017) ("[Plaintiff's] claim that he does not 'recall' receiving the Agreement does not create a genuine dispute as to whether he signed it.").

That is particularly true where, as here, the moving party presents "evidence that the agreement *was* presented" to the plaintiff. *Nguyen v. Tesla, Inc.*, 2020 WL 2114937, at *3 (C.D. Cal. Apr. 6, 2020) ("Whether or not he recalls having seen the [arbitration] agreement or signed it is of no moment, for [defendant] presents sufficient evidence that the agreement *was* presented to [him]."). Plaintiffs' failure to recall is entirely irrelevant in light of the evidence demonstrating that the arbitration clauses were in fact presented to plaintiffs—multiple times.

In short, the record demonstrating contract formation can be summarized as follows: (1) Facebook has produced evidence that *all* Instagram users necessarily have been presented with

---

[9] The emails produced by S.M. contain a watermark on each page created by plaintiffs' counsel that states, "Produced from Archived Unread." This addition is an improper factual characterization and alteration of plaintiffs' records.

9

and required to accept Instagram's arbitration clause; (2) plaintiffs have testified that they do not remember one way or another whether they received the many notifications that Facebook sent about the updates to Instagram's terms; (3) plaintiffs have produced notifications that S.M. *actually received* in 2018 and 2020; and (4) Facebook has produced evidence that *both* plaintiffs *actually received and interacted* with the latest update to the Terms. There is no genuine dispute of fact.

**II.     Plaintiffs' Challenges To Facebook's Evidence Are Meritless.**

Plaintiffs devote most of their brief to a variety of quibbles with Facebook's evidence. As an initial matter, even if the Court were to disregard individual pieces of Facebook's evidence on one of these grounds (*e.g.*, for lack of foundation, or based on some failure to comply with discovery obligations), it would not help plaintiffs. Facebook came forward with multiple, independently sufficient pieces of evidence to support multiple, independently sufficient instances of plaintiffs' assent, and plaintiffs have responded with no competent evidence of their own to contradict Facebook's evidence. But in any event, each of plaintiffs' critiques is meritless.

**A.     Facebook's Declarants Have Personal Knowledge Of The Attested Facts.**

Facebook submitted four declarations in support of its motion to compel. Mr. Duffey submitted a declaration discussing Instagram's historical Terms; the procedures that Instagram followed to notify users about the updates to the Terms in 2013, 2018, and 2020; and records of plaintiffs' account registrations and account activity. Mr. Freitas submitted a declaration discussing his analysis of the source code for ▓▓▓ phones relevant to the sign-up screen that Instagram users would have seen on ▓▓▓▓▓▓, when S.M. registered her first account. Mr. Yoo submitted two declarations discussing his analysis of the source code for ▓▓▓ phones relevant to the sign-up screen that Instagram users would have seen on ▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓ the date S.M. registered her second account. Plaintiffs argue that all three Facebook witnesses lacked "personal knowledge" of the facts in their declarations. Opp'n at 14-18.

Before turning to the individual declarants, it is important to emphasize what "personal knowledge" means under the law. "[P]ersonal knowledge is not strictly limited to activities in which the declarant has personally participated." *Aniel v. GMAC Mortg., LLC*, 2012 WL 5373388,

at *6 (N.D. Cal. Oct. 30, 2012) (quotation marks and alterations omitted). "[P]ersonal knowledge can come from the review of the contents of business records, and an affiant may testify to acts that she did not personally observe but which have been described in business records." *Id.*; *see also Derderian v. S.W. & Pac. Specialty Fin., Inc.*, 673 F. App'x 736, 738 (9th Cir. 2016) (declaration was properly considered under Rule 56 because it "was based on information [employee] learned by personally reviewing her employer's business records").

Because all of Facebook's declarants reviewed the relevant business records forming the basis for their testimony (*see* Duffey Decl ¶ 1; Freitas Decl. ¶ 1; Yoo Decl. ¶ 1; Yoo Supp. Decl. ¶ 1), plaintiffs' argument that they lacked "personal knowledge" of the facts at issue is simply wrong. And plaintiffs' witness-specific complaints fare no better.

*Mr. Duffey*. Plaintiffs contend that Mr. Duffey could not have had personal knowledge of the facts in his declaration about Instagram's Terms because he relied on "hearsay" from Facebook engineers. Opp'n at 1, 3-4, 16. At his deposition, Mr. Duffey testified that certain Facebook engineers helped him "collect[] the screen shots that are attached to [his] declaration, as well as . . . the in app notices that were sent to Instagram users, and the timeline of events." Duffey Dep. at 20:23-21:3, 32:17-22. This does not mean, however, that he lacked personal knowledge of what he learned; the engineers simply provided assistance in gathering the business records that *independently* supported his testimony. Indeed, Mr. Duffey confirmed that his own "team keeps a repository of historical site policies," and that he has an independent "understanding" of the notifications sent to Instagram users. *Id.* at 33:2-20. There is no requirement that Mr. Duffey be the person "with the *most* knowledge" about Instagram's Terms. Opp'n at 1, 4, n. 3, 18 (emphasis added). He was more than competent to attest to the facts in his declaration. *See Derderian*, 673 F. App'x at 738; *Aniel*, 2012 WL 5373388, at *6.

Plaintiffs also take issue with the origin of exhibits attached to Mr. Duffey's first declaration. They complain that Exhibit 3—showing the 2013 Terms update email—was sent to an unidentified Yahoo! address. Opp'n at 6. But the purpose of Exhibit 3 is simply to confirm that the 2013 email was sent to and received by users; the identity of the specific recipient is irrelevant.

11

Facebook also produced contemporaneous records corroborating the content and distribution of the email (*see* pp. 3-4 *supra*), and plaintiffs have offered no evidence suggesting that the email was not sent or that its content was different from the one attached to Mr. Duffey's declaration. Likewise, plaintiffs fault Mr. Duffey for being unable to recall in his deposition the identity of the Gmail user who received Exhibit 7, which shows the April 2018 Terms update email; or how he came into possession of Exhibit 11, which shows the November 2020 Terms update email. Opp'n at 6-7. That creates no doubt about their authenticity: Mr. Duffey compared the content of the two exhibits to the emails he received himself as an Instagram user, and they matched. Duffey Dep. at 84:18-85:25; 189:20-24. They also match the documents Facebook independently produced (Duffey Supp. Decl. Ex. 2) and those *S.M. herself* produced (Provance. Supp. Exs. 9, 10, 11).

***Messrs. Freitas and Yoo**.* Plaintiffs argue that Messrs. Freitas and Yoo lacked personal knowledge of the attested facts because they were not employed by Facebook when plaintiffs created their accounts, and that Mr. Freitas lacked personal knowledge about when Facebook added an arbitration clause to the Terms, whether Facebook collected users' keystrokes in February 2014, and whether a hyperlink from 2014 would actually have taken a user to the Terms. Opp'n at 8-9. These arguments fundamentally misunderstand the work the witnesses did. Both men are software engineers who were tasked with reviewing the source code for the relevant Instagram registration screens and confirming that the code reflected a substantially identical version of the screens attached to their declarations. *See* Freitas Decl. ¶¶ 1-2; Yoo Decl. ¶¶ 1-2; Yoo Supp. Decl. ¶¶ 1-2. The gaps in knowledge identified by plaintiffs have nothing to do with those witnesses' review and analysis of the source code—the accuracy of which is undisputed.

Plaintiffs even go so far as to complain that Mr. Freitas did not *draft* his declaration. Opp'n at 8. That is irrelevant, because he testified that he reviewed the declaration before "[he] signed it" to confirm that everything is "true and accurate." Freitas Dep. at 37:3-10. But plaintiffs' argument is also somewhat surprising: Ms. Whalen and S.M. both testified that they did not author their declarations either. *See* Whalen Dep. at 16:4-8; S.M. Dep. at 19:1-15.

**B.      Facebook Did Not Improperly Withhold Evidence From Plaintiffs.**

Plaintiffs argue that Facebook improperly withheld various pieces of evidence that they believe would have supported their claims. Opp'n at 1, 4-5, 7-9, 21. Critically, *none* of these arguments supplies a basis to deny Facebook's motion to compel arbitration. If plaintiffs were correct, the appropriate course would have been for them to file a motion to compel the discovery that Facebook supposedly withheld—which they did not do, and which would be untimely now. Plaintiffs' arguments are all groundless in any event.

First, plaintiffs assert that at Mr. Duffey's deposition, Facebook's counsel improperly foreclosed questioning about communications among Mr. Duffey and the Facebook engineers who helped him collect business records described in his declaration. Opp'n at 1, 5, 7. Facebook's counsel did no such thing. The cited portions of Mr. Duffey's deposition involved communications between Mr. Duffey and Messrs. *Freitas and Yoo* (Facebook's two other declarants). *See, e.g.*, Duffey Dep. at 33:17-34:5. The communications related to the collection of source code for *production* in this case, and they occurred in Mr. Duffey's capacity as an e-Discovery and Litigation Case Manager, not his capacity as a witness; they had nothing to with the facts set forth in his declaration. *See id.* These inquiries were properly foreclosed based on attorney-client and attorney work product privileges. *See Kintera, Inc. v. Convio, Inc.*, 219 F.R.D. 503, 515 (S.D. Cal. 2003). Mr. Duffey did testify about communications with the engineers who helped him collect business records related to the subject matter of his declaration. *See, e.g.*, Duffey Dep. at 31:21-32:25.

Second, plaintiffs claim that Facebook's counsel "refused to permit Mr. Duffey to answer . . . basic questions concerning the documents reviewed in preparing for his deposition." Opp'n at 5. That is misleading. Mr. Duffey was instructed not to identify the documents "provided to [him] by counsel" in preparation for his deposition; that information was protected as opinion work product. Duffey Dep. at 98:14-99:7; *see Stevens v. Corelogic, Inc.*, 2016 WL 397936, at *9 (S.D. Cal. Feb. 2, 2016) ("[T]he selection and compilation of documents by counsel in preparation for pretrial discovery falls within the highly-protected category of opinion work product." (quotation marks and alteration omitted)); *U.S. Ethernet Innovations LLC v. Acer Inc.*, 2013 WL 5370989, at

*3 (N.D. Cal. Sept. 25, 2013) (only "substantial need" can justify disclosure of documents culled by counsel (quotation marks omitted)). Facebook's counsel permitted plaintiffs' counsel to ask Mr. Duffey if those documents had refreshed his recollection, but they declined to do so. Duffey Dep. at 98:14-100:15. And Facebook's counsel also allowed Mr. Duffey to testify about any documents that formed the basis for his testimony. Indeed, Mr. Duffey testified about the "documents that ha[d] been produced since [his] declaration," his "e-mail notifications related to the 2018 and 2020 terms update," and the URLs in the Terms update emails, which he confirmed were connected to Instagram's Terms of Use (*id.* at 84:18-85:14, 92:13-93:25). Mr. Duffey testified that he did not review any other documents in preparation for his deposition. *Id.* at 99:2-11.[10]

Third, plaintiffs complain that Facebook withheld source code that includes ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Opp'n at 9. But they *never asked* for this data. Facebook produced the code responsive to plaintiffs' discovery request: "all source code that established the process for registering an Instagram account." Provance Supp. Decl. Ex. 12. Plaintiff did not request ancillary data, ▮▮▮▮▮▮▮▮▮▮▮▮▮, *about* the source code that was produced. And Messrs. Freitas and Yoo gave ample testimony describing how they identified the correct versions of the code that correlate to S.M.'s sign-up dates. Freitas Dep. at 43:2-44:3; Yoo Dep. at 35:16-37:17. Plaintiffs did not raise any purported deficiencies in Facebook's production, nor have they offered any legitimate basis to doubt that Facebook's witnesses used the right version of the code.

Fourth, plaintiffs argue that Facebook did not retain records of the specific emails sent to them about the 2013 or 2018 Terms updates or historic data indicating that they personally received the in-app notifications. Opp'n at 4, 21. But as Mr. Duffey explained, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *See* Duffey Dep. at 128:12-16, 129:21-130:1. Facebook had no duty to preserve this data until it "reasonably anticipate[d]" the initiation of this litigation. *Katzman v. Los Angeles Cty. Metro. Transp. Auth.*,

---

[10] Plaintiffs suggest that Mr. Duffey was prevented from testifying about the activity feed notification. Opp'n at 7. Not so. Mr. Duffey accurately testified about the origin and meaning of this document, and plaintiffs then stopped asking questions about it. Duffey Dep. at 187:13-189:7.

1  2015 WL 13861765, at *9 (N.D. Cal. Mar. 26, 2015).  And Facebook produced contemporaneous
2  business records corroborating the 2013 and 2018 notice procedures that Mr. Duffey described.
3  *See* pp. 3-4, 6-7 *supra*; *Pohlman v. NCR Corp.*, 2013 WL 3776965, at *5 (N.D. Ill. July 17, 2013)
4  (granting motion to compel arbitration because defendant provided "evidence of the email sent to
5  *all NCR employees* in 2002 outlining the changes to the ACT program and [plaintiff] continued his
6  employment for an additional ten years" (emphasis added)); *Murphy v. DIRECTV, Inc.*, 2011 WL
7  3319574, at *4 (C.D. Cal. Aug. 2, 2011) (relying on evidence that updated arbitration agreement
8  was mailed "to each of [defendant's] customers").

9  Finally, plaintiffs fault Mr. Freitas for using a rendered image of the 2014 registration screen
10  that S.M. would have seen when she registered her first account (as noted above, plaintiffs do not
11  mention the second registration).  Opp'n at 9.  They contend that Mr. Freitas' "reconstruction" of
12  the image from source code was improper.  *Id.*  This argument is meritless.  Mr. Freitas and Mr.
13  Yoo both testified about the process used to render S.M.'s registration screens:  First, they located
14  the relevant source code in the repository that was in place on the relevant dates of registration;
15  second, they used that source code to recreate an accurate image of the screens that S.M. necessarily
16  saw; and third, ███████████████████████████████████████████
17  ███████████████████████████████████████████
18  ███████████████████████████.  *See* Freitas Dep. at 28:15-29:20, 42:6-21; Yoo
19  Dep. at 38:15-42:4, 61:3-18, 94:9-95:17.  Because the "source of truth is the code itself" (Yoo Dep.
20  at 78:4-11), this process was entirely reliable.  *See In re Facebook Biometric Info. Privacy Litig.*,
21  185 F. Supp. 3d 1155, 1163-64 (N.D. Cal. 2016) (relying on Facebook witness' testimony
22  describing sign-up pages rendered from source code).

23  None of plaintiffs' arguments calls into question the overwhelming evidence that they
24  agreed to Instagram's arbitration clause.  There is no genuine dispute of fact.

## CONCLUSION

26  The Court should (1) compel plaintiffs to arbitrate their claims in accordance with their
27  arbitration agreement and (2) stay this action pending the outcome of any arbitration.

Dated: August 11, 2021

MAYER BROWN LLP

By: */s/ Lauren R. Goldman*
　　Lauren R. Goldman
　　Matthew D. Provance
　　Michael Rayfield

Archis A. Parasharami (321661)
(aparasharami@mayerbrown.com)
1999 K Street, N.W.
Washington, D.C. 20006
Telephone: (202) 263-3328

COOLEY LLP

Michael G. Rhodes
Whitty Somvichian
Lauren J. Pomeroy

Attorneys for Defendants FACEBOOK, INC.