Katrina Carroll (admitted *pro hac vice*)
**CARLSON LYNCH LLP**
111 West Washington Street, Suite 1240
Chicago, IL 60602
Tel.:   312-750-1265
kcarroll@carlsonlynch.com

[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]

*Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| KELLY WHALEN, individually and on behalf of all others similarly situated, and S.M., a minor, by and through her guardian, Tachah Wade, individually and on behalf of all others similarly situated,<br><br>                Plaintiffs,<br><br>       v.<br><br>FACEBOOK, INC.,<br><br>                Defendant. | Case No. 4:20-cv-06361-JST<br><br>**SUPPLEMENTAL OPPOSITION TO FACEBOOK'S MOTION TO COMPEL ARBITRATION AND STAY LITIGATION**<br><br>Date:     TBD<br>Time:    TBD<br>Judge:   Hon. Jon S. Tigar<br>Place:    Courtroom 6, 2nd Floor |

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ............................................................................................................................ 1

ARGUMENT .................................................................................................................................. 1

    A.    FACEBOOK MISREPRESENTS THE RECORD. ........................................................ 1

    B.    FACEBOOK FAILED TO ESTABLISH THAT PLAINTIFFS AGREED TO THE 2020 TERMS. .................................................................................................................. 4

        1.    Facebook failed to prove Plaintiffs read its email notifications. ......................... 5

        2.    Facebook failed to prove that Plaintiffs interacted with the in-app notifications. 5

    C.    FACEBOOK FAILED TO ESTABLISH THAT S.M. AGREED TO ARBITRATE WHEN REGISTERING HER ACCOUNT IN 2017. ..................................................... 8

        1.    Facebook failed to establish what registration screens S.M. actually viewed when registering her account in 2017. ................................................................ 8

        2.    Facebook failed to establish its notice of the Terms to S.M. ........................... 11

CONCLUSION ............................................................................................................................. 14

**TABLE OF AUTHORITIES**

**Page**

**Cases**

*Applebaum v. Lyft, Inc.*,
   263 F. Supp. 3d 454 (S.D.N.Y. 2017) ................................................................................ 12

*Be In, Inc. v. Google Inc.*,
   2013 WL 5568706. (N.D. Cal. Oct. 9, 2013) ....................................................................... 7

*Clark v. City of Los Angeles*,
   650 F.2d 1033 (9th Cir. 1981) .............................................................................................. 6

*Colgate v. JUUL Labs, Inc.*,
   402 F. Supp. 3d 728 (N.D. Cal. 2019) ........................................................................ 13, 14

*Cullinane v. Uber Techs., Inc.*,
   893 F.3d 53 (1st Cir. 2018) ................................................................................................ 12

*In re Juul Labs, Inc., Antitrust Litig.*,
   No. 20-CV-02345-WHO, 2021 WL 3675208 (N.D. Cal. Aug. 19, 2021) ......................... 7

*In re Zappos.com, Inc. Customer Data Sec. Breach Litig*,
   893 F. Supp. 2d 1058 (D. Nev. 2012) .................................................................................. 8

*Kilgore v. KeyBank Nat'l Ass'n*,
   718 F.3d 1052 (9th Cir. 2013) .............................................................................................. 5

*La Porte v. United States*,
   300 F.2d 878 (9th Cir. 1962) ................................................................................................ 6

*Meyer v. Uber Tech., Inc.*,
   868 F.3d 66 (2d Cir. 2017) ................................................................................................ 13

*Nguyen v. Barnes & Noble Inc.*,
   763 F.3d 1171 (9th Cir. 2014) .................................................................................... 4, 5, 7

*Peter v. DoorDash, Inc.*,
   445 F. Supp. 3d 580 (N.D. Cal. 2020) .......................................................................... 13, 14

*Snow v. Eventbrite, Inc.*,
   No. 3:20-cv03698, 2020 WL 6135990 (N.D. Cal. Oct. 19, 2020) ........................ 11, 12, 13

*Specht v. Netscape Commc'ns Corp.*),
   306 F.3d 17 (2d Cir. 2002) ...................................................................................... 5, 6, 8, 9

*Standard Oil Co. of California v. Moore,*
   251 F.2d 188 (9th Cir. 1957) ................................................................................................ 6

*Van Tassell v. United Mktg. Grp. LLC*,
   795 F.Supp.2d 770 (N.D. Ill. 2011) ..................................................................................... 7

**TABLE OF AUTHORITIES (cont.)**

**Page(s)**

**Cases (cont.)**

*Wilson v. Huuuge, Inc.*,
   944 F.3d 1212 (9th Cir. 2019) .................................................................................................. 4

**Rules**

Fed. R. Evid. 803(6) ........................................................................................................................ 6

Fed. R. Evid. 803(6)(A)-(C) ........................................................................................................ 6, 7

**INTRODUCTION**

The only points that truly matter on this Motion are the following: (1) there is no signed agreement to arbitrate between Facebook and Plaintiffs Whalen and S.M.; (2) in the absence of a signed agreement, Facebook is required to establish that Plaintiffs had constructive knowledge of the arbitration provision within its Terms of Use; (3) Facebook used a passive process that never resulted in Plaintiffs acknowledging its terms; and (4) Facebook has shown this Court no records or evidence that prove Plaintiffs ever agreed to arbitrate. Because of that, as discussed below, Facebook failed to satisfy its burden and its Motion (Dkt. 45) should be denied. Plaintiffs chose to file in court and cannot be compelled to arbitrate this matter against their will.

**ARGUMENT**

**A.    FACEBOOK MISREPRESENTS THE RECORD.**

Facebook's Reply (Dkt. 87) contains multiple misrepresentations of the record. Facebook contends it produced evidence that, on as many as nine separate occasions, Instagram provided notice of its Terms to Ms. Whalen and S.M. either via an email or in-app notification. Reply at 3. Here, Facebook attempts to conflate the provision of notices with the receipt and review of notices. There is a difference between providing a notice and actually receiving, reviewing, and interacting with a notice. Facebook has no evidence of Plaintiffs reviewing or interacting with any notices—with the exception of the aforementioned one-page ▬▬▬▬▬▬▬▬▬ that it created during and for purposes of this litigation and produced as supposed evidence of Plaintiffs' interactions with a 2020 notice.

Next, Facebook suggests that, at their depositions, Plaintiffs walked away from their declarations, contending only that they could not recall seeing the notifications Facebook sent to all users. Reply at 1. This is false. At her deposition, Plaintiff Whalen testified, "I would remember if I read, you know, something that may have stuck out for Instagram, but I don't remember anything." Dkt. 91-5 ("Whalen Dep.") 33:20-34:9. When asked whether she is certain she never reviewed them, she answered "yes" and when asked whether she has not reviewed terms during the whole time she has had an account, she again answered, "yes." *Id*. Similarly, S.M. was asked whether anything in her declaration was subsequently deemed inaccurate and she answered, "no." Dkt. 91-6 ("S.M. Dep.") 20:1-4. When asked whether she recalls seeing emails from Instagram, S.M. answered, "no." *Id*. at

51:23-52:1. And when asked whether she ever deleted or moved emails from Instagram, S.M. definitively answered, "no." *Id*. at 52:16-53:3. When S.M. was asked whether she recalls seeing a screen notification in 2018, she answered, "no." *Id.* at 42:17-20. She was subsequently asked whether it's possible she saw the 2018 notice, and she again answered, "no." *Id.* at 43:7-11. When asked whether she saw a screen notification in 2020, she answered, "no." *Id.* at 26:11-16. She was subsequently asked whether it is possible she saw the 2020 notice, and she again answered, "no." *Id*. at 26:17-22.

Facebook also misrepresented that Plaintiffs produced evidence showing that they either received or potentially deleted the notifications that they now claim to have forgotten about. Reply at 8. The reality is that Plaintiff Whalen searched her email account and there were no email notices from Facebook at all. At her deposition, Whalen testified that, during the relevant time period, her email account was never at or near capacity, and that she never deleted emails to reduce space. Whalen Dep. 56:15-20. S.M.'s email account was also searched and unopened and unread email notices from Facebook were found and produced to Facebook.

Facebook also skews the facts to suggest that Plaintiffs engaged in "numerous sessions when the full-screen notice was up and after the date on which continued use of Instagram would constitute acceptance of the 2018 Terms." Reply at 6. A more accurate factual recitation is that Plaintiffs used Instagram during the period of time that Facebook *intended* to provide full-screen notices to users. But, Facebook has submitted no evidence that the full-screen notices actually functioned as intended or ever appeared on screen when Plaintiffs were actively using Instagram. Whalen testified at deposition that she never saw a full-screen notice, notwithstanding Facebook's counsel then badgering her into saying that she could not remember. Whalen Dep. 42:8-18. Likewise, S.M. also testified that she never saw a full-screen notice. When asked whether she recalls seeing a screen notification in 2018, she definitively answered, "no." S.M. Dep. 42:17-20. S.M. was subsequently asked whether it is *possible* she saw the 2018 notice, and she again answered, "no." *Id.* at 43:7-11. When asked whether she saw a screen notification in 2020, S.M. answered, "no." *Id*. at 26:11-16. She was subsequently asked whether it is *possible* she saw the 2020 notice, and she reiterated, "no." *Id.* at 26:17-22.

Facebook also mispresented █████████████████████████████ ███████████ (Dkt. 87-14 ("Duffey Supp. Decl."), Ex. 5), █████████

2
SUPPLEMENTAL OPPOSITION TO MOTION TO COMPEL ARBITRATION AND STAY LITIGATION
Case No. 4:20-cv-06361-JST

1 ▮▮▮▮▮▮ Reply at 7. Significantly, there is a difference between sending and receiving emails.
2 ▮▮▮▮▮▮
3 ▮▮▮▮▮▮
4 ▮▮▮▮▮▮
5 ▮▮▮▮▮▮ Whalen Dep. 33:20-34:9. ▮▮▮▮▮▮
6 ▮▮▮▮▮▮
7 ▮▮▮▮▮▮ Rather, the contents of S.M.'s email account, which were
8 produced to Facebook, establish that she did *not* open or read any email notices from Facebook.

As discussed at length above, Facebook misrepresents that its ▮▮▮▮▮▮
10 ▮▮▮▮▮▮
11 Reply at 7. ▮▮▮▮▮▮
12 ▮▮▮▮▮▮
13 ▮▮▮▮▮▮
14 Dkt. 91-2 ("Duffey Dep.") 155:15-23.

Facebook tells this Court that Plaintiff Whalen testified that she did not remember "one way or the other" whether she received the email notice about the 2013 Terms update, that she did not remember receiving the email or in-app notices about the 2018 Terms update, and that she did not remember receiving either of the two notifications about the 2020 Terms update. Reply at 8.

That is simply false. Whalen actually testified, "I would remember if I read, you know, something that may have stuck out for Instagram, but I don't remember anything." Whalen Dep. 33:20-34:9. Further, when asked whether she is certain she never reviewed them, Whalen answered "yes," and when asked whether she has not reviewed terms during the whole time she has had an account, she again answered, "yes." *Id*.

In connection with Plaintiff Whalen's testimony, Facebook takes her statement that she deletes about 60 percent of the emails she receives out context to suggest that she, therefore, deleted the notification emails from Instagram. Reply at 8. In fact, during her deposition, Whalen testified that, during the relevant time period, her email account was never at or near capacity, and that she has never deleted emails to reduce space. Whalen Dep. 56:15-20.

Facebook also suggests that, by producing unopened and unread emails received from Facebook in 2017, 2018, and 2020, S.M.'s declaration that she did not see notices of updated Terms is demonstrably false. Reply at 9. This is also demonstrably false. S.M. stated in her declaration that she did not open or review any notice emails. This remains true given that receipt of notices is not the same as reviewing or interacting with them. In fact, the emails produced by S.M. contained a watermark on each page created by plaintiffs' counsel stating that they were "Produced from Archived Unread." Facebook contends that this is an improper factual characterization and alteration of plaintiffs' records. Reply at 9, n9. It was clearly necessary to watermark the emails as "unread" so that there was no misunderstanding or misrepresentation about whether S.M. opened or reviewed these emails. If Plaintiffs had not done so, Facebook would likely have cited the emails as evidence that she opened, reviewed, and agreed to the contents. Further, S.M. testified, consistent with the watermark, that she did not open or review any notice emails. S.M. Dep. 42:17-20. She also testified that she never saw a full-screen notice. *Id*. When asked whether she recalls seeing a screen notification in 2018, S.M. answered, "no." *Id*. She was subsequently asked whether it is possible that she saw the 2018 notice, and she again answered, "no." *Id*. at 43:7-11. When asked whether she saw a screen notification in 2020, she answered, "no." *Id.* at 26:11-16. She was subsequently asked whether it is *possible* she saw the 2020 notice, and she consistently answered, "no." *Id*. at 26:17-22.

In sum, these misrepresentations are a feeble attempt by Facebook to prove what it ultimately cannot: that Plaintiffs had constructive notice of the agreement to arbitrate. *See Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014) (holding browsewrap agreement unenforceable where defendant's disclosures failed to provide constructive notice of its website's terms and conditions); *Wilson v. Huuuge, Inc.*, 944 F.3d 1212 (9th Cir. 2019) (declining to enforce arbitration clause where users were not required to view the terms prior to downloading or using the app). The Court should not give credence to Facebook's misrepresentations.

**B.  FACEBOOK FAILED TO ESTABLISH THAT PLAINTIFFS AGREED TO THE 2020 TERMS.**

Plaintiffs' alleged continued use of Instagram is insufficient to establish their agreement to arbitration for three primary reasons: (i) Facebook failed to show that Plaintiffs received, read, or

otherwise interacted with emails conveying the 2020 Terms of Use; (ii) Facebook failed to produce any admissible evidence regarding Plaintiffs' interaction with its in-app notifications regarding the Terms; and (iii) even if Facebook had established that Plaintiffs saw or otherwise interacted with the in-app notification, the notification itself is a "browsewrap," which is not enough to provide notice of the Terms to Plaintiffs.

### 1. Facebook failed to prove Plaintiffs read its email notifications.

Facebook failed to present *any* competent evidence that Plaintiffs read its email notifications. Instead, Facebook relies on business records suggesting that an automated email was sent to Plaintiffs bearing the subject line "We've updated our Terms of Use." Duffey Supp. Decl., Ex. 5,6. Presumably, Facebook has the capability to track whether a user has seen or interacted with its emails, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id*. This corroborates Ms. Whalen's testimony that she does not recall ever seeing the emails. (Whalen Dep. 56:18-20; 72:19-73:7; 74:22-75:7.) It is also consistent with the emails S.M. produced to Facebook, which remain unopened and unread.

Facebook ignores its burden of proving the existence of a valid agreement to arbitrate. *See Kilgore v. KeyBank Nat'l Ass'n*, 718 F.3d 1052, 1058 (9th Cir. 2013) (holding that, before compelling arbitration, a court must find a valid agreement to arbitrate both exists and encompasses the dispute at issue). Without sufficient indicia of assent by any of the parties, there can be no such agreement. *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014) (quoting *Specht v. Netscape Commc'ns Corp.*), 306 F.3d 17, 29 (2d Cir. 2002) (applying California law)). Plaintiffs' failure to recall receiving the notification is supported by Facebook's own business records. Dkt. 87-1 ("Provance Supp. Decl."), Ex. 5, 6. Plaintiffs need not "unequivocally deny" an agreement when Facebook has failed to establish that any such agreement exists.

### 2. Facebook failed to prove that Plaintiffs interacted with the in-app notifications.

Facebook also failed to establish that Plaintiffs interacted with its in-app notifications. Facebook's supposed evidence of this interaction is limited to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Provance Supp. Decl., Ex. 5. However, the ▮▮▮▮▮▮▮▮

1  ▉▉▉▉ is inadmissible hearsay that cannot be considered here. Facebook's witness, Michael
2  Duffey, does not have any personal knowledge of the facts contained therein, and Facebook fails to
3  establish that the ▉▉▉▉▉▉▉ is a business record that would qualify as an exception to
4  the hearsay rule.

5  Mr. Duffey's testimony regarding Plaintiffs' supposed interactions with the in-app notifications
6  is based exclusively on information he learned secondhand from Facebook engineers and data
7  scientists. Duffey Dep. 20:23-21:2; 134:2-135:10; 31:21-25. Mr. Duffey did not create the ▉▉▉▉
8  ▉▉▉▉, nor is he aware of how he came to receive the document. *Id*. at 155:22-156:5; 160:16-22.
9  ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
10 ▉▉▉▉▉▉▉▉. *Id*. at 159:15-160:11.

11 More importantly, the ▉▉▉▉▉▉▉ was *not* generated in the normal course of
12 business, and thus does not qualify under the business record exception against hearsay, which under
13 Rule 803(6) of the Federal Rules of Evidence applies only if the custodian of the records, or some other
14 "qualified witness," offers a declaration attesting that "the record was made at or near the time by--or
15 from information transmitted by--someone with knowledge; ... the record was kept in the course of a
16 regularly conducted activity of a business, organization, occupation, or calling, whether or not for
17 profit; [and] making the record was a regular practice of that activity." Fed. R. Evid. 803(6)(A)-(C).
18 For a record to be considered as having been made in the regular course of business, it must be "made
19 pursuant to established company procedures for the systematic or routine and timely making and
20 preserving of company records," *Standard Oil Co. of California v. Moore*, 251 F.2d 188, 215 (9th Cir.
21 1957), cert. denied, 356 U.S. 975, 78 S.Ct. 1139, 2 L.Ed.2d 1148 (1958), and relied upon by the
22 business in the performance of its functions. *La Porte v. United States*, 300 F.2d 878, 880 (9th Cir.
23 1962). The basis for the business record exception is that accuracy is assured because the maker of the
24 record relies on the record in the ordinary course of business activities. *Clark v. City of Los Angeles*,
25 650 F.2d 1033, 1037 (9th Cir. 1981) (holding that diary kept for purposes of litigation was not
26 admissible as a business record).

27 Despite the fact that Facebook's data scientists reviewed and compiled the data contained
28 within the ▉▉▉▉▉▉▉, Facebook has not submitted any supporting declarations from

1  those individuals or any other qualified witness; nor has Mr. Duffey attested to the facts required under
2  Fed. R. Evid. 803(6)(A)-(C) to establish the business record exception to hearsay. Facebook has simply
3  failed to show that its proffered evidence is admissible.

4  Aside from the inadmissible ███████████████, Facebook has no evidence that Plaintiffs
5  were ever even exposed to the in-app notification. Facebook failed to produce the actual notices it
6  purports that Plaintiffs saw because Facebook does not have any actual copies of these notifications.
7  Duffey Dep. 188:1-19. Even if it had produced the notifications, Facebook fails to disclose the fact that
8  such notifications never appeared on the home screen, but rather on the "activity feed," a secondary
9  screen that a user would need to navigate to after opening the app. Dkt. 45-1 (Duffey Decl.), ¶ 15.
10 Moreover, Plaintiffs specifically testified that they do not recall ever being exposed to these
11 notifications. S.M. Dep. 26:11-22; Whalen Dep. 42:8-44:6; 75:14-76:12.

12  However, even if the Court were to consider Facebook's inadmissible evidence, Facebook has
13 still failed to demonstrate that such notification is *anything more than a mere browsewrap*. *Nguyen*,
14 at 1176 (finding that enforceability of a browsewrap agreement, which does not require users to take any
15 affirmative action, depends on whether the user has actual or constructive knowledge of the websites
16 terms and conditions); *In re Juul Labs, Inc., Antitrust Litig.*, No. 20-CV-02345-WHO, 2021 WL
17 3675208, at *7 (N.D. Cal. Aug. 19, 2021) (recognizing that a defining feature of browsewrap agreements
18 is that the user can continue to use the website without even knowing such agreement it exists).

19  The in-app Instagram notification fails to provide users with notice of the Terms of Use.
20 Whether a user has inquiry notice of a browsewrap agreement depends on the design and content of
21 the website and the agreement's webpage. *See Be In, Inc. v. Google Inc.*, 2013 WL 5568706, at *6.
22 (N.D. Cal. Oct. 9, 2013). The Instagram notification states, "We've Made Our Terms of Use Clearer,"
23 however, there is no reference to the arbitration agreement; rather, users viewing the notification could
24 choose one of two options upon encountering it: to click a link labeled "Learn More," which would
25 then direct users to a copy of the 2020 Terms of Use, or to dismiss the notification altogether. (Mot.
26 at 12.) The notification indicates that continued use of the app indicates assent to the Terms, but does
27 not require users to make any affirmative action, and thus fails to provide users with actual or
28 constructive knowledge of the Terms of Use. *See Van Tassell v. United Mktg. Grp. LLC*, 795 F.Supp.2d

770, 792–93 (N.D. Ill. 2011) (refusing to enforce arbitration clause in browsewrap agreement that was only noticeable after a "multi-step process" of clicking through non-obvious links); *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 23(2d Cir. 2002) (applying California law)(refusing to enforce terms of use that "would have become visible to plaintiffs only if they had scrolled down to the next screen"); *In re Zappos.com, Inc. Customer Data Sec. Breach Litig*, 893 F. Supp. 2d 1058, 1064 (D. Nev. 2012) ("The Terms of Use is inconspicuous, buried in the middle to bottom of every Zappos.com webpage among many other links, and the website never directs a user to the Terms of Use."). Even if the Court were to consider Facebook's inadmissible hearsay evidence and accept as true that Plaintiffs viewed and dismissed its in-app notifications, Facebook still failed to show that interacting with the notification provided any actual notice of Terms of Use and the arbitration agreement contained therein.

**C.  FACEBOOK FAILED TO ESTABLISH THAT S.M. AGREED TO ARBITRATE WHEN REGISTERING HER ACCOUNT IN 2017.**

Facebook failed to establish that S.M. agreed to arbitrate when registering her account on December 25, 2017, just as it failed to establish her agreement to arbitrate when registering in 2014. Facebook also failed to introduce a witness with personal knowledge of what the registration screen seen by Plaintiff S.M. *actually* looked like, relying instead on an unreliable re-creation of only one of the several registrations screens that S.M. *may* have seen when registering in 2017. Regardless, even if this reconstructed approximation of a portion of the registration process was proper evidence and appropriately before this Court, the proffered screen image fails to indicate that users were provided constructive or inquiry notice of the Terms.

**1.  *Facebook failed to establish what registration screens S.M. actually viewed when registering her account in 2017.***

Facebook failed to proffer a witness with personal knowledge of what S.M. actually saw when she registered her account on December 25, 2017. Instead, Facebook relies on Gene Yoo, a senior software engineer at Facebook, to introduce statements regarding what minor Plaintiff S.M. *could* have seen when she created her account. *See* Dkt. 87-21 ("Yoo Supp. Decl."); Dkt. 91-3 ("Yoo Dep."). Continuing its practice of ambushing Plaintiffs, Facebook produced Mr. Yoo's eleventh-hour supplemental declaration on June 16, 2021, *the evening before his deposition*, despite Mr. Yoo

testifying that he was asked to reconstruct the 2017 rendering "a couple months ago," and despite being first provided with his attorney-drafted declaration "a couple weeks ago." Yoo Dep. 89:25-90:3; 118:2-10. Rather than include argument concerning the 2017 registration in its opening Motion or amending its opening Motion, Facebook included these arguments for the first time in its Reply brief.[1]

Mr. Yoo was not employed by Facebook when Plaintiff S.M. created her account on December 25, 2017. *Id*. at 16:20-22. Like Mr. Freitas, Mr. Yoo has no personal knowledge regarding the majority of his supplemental declaration. He did not author his own supplemental declaration and could not answer basic questions about it, including who wrote it or why. *Id*. at 89:12-89:23; 90:10-18.[2] Nor does Mr. Yoo understand what arbitration is or have any personal knowledge about when Facebook first added an arbitration provision to its Terms, or whether that provision was included in the Terms in 2017. *Id*. at 25:23-26:23; 29:2-30:7. He does not have any personal knowledge about whether S.M. ever saw, clicked on, or read the Terms in December 2017. *Id*. at 120:14-121:10. Although various tests were purportedly in place to identify links that do not work, Mr. Yoo cannot say with certainty that the purported hyperlink, if clicked on December 25, 2017, would have actually enabled S.M. to review the Terms. *Id*. at 103:10-23.

Even more concerning, however, is that the image attached to Mr. Yoo's Supplemental Declaration is a *rendered* image of the account registration screen as it purportedly appeared in 2017, as supposedly *reconstructed* from Facebook's source code, rather than a screenshot or image from Facebook's archives showing what a new Instagram user *actually* saw during the account registration process in 2017 *See* Dkt. 87-21 at Ex. 1. Although Mr. Yoo checked timestamps, screenshots, and design mocks to confirm his previously submitted renderings of the Apple registration screens from 2014 (Yoo Dep. 34:15-35:21; 41:1-7; 41:23-42:4), he decided *not* to compare any timestamps, screenshots, or design mocks of the 2017 registration screen to the screen he reconstructed, despite having confirmed that they do exist and searching for them. *Id*. at 93:6-94:7. Mr. Yoo failed to confirm

---

[1] Accordingly, Plaintiffs' opposition (Dkt. 91) focused on the testimony of Daniel Freitas, whose testimony concerned S.M.'s registration process in 2014 on her Android device.

[2] As was the case with Plaintiffs' same questions to Mr. Freitas, Facebook improperly instructed Mr. Yoo not to answer this line of questioning on the basis of attorney-client and work product privilege. *Id*.

1  the accuracy of his rendered 2017 image because he was "*slightly* more confident that the rendering
2  would match the design rendering." *Id*. at 93:23-94:7 (emphasis added). Moreover, Facebook did not
3  attach these timestamps, screenshots, and design mocks to Mr. Yoo's supplemental declaration or
4  otherwise produce them, prejudicing Plaintiffs' and the Court's ability to assess the accuracy of the
5  declarant's statements and the rendered image.

6  As did Mr. Freitas, Mr. Yoo also testified that he supposedly knew which portions of the source
7  code would have been operative in December 2017 by consulting the time-stamped *internal* source
8  code in Facebook's source code repository tool, which he reviewed and on which his renderings are
9  based. *Id*. at 95:9-17. *Critically, Facebook withheld this source code from production*. Instead,
10 Facebook provided ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
11 ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬. *Id*. at 97:14-98:15.

12 Moreover, Mr. Yoo's Supplemental Declaration does not even purport to establish the
13 registration screen that S.M. saw. Instead, it avers only that the "[t]he size, font, and positioning of the
14 text depicted in Exhibit 1 is substantially identical to what an iOS user would have seen on
15 December 25, 2017," (Yoo Supp. Decl., ¶ 3). Mr. Yoo specifically qualifies that "[t]he size and color
16 of the text used for this statement, *relative to other text that appeared on the screen*, is accurately
17 depicted in Exhibit 1." *Id*., ¶ 3(b) (emphasis added). As Mr. Yoo explained at his deposition with
18 respect to his 2014 rendered image (for which his original declaration contains the same qualification
19 (Dkt. 45-2, ¶ 3(b)), it is possible that his rendering is not what S.M. actually saw when registering her
20 device. The size of the text can vary based on certain factors, like the type of device the user is using
21 during the registration process or the size of their device. Yoo Dep. 51:1-11; 76:1-77:7. ▬▬▬▬▬
22 ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
23 ▬▬▬ *Id*. at 70:8-13. Likewise, the colors on the screen that S.M. actually saw can vary depending
24 on S.M.'s system-level device settings of which Mr. Yoo has no knowledge. Yoo Dep. 64:25-66:1.

25 Mr. Yoo's reconstructed screen from S.M.'s purported 2017 registration process suffers from
26 an additional fatal defect— it only purports to show an excerpt of S.M.'s registration process. Mr. Yoo
27 explains that several registration screens preceded the screen he reconstructed and that several screens
28 followed. *Id*., 116:11-118:1. "But then […] what's different about this screen is that there would be

more than one screen for the fields. There would be dedicated screens for the fields, each with a button to proceed or go back." *Id*, 116:16-25. "Eventually after entering the contact point with the password, then the user would eventually see a screen that suggests a username," which is the screen attached to Mr. Yoo's Supplemental Declaration. *Id.*, 117:1-10.

But that reconstructed image, containing what is purportedly the hyperlinked Terms at the bottom of the page, was *not* the last page that S.M. would have viewed. Although the Terms state that "By signing up, you agree to our Terms & Privacy Policy," the blue button to proceed only states "Next." Yoo Supp. Decl., at Ex. 1. Mr. Yoo confirmed that "after the page, there would be several screens, but they would not necessarily be registration screens. They would be different types of screens." Yoo. Dep. 117:23-118:1. By failing to include these prior and successive screens in the record, Facebook has materially prejudiced Plaintiffs' and the Court's ability to understand what S.M. saw in connection with her 2017 registration and impaired the evaluation of whether and when during the registration process she was purportedly presented with the Terms.

## 2.   *Facebook failed to establish its notice of the Terms to S.M.*

Facebook's newly raised argument—that S.M., when she was fourteen years old, agreed to the Terms when registering her account on December 25, 2017, via a sign-in wrap agreement— also fails. S.M. did not agree to the Terms when registering in 2017 for the same reasons she did not agree during her 2014 registration. First, Facebook failed to offer competent evidence of the registration screen as it existed when S.M. opened her account in 2017. Even if it had, the proffered registration screen cherrypicked from the middle of the registration flow still did not provide S.M. or any other user with inquiry notice of the Terms. *See Snow v. Eventbrite, Inc.*, No. 3:20-cv03698, 2020 WL 6135990, *4 (N.D. Cal. Oct. 19, 2020).

As was the case in its opening brief, Facebook has *still* failed to identify any case law finding a valid sign-in wrap agreement absent the defendant providing screenshots of pages the plaintiff actually saw. Instead of producing any real screenshots showing the registration screens actually presented to S.M. when she registered her account, Facebook proffers an image that one of its software engineers rendered for purposes of this litigation without personal knowledge of what that screen actually looked like. Mr. Yoo's Declaration confirms that the image he rendered depicts only one of the multiple

1  screens S.M. saw, and that the color, size, and distance between the purported hyperlink and "Next"
2  button in his reconstructed screen may have differed from what S.M. actually saw. *See Snow*, 2020 WL
3  6135990, at *5-7 (denying motion to compel arbitration when defendant could not produce images of
4  the webpages actually presented to plaintiff).
5  　　　　Worse yet, Facebook has not bothered to produce any of the other screens in the registration
6  flow appearing before or after Mr. Yoo's reconstructed screen. Facebook's mistake is fatal to its Motion
7  because the reconstructed image states "By signing up, you agree to our Terms & Privacy Policy."
8  However, the page contains no "sign up" button. Instead, the only button is "Next," the clicking of
9  which was insufficient to manifest S.M.'s assent. By Facebook's own language, a reasonable user could
10 have seen the purportedly hyperlinked Terms and clicked "Next" without manifesting any intent to
11 agree, because a user would have no idea whether "Next" would pull up another intermediary page or
12 complete the registration process. Moreover, because Facebook presented users with additional pages
13 after tapping "Next," the sign-up process would not have concluded until after multiple other screens
14 were presented. As such, not only was the purported Terms hyperlink inconspicuously located on the
15 opposite side of the page as the "Next" button, but it did not even appear *on the same screen* finalizing
16 the sign-up process (whichever that last page ultimately may have been).
17 　　　　In any event, even if Facebook did establish that the image Mr. Yoo rendered depicted the
18 registration screen actually presented to S.M., that screen is insufficient to put her on notice because
19 the message as a whole is inconspicuous. For instance, the purportedly hyperlinked Terms do not
20 appear to be hyperlinked at all—they are not blue and are not underlined, the hallmarks of a hyperlink.
21 Moreover, this language is the smallest text on the page, appearing in a faded gray font, and
22 inconspicuously located at the very bottom of the page. This contrasts with the large, black and blue
23 text prominently presented at the top of the screen, and the bright, blue "Next Button," located far
24 above the hidden hyperlink. *See Cullinane v. Uber Techs., Inc.*, 893 F.3d 53, 62-63 (1st Cir. 2018)
25 (gray rectangular box with the language "Terms of Service & Privacy Policy" displayed in larger font,
26 in bold, contrasting in color, and highlighted by the box around it was not reasonably conspicuous);
27 *Applebaum v. Lyft, Inc.*, 263 F. Supp. 3d 454, 466-67 (S.D.N.Y. 2017) (hyperlink in smallest font on
28 the screen but colored in light blue on a white background insufficient to provide notice).

| | |
|---|---|
| 1 | Like in *Snow*, the inconspicuous text, combined with the large, colorful button, contrasts starkly, leading many users to click the large, vibrant button while never knowing that the low-contrast disclaimer subjects them to the Terms. *See Snow*, 2020 WL 6135990, at *9. And as set forth above, Facebook failed to put users on notice that clicking the "Next" button would manifest agreement to arbitration, because Facebook states an agreement is made by "signing up," not proceeding to the next screen. |
| 7 | This Motion should be denied based on the authority that Facebook itself cited. In its Reply, Facebook cites *Rodriguez v. Instagram, LLC*, No. 13-53287, at 2, 5 (Cal. Super. Ct. Feb. 28, 2014) (Dkt. 45-4), which has nothing to do with sign-in wrap agreements, arbitration, the 2017 registration flow, or the prominence of the Terms. In *Rodriguez*, the plaintiff conceded that she was alerted to the terms of use and opted out of the arbitration provision. *Id*. at 2. In *Meyer v. Uber Tech., Inc.*, 868 F.3d 66, 71, 78 (2d Cir. 2017), the court found conspicuous notice when the text sat immediately below the "Register" button and the hyperlinks were blue and underlined. Likewise, in *Peter v. DoorDash, Inc.*, 445 F. Supp. 3d 580, 586-87 (N.D. Cal. 2020), this Court found hyperlinked terms conspicuous when the hyperlink appeared in blue text, appeared immediately below the "Sign Up" button, and stated "By tapping Sign up, Continue with Facebook or Continue with Google, you agree to our [Terms]." *See Peter* Dkt. 17-1, at 14. |
| 18 | Here, Facebook's purported hyperlinks are most analogous to the inconspicuous hyperlinks discussed in *Colgate v. JUUL Labs, Inc.*, 402 F. Supp. 3d 728,764-66 (N.D. Cal. 2019). In *Colgate*, the court found that a set of hyperlinks appearing in black text without underline were inconspicuous. *Id*. at 764-65. Moreover, the court found another set of hyperlinks—this time appearing in blue text— was still inconspicuous because a "hyperlink to the password recovery page was bolded, underlined, and appears to be in a larger font size than the hyperlink at issue." *Id*. at 766. The court reasoned that a reasonable user would scan the page, first see the "Forgot Password?" hyperlink, and "would observe that it is a different color, underlined, and of a particular fond size." *Id*. "That user would not then see the [terms hyperlinks] and conclude that they were clickable," because "they are not underlined, they are the same size as the sentence they are in, and the color is different from the initial hyperlink they would see." *Id*. |

13
SUPPLEMENTAL OPPOSITION TO MOTION TO COMPEL ARBITRATION AND STAY LITIGATION
Case No. 4:20-cv-06361-JST

Here, Facebook's inconspicuous, purported hyperlinks appear in gray text at the very bottom of the page and are not underlined. Like in *Colgate*, the registration page contains not one, *but two* more visible and differently formatted hyperlinks to confuse a reasonable viewer. A reasonable viewer would scan the page and first see the large, blue text hyperlink to "Change Username" displayed in the middle of the page, and then see the large, blue text hyperlink to "Sign In" at the bottom of the page. A reasonable user would not see the faded gray reference to Terms between these two other bold hyperlinks and, by comparison, would infer that the terms were *not* hyperlinked because Facebook formatted it differently and less conspicuously than all other hyperlinks on the page. For these reasons, Facebook's purported hyperlinks are like those in *Colgate* and different from those in *Peter*. For these reasons, Facebook's Motion should be denied.

## CONCLUSION

Facebook failed to carry its burden of showing a valid agreement to arbitrate. Accordingly, the Court should deny Defendant's Motion in its entirety.

Dated: October 1, 2021

**CARLSON LYNCH LLP**

*/s/ Katrina Carroll*
Katrina Carroll (*pro hac vice*)
Nicholas R. Lange (*pro hac vice*)
111 West Washington Street, Suite 1240
Chicago, IL 60602
Tel.:   312-750-1265
kcarroll@carlsonlynch.com
nlange@carlsonlynch.com

Todd D. Carpenter (SBN 234464)
**CARLSON LYNCH LLP**
1350 Columbia St., Ste. 603
San Diego, CA 92101
Tel.:   619-762-1900
Fax:   619-756-6991
tcarpenter@carlsonlynch.com

Matthew E. Lee
Erin J. Ruben
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN PLLC**
900 W. Morgan Street
Raleigh, North Carolina 27603
Tel.:   919-600-5000
Fax:   919-600-5035
mlee@milberg.com
eruben@milberg.com

Jonathan B. Cohen
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN PLLC**
800 S. Gay Street, Suite 1100
Knoxville, TN 37929
Tel.:   865-247-0080
jcohen@milberg.com

*Counsel for Plaintiffs*