MAYER BROWN LLP
LAUREN R. GOLDMAN (*pro hac vice*)
(lrgoldman@mayerbrown.com)
MICHAEL RAYFIELD (*pro hac vice*)
(mrayfield@mayerbrown.com)
1221 Avenue of the Americas
New York, NY 10016
Telephone:  (212) 506-2500

MAYER BROWN LLP
MATTHEW D. PROVANCE (*pro hac vice*)
(mprovance@mayerbrown.com)
71 S. Wacker Drive
Chicago, IL 60606
Telephone: (312) 701-8598

COOLEY LLP
MICHAEL G. RHODES (116127)
(rhodesmg@cooley.com)
WHITTY SOMVICHIAN (194463)
(wsomvichian@cooley.com)
LAUREN J. POMEROY (291604)
(lpomeroy@cooley.com)
101 California Street, 5th Floor
San Francisco, CA 94111-5800
Telephone:  (415) 693-2000

*Attorneys for Defendant Facebook, Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| KELLY WHALEN and S.M., a minor, by and through her guardian, Tachah Wade, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>FACEBOOK, INC.,<br><br>Defendant. | Case No. 4:20-cv-06361-JST<br><br>**FACEBOOK'S SUPPLEMENTAL REPLY IN SUPPORT OF ITS MOTION TO COMPEL ARBITRATION AND STAY LITIGATION**<br><br>Date: To Be Determined<br>Time: To Be Determined<br>Location: Courtroom 6, 2nd Floor<br>Judge: Hon. Jon S. Tigar<br>Trial Date: None<br>Complaint Filed: January 26, 2021 |

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................... 1

ARGUMENT ................................................................................................................................. 2

I.    There Is No Genuine Dispute That Plaintiffs Agreed To Arbitrate Their Claims ............. 2

    A.    Plaintiffs Assented To The 2013 Terms.......................................................... 2

    B.    Plaintiffs Assented To The 2018 Terms.......................................................... 5

    C.    Plaintiffs Assented To The 2020 Terms.......................................................... 6

        1.    Any Failure By Plaintiffs To Read The 2020 Terms Update Emails Does Not Negate The Sufficiency Of Facebook's Notice ......................... 6

        2.    The 2020 Terms Are Not An Unenforceable Browsewrap Agreement ..................................................................................................... 7

II.    Plaintiffs Have Not Even "Unequivocally" Denied That They Received The Notifications—The Bare Minimum Required To Rebut Facebook's Showing .................. 9

III.    Plaintiffs' Procedural Challenges To Facebook's Evidence Are Meritless ..................... 10

    A.    Facebook Established The Appearance Of Instagram's 2017 Sign-Up Screens ......................................................................................................... 10

    B.    Facebook's Structured Data Table Is A Business Record ................................. 13

CONCLUSION ............................................................................................................................ 15

# TABLE OF AUTHORITIES

**Cases**

*Aniel v. GMAC Mortg., LLC*,
2012 WL 5373388 (N.D. Cal. Oct. 30, 2012) ............................................................................ 11

*Aquino v. Toyota Motor Sales USA, Inc.*,
2016 WL 3055897 (N.D. Cal. May 31, 2016) .............................................................................. 6

*Be In, Inc. v. Google Inc.*,
2013 WL 5568706 (N.D. Cal. Oct. 9, 2013) ................................................................................. 8

*Blau v. AT&T Mobility*,
2012 WL 10546 (N.D. Cal. Jan. 3, 2012) ................................................................................. 1, 9

*Colgate v. JUUL Labs, Inc.*,
402 F. Supp. 3d 728 (N.D. Cal. 2019) .......................................................................................... 4

*Derderian v. S.W. & Pac. Specialty Fin., Inc.*,
673 F. App'x 736 (9th Cir. 2016) ............................................................................................... 11

*Dohrmann v. Intuit, Inc.*,
823 F. App'x 482 (9th Cir. 2020) ................................................................................................. 4

*In re Facebook Biometric Info. Privacy Litig.*,
185 F. Supp. 3d 1155 (N.D. Cal. 2016) ........................................................................... 5, 7, 8, 12

*In re Juul Labs, Inc., Antitrust Litig.*,
2021 WL 3675208 (N.D. Cal. Aug. 19, 2021) ............................................................................. 8

*Kliff v. Hewlett Packard Co.*,
318 F. App'x 472 (9th Cir. 2008) ................................................................................................. 6

*Lee v. Ticketmaster LLC*,
817 F. App'x 393 (9th Cir. 2020) ............................................................................................. 6, 7

*Meyer v. Uber Techs. Inc.*,
868 F.3d 66 (2d Cir. 2017) .......................................................................................................... 10

*Nguyen v. Barnes & Noble, Inc.*,
763 F.3d 1171 (9th Cir. 2014) ........................................................................................... 1, 6, 7, 8

*Peter v. DoorDash, Inc.*,
445 F. Supp. 3d 580 (N.D. Cal. 2020) .................................................................................. 3, 4, 5

*Specht v. Netscape Commc'ns Corp.*,
306 F.3d 17 (2d Cir. 2002) ............................................................................................................ 8

*U-Haul Int'l, Inc. v. Lumbermens Mut. Cas. Co.*,
    576 F.3d 1040 (9th Cir. 2009) ........................................................................................... 14, 15

*Van Tassell v. United Mktg. Grp. LLC*,
    795 F. Supp. 2d 770 (N.D. Ill. 2011) ............................................................................................ 8

*In re Zappos.com, Inc. Customer Data Sec. Breach Litig*,
    893 F. Supp. 2d 1058 (D. Nev. 2012) .......................................................................................... 8

**Other Authorities**

Fed. R. Evid. 803(6) ............................................................................................................................ 14

**INTRODUCTION**

In response to the Court's invitation to file a supplemental brief responding to the new evidence presented in Facebook's reply (Dkt. 92), plaintiffs filed a second opposition that almost entirely recycles their meritless arguments from the first. During discovery, Facebook produced evidence showing that Ms. Whalen and S.M. were provided notice of Instagram's Terms on as many as *nine* separate occasions. To avoid arbitration, plaintiffs had to show that *none* of these notifications was sufficient to place them on inquiry notice of Instagram's Terms and its arbitration clause. They have not come close—and in fact, they have not tried.

Rather than attempting to demonstrate systematically that each of the notifications they received was insufficient to bind them to Instagram's Terms, plaintiffs repeat their arguments as to *some* of Instagram's Terms update notifications. Their brief contains a section about the 2020 Terms (Part B); a section about the S.M.'s 2017 registration (Part C); and a section titled "Facebook misrepresents the record" with a series of disconnected potshots at Facebook's briefs (Part A). Plaintiffs repeat, for example, their argument that Facebook's registration screens were insufficient to put S.M. on notice of Instagram's Terms, even though S.M. was required on *two separate occasions* to assent to the Terms by affirmatively clicking a button. They argue that because they allegedly did not *review* Instagram's Terms, they cannot be *bound* by them, even though the Ninth Circuit has squarely held that the "failure to read a contract before agreeing to its terms does not relieve a party of its obligations under the contract." *Nguyen v. Barnes & Noble, Inc.*, 763 F.3d 1171, 1179 (9th Cir. 2014). And they argue that Facebook somehow "misrepresented" plaintiffs' testimony that they did not recall receiving the notifications, even though our brief simply *quoted* from their depositions.

Plaintiffs cannot assert the "unequivocal denials" necessary to raise a genuine dispute of fact. *Blau v. AT&T Mobility,* 2012 WL 10546, at *4 (N.D. Cal. Jan. 3, 2012). They therefore fall back on the same misguided procedural arguments they have asserted before. Plaintiffs contend again that Facebook's declarants lack personal knowledge and cannot properly authenticate Facebook's business records. But the evidence shows that Facebook's witnesses reviewed records

1

that were created and maintained in the ordinary course of Facebook's business and testified based on their contents. Under controlling precedent, no more is required to show personal knowledge or to authenticate a business record. Plaintiffs also fault Facebook's software engineers for producing *rendered* images of S.M.'s registration screens. But the evidence shows that Facebook's engineers, Messrs. Yoo and Freitas, carefully analyzed Facebook's source code—the "source of truth" for determining what S.M. actually saw when she registered her Instagram accounts—and confirmed that the code reflected a substantially identical version of the screens attached to their declarations. The process was entirely reliable.

Plaintiffs have failed to raise a genuine dispute about their agreement to arbitrate. The Court should grant Facebook's motion to compel arbitration and stay this litigation.

## ARGUMENT

### I. There Is No Genuine Dispute That Plaintiffs Agreed To Arbitrate Their Claims.

Facebook's motion to compel arbitration demonstrated that plaintiffs received notifications of Instagram's Terms on as many as nine separate occasions: one email update in 2013; up to two email updates and two in-app notices in 2018; and one email update and up to three in-app notices in 2020. To avoid arbitration, plaintiffs had to demonstrate that *none* of these notices was sufficient. They have not; plaintiffs have failed to raise a genuine dispute that they assented to arbitration.

#### A. Plaintiffs Assented To The 2013 Terms.

*Ms. Whalen.* Instagram's Terms of Use did not include an arbitration clause when Ms. Whalen registered her account in 2011. Def. Mot. at 2. When Facebook added an arbitration clause to the Terms in 2013, it sent an email update—with a hyperlink to the Terms—to all users who had provided an email address, including Ms. Whalen. Duffey Decl. ¶¶ 2, 3. In discovery, Facebook produced a copy of the email delivered to all users, confirming the contents of the 2013 email attached to Facebook's opening brief. *Compare* Duffey Supp. Decl. Ex. 2, *with* Duffey Decl. Ex. 3. Ms. Whalen continued to use Instagram after receiving the email notice. Def. Mot. at 3.

In their supplemental opposition, plaintiffs do not even *address* the 2013 Terms update process. That is unsurprising: As Facebook argued in its reply brief (at 5-6), in 2014 a California

1 state court held that the 2013 process gave users such as Ms. Whalen "a full and perfectly reasonable opportunity to read . . . the New Terms" and to "decline[] the revised agreement" by stopping use of the service. *Rodriguez v. Instagram, LLC*, No. 13-53287, at 4 (Cal. Super. Ct. Feb. 28, 2014) (Ex. 2 to first Provance Decl.). Because Ms. Whalen "continued to use [Instagram]" after she received notice of the updated Terms and "after the [modified] Terms went into effect," she "must have consented to the [modified] Terms." *Id.*

Plaintiffs contend that *Rodriguez* is inapposite because it "has nothing to do with sign-in wrap agreements, arbitration, the 2017 registration flow, or the prominence of the Terms," and because the plaintiff "conceded that she was alerted to the terms of use and opted out of the arbitration provision." Pl. Supp. Opp. at 13. That misses the point: The court found that the *process* by which Instagram modified its Terms *in 2013*, as well as the fact that the plaintiff "continue[d] to use and presumably benefit from the Instagram site," indicated plaintiff's "consent[] to the" *entirety* of the Terms, including the arbitration provision. *Rodriguez*, No. 13-53287 at 4. The same is true of Ms. Whalen.

**S.M.** S.M. registered for Instagram twice: once in ███, on an ███ device, and again in ███, on an ███ device. On both occasions, the 2013 Terms were in effect. For the 2014 registration, S.M. was shown a sign-in screen that stated: "By clicking Register, you are indicating that you have read and agree to the Terms of Service and Privacy Policy." Def. Reply at 3-4. Directly underneath this language was a green button labeled "Register" that S.M. was required to press to open her account. *Id.* The sign-up screen for S.M.'s ███ registration was similar: It required her to fill out personal information to register her account, and then showed a "Welcome to Instagram" screen, prompting her to press a blue button labeled "Next." *Id.* at 4-5. On the Welcome page and below the "Next" button was a statement that read: "By signing up, you agree to our **Terms** & **Privacy Policy**," with a hyperlink to the 2013 Terms. *Id.*

Facebook argued in its reply brief (at 5-6) that this Court found a similar "sign-in wrap" agreement enforceable in *Peter v. DoorDash, Inc.*, 445 F. Supp. 3d 580 (N.D. Cal. 2020) (Tigar, J.). Plaintiffs suggest that *DoorDash* is distinguishable because the Court "found hyperlinked terms

3

1 conspicuous when the hyperlink appeared in blue text, immediately below the 'Sign Up' button,
2 and stated 'By tapping Sign up, Continue with Facebook or Continue with Google, you agree to
3 our [Terms].'" Pl. Supp. Opp. at 13. But plaintiffs do not actually attempt to identify a material
4 distinction between the Instagram and *DoorDash* sign-in screens, and in fact they are markedly
5 similar. Just as in *DoorDash*, the sign-up screens S.M. encountered in ▮ and ▮ were
6 "uncluttered and wholly visible," and the Terms were either in blue or bolded font that "contrast[ed]
7 clearly with the background," thereby "indicating to users that [the words were] clickable." 445 F.
8 Supp. 3d at 586-87; Def. Reply at 4-5; *see also Dohrmann v. Intuit, Inc.*, 823 F. App'x 482, 484
9 (9th Cir. 2020) (TurboTax's website "provided sufficient notice . . . of its Terms" where the
10 hyperlink to the terms was in "light blue" font located "directly below the sign-in button, and the
11 sign-in page was relatively uncluttered").

12 Plaintiffs argue that the Instagram registration screens are more analogous to those at issue
13 in *Colgate v. JUUL Labs, Inc.*, 402 F. Supp. 3d 728 (N.D. Cal. 2019). Pl. Supp. Opp. at 13-14.
14 But in *Colgate*, the hyperlinked terms of service were "*not* [in] a different color, underlined,
15 italicized, or in any way visually distinct from the surrounding text"; they were "formatted
16 differently" from other hyperlinks on the page; and they were therefore not "conspicuous enough"
17 to put plaintiffs on inquiry notice of the arbitration provision. 402 F. Supp. 3d at 764-66 (emphasis
18 added). This analysis only underscores that S.M.'s screens were sufficient. When S.M. registered
19 her first account on ▮, the "Terms of Service and Privacy Policy" were the *only*
20 words on the screen in blue font and underlined, thus indicating to users (like S.M.) that these words
21 were hyperlinked. Freitas Decl. Ex. 1. Likewise, when S.M. registered her second account on an
22 ▮ device in ▮, the registration screen was "uncluttered" and the hyperlinked text "**Terms**"
23 appeared on the screen in bold and "plainly readable" font, in clear "contrast[] with the
24 background." *DoorDash*, 445 F. Supp. 3d at 586; Yoo Supp. Decl. Ex. 1. This was sufficient to
25 provide notice to "[a] reasonable user scanning the page" (*Colgate*, 402 F. Supp. 3d at 765) that the

Terms were hyperlinked.[1]  S.M. was therefore placed on notice of Instagram's 2013 Terms in connection with both her initial registration in ▮ *and* her second registration in ▮.

### B. Plaintiffs Assented To The 2018 Terms.

Facebook modified the Terms and arbitration clause in 2018, and provided users with as many as four notices—including two emails and two in-app notifications—about the update.  *See* Def. Mot. at 7; Def. Reply at 6.  S.M. and Ms. Whalen engaged in numerous Instagram "sessions" both (1) during the periods when the full-screen notices were in place for users who had not interacted with the prior notices and (2) after the date on which continued use of Instagram would constitute acceptance of the 2018 Terms.  Def. Mot. at 8-9; *see also Rodriguez*, No. 13-53287 at 4 (plaintiff "consented to the [modified] Terms" where plaintiff "continue[d] to use and presumably benefit from the Instagram site"); *In re Facebook Biometric Info. Privacy Litig.*, 185 F. Supp. 3d 1155, 1167 (N.D. Cal. 2016) (finding updated terms of use enforceable where "plaintiffs accepted and agreed to the current terms by continuing to use Facebook after receiving" email notice).

Plaintiffs say almost nothing about the 2018 update.  They argue that Facebook "submitted no evidence that the [2018] full-screen notices actually functioned as intended or ever appeared on screen when Plaintiffs were actively using Instagram."  Pl. Supp. Opp. at 2.  That assertion is baffling.  Facebook produced records indicating that the in-app notice was rolled out to 99% of U.S. Instagram users by June 15, 2018.  Duffey Supp. Decl. Ex. 4.  And as discussed in Facebook's reply (at 6-7), Facebook produced contemporaneous business records dated April 18, 2018 indicating that *all users* outside the EU (including Ms. Whalen and S.M.) would "experience a notification that . . . asks them to accept the new Terms and Data Policy," and that Facebook would "be sending an email reminder to people who have not opened the app" (Duffey Supp. Decl. Ex. 3).  It is difficult to imagine how Facebook could have proven this point more thoroughly.

---

[1]  Plaintiffs also argue that the hyperlinks to "Change Username" and "Sign In" indicated on the 2017 Instagram registration screen would "confuse a reasonable viewer."  Pl. Supp. Opp. at 14.  Not so:  The registration screen at issue in *DoorDash* also contained several large hyperlinks (for example, to "Skip," "Continue with Facebook," and "Continue with Google" (*DoorDash*, Dkt. 17-1 at 4)), and yet because the display was otherwise "uncluttered and wholly visible" (as here), the registration screen was sufficient to establish inquiry notice.

5

**C.      Plaintiffs Assented To The 2020 Terms.**

Instagram's Terms were updated most recently in 2020, and Facebook provided users with two notifications: an email stating that continued use of Instagram after December 20, 2020 would constitute acceptance of the 2020 Terms; and an in-app notification with the same message that appeared as many as three times. Def. Mot. at 12; Def. Reply at 7-8. During discovery, Facebook produced business records showing that (1) Ms. Whalen received the email notice on November 20, 2020 (Duffey Supp. Decl. Ex. 5); (2) S.M. received the email notice on December 10, 2020 (*id.* Ex. 6); and (3) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Provance Supp. Decl. Ex. 5)).

Plaintiffs devote most of their brief to the 2020 update—as discussed above, they have little if anything to say about the earlier versions of the Terms. But even as to the 2020 Terms, they raise only two challenges to the sufficiency of Facebook's notice. First, they argue that "Facebook failed to show that Plaintiffs received, read, or otherwise interacted with emails conveying the 2020 Terms of Use." Pl. Supp. Opp. at 4-5. Second, they contend that Facebook's notification is an unenforceable "browsewrap" agreement. *Id.* at 5. Both arguments are meritless.[2]

**1.      Any Failure By Plaintiffs To Read The 2020 Terms Update Emails Does Not Negate The Sufficiency Of Facebook's Notice.**

Plaintiffs assert that Facebook's email notification to plaintiffs about the 2020 Terms update was insufficient because "Facebook failed to prove Plaintiffs *read* its email notifications." Pl. Supp. Opp. at 5 (emphasis added). That is legally irrelevant: The "failure to read a contract before agreeing to its terms does not relieve a party of its obligations under the contract." *Nguyen*, 763 F.3d at 1179. What matters is that plaintiffs "had a legitimate *opportunity*" to review the Terms. *Lee v. Ticketmaster LLC*, 817 F. App'x 393, 395 (9th Cir. 2020) (emphasis added); *see also Kliff v. Hewlett Packard Co.*, 318 F. App'x 472, 474-75 (9th Cir. 2008) ("reject[ing] at the outset" plaintiff's argument that he was not bound by a provision because he did not read it); *Aquino v.*

---

[2]      Plaintiffs also challenge the admissibility of the spreadsheet indicating that both Ms. Whalen and S.M. viewed the 2020 in-app notification and dismissed it with a click. This argument is addressed below. *See* pp. 13-15 *infra*.

6

*Toyota Motor Sales USA, Inc.*, 2016 WL 3055897, at *4 (N.D. Cal. May 31, 2016) (compelling arbitration where it was "undisputed that [plaintiff] *received* the Agreement (at least via email)" and "continued to work at Toyota after the agreement went into effect" (emphasis added)).

Plaintiffs cannot dispute this point. Facebook demonstrated that it *sent* plaintiffs the 2020 Terms update email. Provance Supp. Decl. Ex. 11; Duffey Supp. Exs. 5-6. Facebook therefore gave plaintiffs *at least* a "legitimate opportunity" (*Lee*, 817 F. App'x at 395) to review the email and the updated Terms, including the arbitration clause. If plaintiffs' theory were accepted, arbitration agreements would be meaningless. Any user could avoid arbitration unless the defendant were able to produce a video recording of the user reading the entirety of the clause.

### 2. The 2020 Terms Are Not An Unenforceable Browsewrap Agreement.

The 2020 Terms update in-app notification was not "a mere browsewrap" agreement. Pl. Supp. Opp. at 7. Browsewrap agreements purport to obtain users' consent based on little more than their passive use (browsing) of the webpage or platform. *Nguyen*, 763 F.3d at 1176. Facebook's process was nothing of the sort: Beginning around November 19, 2020, Instagram users began receiving a notice of the 2020 Terms update at the top of their screen stating that "[c]ontinuing to use the app means you accept these updates." Duffey Decl. ¶ 16 & Ex. 12.[3] Users could respond to the notice by (1) pressing a button that said "Learn More," which would direct them to the 2020 Terms; (2) dismissing the notice by pressing an "X" at the top-right corner of the notice; or (3) declining to interact with the notice, in which case it would appear at the top of the user's Instagram feed *two more* times. Duffey Decl. ¶ 16 & Ex. 12.

A substantially similar process was held sufficient to bind users in *In re Facebook Biometric Information*, 185 F. Supp. 3d 1155 (N.D. Cal. 2016). In that case, in addition to sending email notice, Facebook provided "jewel notifications" on the "notification tray at the top of the

---

[3] Plaintiffs assert that the notice appeared on a "secondary screen that a user would need to navigate to after opening the app." Pl. Supp. Opp. at 7. But as the rendering of the 2020 Terms in-app notice makes clear, the notice appears on the screen that Instagram users see when they open the app. *See* Duffey Decl. Ex. 12. In any event, this is an entirely moot point for plaintiffs, who actually interacted with the notice and dismissed it. *See* p. 8 *infra*.

[Facebook] site" indicating "how many notifications [the user] ha[d]." *Id.* at 1164. Once a user clicked on the jewel notification, the notice "let [users] know that there were new Terms proposed and getting updated." *Id.* (quotations and alterations omitted). "Users were not required to click anything or otherwise take any affirmative steps to be subjected to the current Terms of Use"; instead, "Facebook took users' continued use as assent to the terms." *Id.* The court concluded that the "plaintiffs agreed to the current user agreement" for purposes of demonstrating assent to a choice-of-law provision because "[t]his individualized notice in combination with a user's continued use is enough for notice and assent." *Id.* at 1167.

Here, Instagram users were given several in-app opportunities to review the 2020 Terms update; indeed, Instagram's notifications provided even *more* notice than the notifications in *Facebook Biometric*: Whereas Facebook's update required users to click the "jewel notification" to see the notification (*id.* at 1164), Instagram's notification was displayed prominently at the top of every user's screen regardless of whether they clicked anything (Def. Mot. at 12). In addition, Facebook has produced ███████████████████████████████████████████████████████████████████████████████████. Provance Supp. Decl. Ex. 5. Simply put, plaintiffs did not merely agree to the 2020 Terms by *browsing* Instagram; they agreed by clicking a button that affirmatively manifested their assent. That is nothing like the processes in the cases cited by plaintiffs.[4]

---

[4]   *See, e.g.*, *Nguyen*, 763 F.3d at 1178-79 (refusing to enforce terms of use where webpage contained hyperlink to terms but "otherwise provide[d] no notice to users []or prompt[] to take any affirmative action to demonstrate assent"); *Be In, Inc. v. Google Inc.*, 2013 WL 5568706, at *6. (N.D. Cal. Oct. 9, 2013) (refusing to enforce terms of use where pleadings alleged only that homepage included a link to terms of service); *Van Tassell v. United Mktg. Grp. LLC*, 795 F. Supp. 2d 770, 792 (N.D. Ill. 2011) (refusing to enforce arbitration clause where there were "multiple steps necessary to find[] the Conditions of Use" where arbitration clause was located); *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 23 (2d Cir. 2002) (refusing to enforce terms of use that "would have become visible to plaintiffs only if they had scrolled down to the next screen"); *In re Zappos.com, Inc. Customer Data Sec. Breach Litig.*, 893 F. Supp. 2d 1058, 1064 (D. Nev. 2012) ("The Terms of Use is inconspicuous, buried in the middle to bottom of every Zappos.com webpage among many other links, and the website never directs a user to the Terms of Use."). Plaintiffs also cite *In re Juul Labs, Inc., Antitrust Litig.*, 2021 WL 3675208 (N.D. Cal. Aug. 19, 2021), but that case concerned a sign-in wrap agreement that the court found enforceable. *Id.* at *11.

**II.     Plaintiffs Have Not Even "Unequivocally" Denied That They Received The Notifications—The Bare Minimum Required To Rebut Facebook's Showing.**

As discussed above, and further below, plaintiffs' brief consists of a series of challenges to *Facebook's* evidence that plaintiffs assented to Instagram's Terms. But they still have not produced a shred of meaningful evidence of their own. Once Facebook made a prima facie showing of an agreement to arbitrate, plaintiffs had the burden to "*unequivocally deny* the agreement." *Blau v. AT&T Mobility*, 2012 WL 10546, at *4 (N.D. Cal. Jan. 3, 2012) (emphasis added; quotation marks omitted). Plaintiffs have not even accomplished that bare minimum. Although both plaintiffs claimed that they could not *recall* seeing the terms of service, it is well established that such testimony "do[es] not rise to the level of unequivocal denials of having agreed to those terms." *Id.*

As explained in Facebook's reply (at 8), Ms. Whalen testified that she had no recollection of the April 2018 in-app notification (Whalen Dep. at 45:24-46:9); that she could not remember "one way or the other" whether she saw the June 2018 in-app notification that took up Instagram users' entire screen (*id.* at 48:5-20); and that "it's possible" she viewed and dismissed the 2020 in-app notification (*id.* at 43:9-12, 44:1-6). She also testified that although she could not recall receiving emails from Instagram about the Terms updates in 2013, 2018, and 2020 (*id.* at 74:22-24, 75:14-19, 76:3-9, 77:13-78:3), her general approach was to *delete* approximately 60 percent of her emails—which potentially included emails she received from Instagram (*id.* at 66:5-17, 67:16-68:12). So Plaintiffs' argument that Ms. Whalen "never deleted emails to reduce space" (Pl. Supp. Opp. at 2-3) and the fact that Mrs. Whalen did not produce emails from Instagram during discovery (*see id.* at 2) do not help plaintiffs in the slightest.

S.M. likewise testified that she did not recall any of the 2018 or 2020 Terms updates. Def. Reply at 8 (citing S.M. Dep. at 28:3-10, 43:12-44:10, 46:17-47:5). But unlike Ms. Whalen, S.M. *did* produce copies of the unopened 2018 and 2020 emails she received from Instagram providing notice of the Terms updates for those years (S.M. did not receive the 2013 email because she was not yet an Instagram user at that time). Provance Supp. Decl. Exs. 10, 11.

Plaintiffs' brief offers no response to these points. They repeatedly cite testimony from Ms. Whalen and S.M. in which they *initially* denied having seen the 2018 and 2020 in-app notifications.

9

Pl. Supp. Opp. at 1-4.  But when confronted with evidence that they *had* received the notifications, they abandoned their categorical denials and said they could not remember receiving them.  "If a party could get out of a contract by arguing that he did not recall making it, contracts would be meaningless."  *Id.*; *see also Meyer v. Uber Techs. Inc.*, 868 F.3d 66, 71, 80 (2d Cir. 2017) (plaintiff was on inquiry notice regardless of claim that he did "not recall seeing . . . the hyperlink") (applying California law).  Plaintiffs have offered no evidence to meet their burden of proof.

### III.  Plaintiffs' Procedural Challenges To Facebook's Evidence Are Meritless.

Plaintiffs argue that Facebook failed to establish (1) what S.M.'s registration screens actually looked like in 2017 and (2) ▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅ is a business record subject to a hearsay exception.  These arguments are meritless—and they certainly cannot overcome the *multiple independent* sources of evidence demonstrating that plaintiffs received notice of the Terms on as many as nine separate occasions.

### A.  Facebook Established The Appearance Of Instagram's 2017 Sign-Up Screens.

Mr. Yoo's supplemental declaration discussed his analysis of the registration screen that ▅▅ users saw when they signed up for Instagram on ▅▅▅▅▅▅▅▅, the date S.M. registered her second Instagram account.  He testified that this analysis was "based on [his] own personal knowledge, or from [his] review of records, including records of source code, maintained by Facebook in the ordinary course of business."  Yoo Supp. Decl. ¶ 1.  Based on his review of the source code, Mr. Yoo rendered an image of the registration screen that S.M. would have seen on the date she registered her second account.  Def. Reply at 4-5.  Plaintiffs respond with same argument they made in their first opposition brief: that Mr. Yoo lacks "personal knowledge" of the facts in his declaration.  Pl. Opp. at 8-9, 14-18; Pl. Supp. Opp. at 8-9.  Plaintiffs have once again failed to cite any authority for the proposition that it is impermissible for affiants to review relevant business records and provide testimony based on what they learned.  Def. Reply at 15.  Plaintiffs' arguments fail for that reason and others.

First, plaintiffs attempt to distance Mr. Yoo from the analysis in his declaration.  They assert that Mr. Yoo "was not employed by Facebook when Plaintiff S.M. created her account on

1  ████████████," "did not author his own supplemental declaration," did not "understand what
2  arbitration is or have any personal knowledge about when Facebook first added an arbitration
3  provision to its Terms," did "not have any personal knowledge about whether S.M. ever saw,
4  clicked on, or read the Terms in ████████," and could not "say with certainty that the
5  purported hyperlink, if clicked on ████████, would have actually enabled S.M. to review
6  the Terms." Pl. Supp. Opp. at 8-9.[5]

7  Facebook responded to each of these points in its reply, and plaintiffs offer no response.
8  *See* Def. Reply at 10, 12-15. In brief: Plaintiffs' standard of "personal knowledge" is baseless.
9  "[A]n affiant may testify to acts that she did not personally observe but which have been described
10 in business records." *Aniel v. GMAC Mortg., LLC*, 2012 WL 5373388, at *6 (N.D. Cal. Oct. 30,
11 2012); *see Derderian v. S.W. & Pac. Specialty Fin., Inc.*, 673 F. App'x 736, 738 (9th Cir. 2016).
12 Mr. Yoo was tasked with reviewing the source code for the relevant registration screens on the
13 relevant dates in order to verify that the code would generate a substantially identical version of the
14 screens attached to his declarations. That is what his testimony confirmed. *See* Yoo Decl. ¶¶ 1-2;
15 Yoo Supp. Decl. ¶¶ 1-2. And there is no support for plaintiffs' attack on Mr. Yoo's testimony about
16 the functionality of the hyperlinks in the sign-up screens. Pl. Supp. Opp. at 9. Mr. Yoo repeatedly
17 testified that, based on Facebook's "████████████████████████████
18 ████████████████████████████████████████████████
19 ████████████████████████████████████████████████
20 ████ would be directed to the 2013 Terms. Yoo Dep. at 85:10-15; *see also id.* at 101:23-102:10

---

[5] Plaintiffs also say that Facebook "ambush[ed] Plaintiffs" with Mr. Yoo's supplemental declaration. Pl. Supp. Opp. at 8-9. Not so. Plaintiffs disclosed the information needed to identify S.M.'s second account for the first time on May 5, 2021. Provance Supp. Decl. Ex. 1. Facebook then immediately investigated the relevant account records to determine the date that S.M. registered her second account and identified the source code associated with her sign-up date. Facebook produced the source code associated with S.M.'s second Instagram registration sixteen days later, on May 21, 2021. In the meantime, Mr. Yoo analyzed the relevant source code and prepared the sign-up screen attached to his supplemental declaration. He executed his supplemental declaration on June 16, 2021, and it was provided to plaintiffs on that same day. Plaintiffs had an opportunity to question Mr. Yoo about both the source code and his supplemental declaration at his deposition, and spent nearly 20 pages examining him on these topics. *See* Yoo Dep. at 88-105.

1  ("Q: Do you know whether the hyperlink for the terms and privacy policy was functioning properly
2  on December 25, 2017?" "A: ███████████████
3  ████████████████████████████████████████
4  ████████████████████████████.").

5        Second, plaintiffs recycle their argument (Pl. Opp. at 9) that because the image attached to
6  Mr. Yoo's supplemental declaration "is a *rendered* image of the account registration screen as it
7  purportedly appeared in 2017," this detracts from the reliability of Mr. Yoo's analysis. Pl. Supp.
8  Opp. at 9. This, too, is baseless. Mr. Yoo testified that "reconstruction" of a screen based on
9  underlying source code is a "standard practice for . . . engineer[s]" to recreate an accurate image of
10 a screen that a user necessarily saw on a particular day. Yoo Dep. 61:3-18. And because the
11 "source of truth is the code itself" (Yoo Dep. at 78:4-11), Mr. Yoo's process is the *most* reliable
12 method available. *See also In re Facebook*, 185 F. Supp. 3d at 1163-64 (cited at Def. Reply 15).
13 Facebook made these points in its reply brief (at 15)—and again, plaintiffs ignore them.

14       Third, plaintiffs argue that Facebook "withheld" source code from their production that
15 would allegedly show "timestamp[s]" reflecting whether specific portions of the code were
16 operative on a certain date. Pl. Supp. Opp. at 10. As explained in Facebook's reply (at 14),
17 plaintiffs never *requested* this additional data during discovery. In any event, the ███████
18 ████████████████████████████████████ (Yoo Dep. 97:21); ███████
19 ████████████████████████████, that is "associate[d]" with the relevant
20 source code (*id.* at 35:18-21).

21       Fourth, plaintiffs argue that "Mr. Yoo's Supplemental Declaration does not even purport to
22 establish the registration screen that S.M. saw." Pl. Supp. Opp. at 10. Yes it does. Mr. Yoo's
23 testimony could not have been clearer: "[C]oding languages are set up . . . such that you can [either]
24 manually define stuff yourself, or you can leave things as dynamic." Yoo Dep. at 56:10-13. So,
25 while "*it is possible*," "*in theory*," that certain parameters can change based on the "height and the
26 width of the screen," ████████████████████████████████████
27 ████████████████████████████████████████████████
28

12

1 [REDACTED] *Id.* at 55:22-56:22 (emphasis added). Mr. Yoo also confirmed that the image was substantially identical to the screen S.M. saw during her registration in 2017 "[b]y looking at the repository" and "find[ing] the matching code files and the file names, the authors, the timestamps, etc," and confirming that they "match[ed] this form of the screen exactly" as reflected in his declaration. *Id.* at 95:11-17. In other words, the images attached to Mr. Yoo's declarations are "substantially identical" to the screens that S.M. saw during her Instagram registration (both in 2014 and 2017). *Id.* at 76:18-77:8.

Finally, plaintiffs argue that Mr. Yoo's failure to depict "the last page that S.M. would have viewed" somehow "materially prejudiced" and "impaired" plaintiffs' ability to understand what S.M. saw in connection with her 2017 registration and "whether and when" S.M. was "presented with the Terms." Pl. Supp. Opp. at 11. This makes no sense. For both registration dates, Mr. Yoo attached an accurate image of the *relevant* screen—the screen containing a hyperlink to Instagram's 2013 Terms—that S.M. necessarily saw when she registered her account. There was no need to attach any additional pages connected to the registration process.

### B. Facebook's Structured Data Table Is A Business Record.

In addition to the email notification informing plaintiffs of Instagram's updated 2020 Terms, Instagram users received a direct in-app notification of the update. During discovery, Facebook produced [REDACTED]. Provance Supp. Decl. Ex. 5.[6] Recognizing that this evidence is dispositive, plaintiffs urge the Court to disregard it, arguing that the spreadsheet is "inadmissible hearsay that cannot be considered here." Pl. Supp. Opp. at 5-6. This argument is wrong on a number of levels.

First, plaintiffs incorrectly contend that the spreadsheet "does not qualify under the business record exception against hearsay." Pl. Supp. Opp. at 6. This exception applies to evidence if: (1) it was regular business practice to make the record; (2) it was kept in the regular course of business;

---

[6] Plaintiffs refer to the structured data table, attached as Exhibit 5 to the Provance supplemental declaration, as the "Notification Spreadsheet."

1  (3) it was made by a person with knowledge; and (4) it was made at or near the time the event
2  recorded. Fed. R. Evid. 803(6). "A business record may include data stored electronically on
3  computers and later printed out for presentation in court, so long as the original computer data
4  compilation was prepared pursuant to a business duty in accordance with regular business practice."
5  *U-Haul Int'l, Inc. v. Lumbermens Mut. Cas. Co.*, 576 F.3d 1040, 1044 (9th Cir. 2009).

6  At his deposition, Mr. Duffey explained that the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
7  ▮▮▮▮ ("Facebook and Instagram have structured data tables that track different aspects of user
8  activity," Duffey Dep. at 125:3-5); that these data tables are regularly maintained by Facebook
9  ("▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
10 ▮▮▮▮," *id.* at 155:9-13); that the data is retained in the ordinary course of business ("▮▮▮▮
11 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
12 ▮▮▮▮," *id.* at 130:16-20); and that the data tables were then "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" for
13 presentation in court (*id.* at 154:23-25). The spreadsheet therefore plainly qualifies as a business
14 record under Ninth Circuit precedent.

15 Second, plaintiffs argue that Mr. Duffey lacked personal knowledge of the facts contained
16 in the spreadsheet. Pl. Supp. Opp. at 6. This argument once again fails: Mr. Duffey's initial
17 declaration referred to records maintained by Facebook "in the ordinary course of business"
18 showing that both Ms. Whalen and S.M. received the "Activity feed notice regarding the 2020
19 Terms of Use update." Duffey Decl. ¶¶ 23, 33. His supplemental declaration attests that he is
20 "familiar with Facebook's record-keeping systems and the business records created and maintained
21 by Facebook in the ordinary course of business," including "records pertaining to Instagram users'
22 accounts and account activity." Duffey Supp. Decl. ¶ 3. He testified at his deposition that "[he]
23 worked with [Facebook's] data scientists on the eDiscovery team to generate" the spreadsheet so
24 that it showed only the named plaintiffs' interaction with the in-app notifications. *See* Duffey Dep.
25 at 155:9-17. "The document provides information about actions taken as part of the terms of use
26 update notification that was sent via the activity feed" and shows "the Instagram ID number and
27 the time stamp" associated with plaintiffs' activity. *Id.* at 156:13-17. Mr. Duffey further explained
28

14

1 | that, to generate the spreadsheet, Facebook's "███████████████████████

2 | ██"—which are "██████████████████████"—and "█████████████

3 | ██████." *Id.* at 154:14-25, 155:9-13.

It makes no difference that Mr. Duffey did not *personally* input each piece of data himself. He "was qualified to testify about the business practices and procedures for inputting the underlying data," and "[i]t is not necessary for each individual who entered a record . . . into the database to testify as to the accuracy of each piece of data entered." *U-Haul Int'l, Inc.*, 576 F.3d at 1044.

The spreadsheet is admissible, and it shows beyond doubt that plaintiffs assented to the 2020 Terms—as they did to the previous versions.

## CONCLUSION

The Court should (1) compel plaintiffs to arbitrate their claims in accordance with their arbitration agreement and (2) stay this action pending the outcome of any arbitration.

15

| | | |
|---|---|---|
| Dated: October 22, 2021 | | MAYER BROWN LLP |
| | | By: */s/ Lauren R. Goldman* |
| | |     Lauren R. Goldman |
| | |     Matthew D. Provance |
| | |     Michael Rayfield |

Archis A. Parasharami (321661)
(aparasharami@mayerbrown.com)
1999 K Street, N.W.
Washington, D.C. 20006
Telephone: (202) 263-3328

COOLEY LLP

Michael G. Rhodes
Whitty Somvichian
Lauren J. Pomeroy

Attorneys for Defendants Facebook, Inc.

16