UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KELLY WHALEN, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>FACEBOOK, INC.,<br><br>    Defendant. | Case No. 20-cv-06361-JST<br><br>**ORDER GRANTING DEFENDANT'S MOTION TO COMPEL ARBITRATION AND ADMINISTRATIVELY CLOSING CASE**<br><br>Re: ECF No. 45 |

Before the Court is Defendant Facebook, Inc.'s motion to compel arbitration. ECF No. 45. The Court will grant the motion.

## I.    BACKGROUND

Plaintiffs Kelly Whalen and S.M., a minor by and through her guardian, bring this putative class action against Facebook for alleged violations of the Illinois Biometric Information Privacy Act, 740 Ill. Comp. Stat. 14/1 *et seq.*[1] They contend that Facebook used facial recognition technology to "illegally harvest[] the protected biometrics of users of its Instagram application." ECF No. 37 ¶ 6.

Facebook has now moved to compel arbitration of Plaintiffs' claims, the merits of which are not currently before the Court. The parties do not dispute that, since 2013, Instagram's terms of use have contained an arbitration clause that, if valid, would encompass Plaintiffs' claims. However, Plaintiffs contend that the parties never formed an agreement to arbitrate.

## II.    JURISDICTION

The Court has jurisdiction pursuant to 28 U.S.C. § 1332(d)(2).

---

[1] A third plaintiff, Victoria Edelstein, voluntarily dismissed her claims while the motion to compel arbitration was pending. ECF No. 55.

## III. LEGAL STANDARD

The parties agree that the Federal Arbitration Act ("FAA") applies to the arbitration clause at issue in this case. Under the FAA, agreements to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. This provision reflects "both a liberal federal policy favoring arbitration, and the fundamental principle that arbitration is a matter of contract." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (quotation marks and citations omitted).

On a motion to compel arbitration, the court's role under the FAA is "limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000). The court must "hear the parties," and if it is "satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement." 9 U.S.C. § 4.

In making this determination, "district courts rely on the summary judgment standard of Rule 56 of the Federal Rules of Civil Procedure." *Hansen v. LMB Mortg. Servs., Inc.*, 1 F.4th 667, 670 (9th Cir. 2021). Thus:

> In considering a motion to compel arbitration which is opposed on the ground that no agreement to arbitrate was made, a district court should give to the opposing party the benefit of all reasonable doubts and inferences that may arise. Only when there is no genuine issue of material fact concerning the formation of an arbitration agreement should a court decide as a matter of law that the parties did or did not enter into such an agreement.

*Concat LP v. Unilever, PLC*, 350 F. Supp. 2d 796, 804 (N.D. Cal. 2004) (citations omitted) (cited with approval in *Hansen*, 1 F.4th at 670). If the court "concludes that there are genuine disputes of material fact as to whether the parties formed an arbitration agreement, the court must proceed without delay to a trial on arbitrability and hold any motion to compel arbitration in abeyance until the factual issues have been resolved." *Hansen*, 1 F.4th at 672.

## IV. DISCUSSION

When deciding whether a valid arbitration agreement exists, federal courts "apply ordinary

2

state-law principles that govern the formation of contracts." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). Although the parties dispute whether California or Illinois law applies, they agree that the two states' laws are consistent on the question of contract formation. The Court therefore need not make a choice-of-law determination. *See Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014) (declining to decide whether California or New York law applied because the laws of both states "dictate the same outcome").

As this Court has previously explained: "In California, a party petitioning the court to compel arbitration bears the burden of proving by a preponderance of evidence the existence of an arbitration agreement. An essential element of a contract is consent. Assent is evaluated by an objective standard." *Peter v. DoorDash, Inc.*, 445 F. Supp. 3d 580, 585 (N.D. Cal. 2020) (quotation marks, alteration marks, and citations omitted).

Facebook argues that Plaintiffs assented to arbitration multiple times: Whalen in 2013, S.M. in 2014 and 2017, and both Plaintiffs in 2018 and 2020. As discussed below, the Court concludes that Plaintiffs assented to Instagram's terms of use, including the arbitration clause, by continuing to use the app after being notified of revised terms of use via an in-app notification in November 2020. The Court does not address the other asserted instances of assent because Plaintiffs do not dispute that assent based on the 2020 in-app notification would be sufficient to compel arbitration.

Instagram users received the 2020 in-app notice "at the top of their 'Activity' feed" beginning on November 19, 2020. ECF No. 45-1 at 4 (¶ 15).

> Users could respond to the Activity feed notice in one of three ways. Users could press the button at the bottom of the notice that read, "Learn More," which, if pressed, directed the user to a copy of the 2020 Terms of Use. Users could also dismiss the notice by pressing the "X" located at the top-right corner of the notice. Alternatively, users could decline to interact with the Activity feed notice, in which case the notice would appear at the top of the user's Activity feed three times before it was taken down.

*Id.* at 5 (¶ 16). A screenshot of the notice appears below:

/ / /

/ / /

3



*Id.* at 55.

Facebook has introduced evidence, in the form of a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. ECF No. 86-22 at 2; *see also* ECF No. 89-4 at 42 ("The document provides information about actions taken as part of the terms of use update notification that was sent via the activity feed, I believe, and it shows the Instagram ID number and the time stamp. . . . In column D, the longer number would be the SM plaintiff. The shorter number would be Ms. Whalen."). Plaintiffs object to this evidence on grounds that it is hearsay and that Facebook's witness lacks personal knowledge. The

4

Court overrules these objections. First, Michael Duffey, Facebook's eDiscovery and litigation case manager, has sufficient personal knowledge. He declared under penalty of perjury that he has personal knowledge of the Instagram terms of use and "of the records pertaining to Instagram users' accounts and account activity that are maintained in the ordinary course of business." ECF No. 45-1 at 2 (¶ 1); *see also* ECF No. 87-14 ¶ 3 ("I am also generally familiar with Facebook's record-keeping systems and the business records created and maintained by Facebook in the ordinary course of business, including . . . records pertaining to Instagram user's accounts and account activity. . . ."). He also testified at his deposition about ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████. *E.g.*, ECF No. 89-4 at 34-37, 41-43.

    Second, a business record is an exception to the rule against hearsay if:

    (A) the record was made at or near the time by – or from information transmitted by – someone with knowledge;

    (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;

    (C) making the record was a regular practice of that activity;

    (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and

    (E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

Fed. R. Evid. 803(6). Duffey's testimony establishes the first three requirements. Although Duffey did not himself generate the structured data tables and relied on others to extract the data presented in the spreadsheet, "[t]he foundation requirement for Rule 803(6) may be satisfied by the testimony of anyone who is familiar with the manner in which the document was prepared, even if he lacks firsthand knowledge of the matter reported, and even if he did not himself either prepare the record or even observe its preparation." *Miller v. Fairchild Indus., Inc.*, 885 F.2d 498, 514 (9th Cir. 1989) (quotation marks and citation omitted). In addition, that the spreadsheet was

prepared for litigation does not render it inadmissible where, as here, the information was extracted from records kept in the ordinary course of business. *U-Haul Int'l, Inc. v. Lumbermens Mut. Cas. Co.*, 576 F3d. 1040, 1043-44 (9th Cir. 2009). "[P]rintouts prepared specifically for litigation from databases that were compiled in the ordinary course of business are admissible as business records to the same extent as if the printouts were, themselves, prepared in the ordinary course of business." *Id.* at 1044 (quotation marks and citation omitted). Plaintiffs have presented no evidence to indicate a lack of trustworthiness, and the Court finds the spreadsheet to be an admissible business record.

Plaintiffs contend that whether they saw the notification is a disputed factual question because both Plaintiffs initially testified at their depositions that they did not see the notification. ECF No. 82-10 at 43; ECF No. 82-12 at 27-28. However, upon further questioning, including by reference to the spreadsheet, Plaintiffs' testimony was more equivocal. S.M. testified, "I don't recall," when asked whether it was her testimony that Facebook's records showing that she viewed the 2020 in-app notification and clicked on the "X" were incorrect. ECF No. 82-12 at 29. Similarly, Whalen twice answered, "It's possible, but I don't remember," when asked whether it was possible that she saw the notice but did not remember, and she also testified that she does not remember everything that she saw on Instagram over six months ago (the time between the November 2020 in-app notification and her deposition). ECF No. 82-10 at 43-45. The only inference that can be drawn from Plaintiffs' testimony is that they are both uncertain whether they saw the in-app notification. This is not sufficient to create a disputed fact. "Plaintiffs' statements that they 'do not recall' seeing the terms of service at the time they agreed do not rise to the level of unequivocal denials of having agreed to those terms. If a party could get out of a contract by arguing that he did not recall making it, contracts would be meaningless." *Blau v. AT & T Mobility*, No. C 11-00541 CRB, 2012 WL 10546, at *4 (N.D. Cal. Jan. 3, 2012) (citations omitted); *see also Perez v. Maid Brigade, Inc.*, No. C 07-3473 SI, 2007 WL 2990368, at *3-4 (N.D. Cal. Oct. 11, 2007) (finding, on a motion to compel arbitration, "that plaintiff has not met her burden to prove that she did not sign the agreement" where the plaintiff did "not unequivocally deny signing the document" and instead stated in a declaration that she did "not recall signing

6

these documents").

Plaintiffs also argue that the in-app notification was insufficient to demonstrate assent. They correctly describe the notice as browsewrap because it "does not require the user to manifest assent to the terms and conditions expressly," and parties instead give assent "simply by using" the app. *Nguyen*, 763 F.3d at 1176 (quotation marks and citation omitted). "Because no affirmative action is required by the . . . user to agree to the terms of a contract other than his or her use of the [app], the determination of the validity of the browsewrap contract depends on whether the user has actual or constructive knowledge of [the app's] terms and conditions." *Id.* (quoting *Van Tassell v. United Mktg. Grp., LLC*, 795 F. Supp. 2d 770, 790 ((N.D. Ill. 2011)). Facebook does not present evidence that either Plaintiff had actual knowledge of the arbitration clause in the terms of use, but "[a]n arbitration clause within a contract may be binding on a party even if the party never actually read the clause." *Pinnacle Museum Tower Ass'n v. Pinnacle Mkt. Dev. (US), LLC*, 55 Cal. 4th 223, 236 (2012). The question is "whether the [in-app notice] puts a reasonably prudent user on inquiry notice of the terms of the contract" – i.e., whether Plaintiffs had constructive or inquiry notice. *Nguyen*, 763 F.3d at 1177. "[T]he conspicuousness and placement of the 'Terms of Use' hyperlink, other notices given to users of the terms of use, and the website's general design all contribute to whether a reasonably prudent user would have inquiry notice of a browsewrap agreement." *Id.*

The 2020 in-app notification provides such notice. While it did not specifically reference an arbitration agreement, it is not disputed that clicking on the "Learn More" button would have taken Plaintiffs to the terms of use, which included an arbitration clause. As shown in the screenshot, the notification consumed roughly one-third of the screen, and the "Learn More" button is prominently placed, appears in reasonably sized type and in a different color, and is viewable without any scrolling. These facts are materially different from the cases relied on by Plaintiffs, where courts have found insufficient notice. For example, the link to the terms of use was not located in a place that "would have become visible to plaintiffs only if they had scrolled down to the next screen." *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 23 (2d Cir. 2002). It also was not "inconspicuous, buried in the middle to bottom of every . . . webpage among many

7

other links." *In re Zappos.com, Inc., Customer Data Sec. Breach Litig.*, 893 F. Supp. 2d 1058, 1064 (D. Nev. 2012).  Nor did the notification involve a "multi-step process" that required a user to scroll to the bottom of one page, click a "Customer Service" link, and then scroll to the bottom of that page or find and click on another link, contained in a list of several links, to find the conditions of use.  *Van Tassell*, 795 F. Supp. 2d at 792-93.  Additionally, the in-app notification clearly stated, "Continuing to use the app means you accept these updates."  ECF No. 45-1 at 55.  As the Ninth Circuit has explained, "where the website contains an explicit textual notice that continued use will act as a manifestation of the user's intent to be bound, courts have been more amenable to enforcing browsewrap agreements."  *Nguyen*, 763 F.3d at 1177.  Moreover, although Plaintiffs contend that they did not take any affirmative steps to manifest assent, the evidence demonstrates that they interacted with the notification by clicking on the "X" to close it.  Plaintiffs do not dispute that they continued to use Instagram, nor do they dispute that they did not opt out of arbitration as allowed by the terms of the arbitration clause.

For all of the above reasons, Facebook has met its burden of demonstrating that Plaintiffs agreed to Instagram's terms of use, which include an agreement to arbitrate.  Other than arguing that no agreement was formed, Plaintiffs do not contest the enforceability of the arbitration clause.  Nor do Plaintiffs contest that the claims in this case fall within the scope of that clause.

## CONCLUSION

Accordingly, the Court grants Facebook's motion to compel arbitration and stays these proceedings. The Clerk shall administratively close the file.  This order shall not be considered a dismissal or disposition of this action against any party.  If further proceedings become necessary, any party may initiate them in the same manner as if this case had not been administratively closed.

**IT IS SO ORDERED.**

Dated:  March 21, 2022



JON S. TIGAR
United States District Judge

8